**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

COMPASSCARE, a New York nonprofit
corporation; NATIONAL INSTITUTE OF
FAMILY AND LIFE ADVOCATES d/b/a
NIFLA, a Virginia corporation; FIRST BIBLE
BAPTIST CHURCH, a New York nonprofit
corporation,

                    Plaintiffs,

    vs.

ANDREW M. CUOMO, in his official capacity as
the Governor of the State of New York; ROBERTA
REARDON, in her official capacity as the
Commissioner of the Labor Department of the State
of New York; and LETITIA JAMES, in her official
capacity as the Attorney General of the State of New
York,

                    Defendants.

**VERIFIED COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

1:19-cv-1409 (TJM/DJS)

## INTRODUCTION

1.    This case is a pre-enforcement federal civil rights action, brought pursuant to 42 U.S.C.

§ 1983, challenging the constitutionality of New York Senate Bill 660 (SB 660), which was passed by

the New York State Legislature on January 22, 2019 and was signed into law by Governor Andrew

Cuomo on November 8, 2019. A copy of SB 660 is attached as Exhibit 1.[1]

2.    SB 660, dubbed the "Boss Bill" by its supporters, is the third in a trio of abortion-

protective and abortion-advancing laws passed by the New York State Legislature on January 22, 2019.

The first, the Reproductive Health Act (SB 240), effectively permits an abortion to be performed up

until the birth of the child in the event "there is an absence of fetal viability" or the abortion is deemed

necessary to protect the "patient's . . . health." The second, the Comprehensive Contraception

Coverage Act (SB 659A), requires health insurers to provide no-cost coverage for contraceptives in

---

[1] The Assembly version of SB 660 is A584. For ease of reference this complaint cites only to SB 660.

their health plans, including abortifacient drugs.

3.  SB 660 is a transparent attempt to meddle in the affairs of religious and pro-life organizations—including but not limited to pregnancy care centers, churches, and schools—by forcing them to employ and associate with those persons who do not share or live by the organizations' beliefs regarding abortion, contraception, and the impropriety of sexual relations outside the context of a marriage between a man and a woman.

4.  SB 660 compounds this unwarranted interference by prohibiting these organizations from requiring their employees to comply with their missions and beliefs on these contested subjects by having them assent to and/or sign off on the contents of, among other things, employment contracts, employee handbooks, statements of faith, positional statements, and codes of conduct.

5.  SB 660 yet furthers the affront to the autonomy of these religious and pro-life organizations by requiring them to include notice of the "rights" provided by this unconstitutional law in their employee handbooks, thereby compelling them to speak the government's message.

6.  Taken together, these requirements compromise the very reason for being of these organizations, which is to promote life, oppose abortion, and teach and live a sexual ethic consistent with biblical principles.

7.  SB 660 was sold by its proponents as a matter of simple fairness made necessary by the alleged discriminatory treatment of employees by their employers based upon the employees' reproductive health decisions, but it is in fact a remedy for a nonexistent problem.

8.  SB 660's legislative history contains not one documented instance of employment discrimination based upon employee reproductive health decisions in New York State, or anywhere else for that matter, despite the fact that one of the main sponsors of the legislation was expressly invited to bring such examples forth during floor debate.

9.  SB 660's legislative history thus contains no justification for the law, whether

compelling, substantial, rational, or legitimate.

10.     What SB 660's legislative history does reveal, however, is that the law intentionally targets religion for disfavored treatment.

11.     SB 660's main sponsor in the New York State Senate, Senator Jennifer Metzger, expressed the view on the Senate floor that lawsuits filed by employers to protect themselves from having to provide abortifacient drugs under the federal Affordable Care Act's (ACA) contraceptive mandate were tantamount to a denial of reproductive health services. *See* Senate Transcript at 433, available at https://www.nysenate.gov/transcripts/floor-transcript-012219txt. A copy of the relevant Senate testimony is excerpted and attached as Exhibit 2.

12.     Metzger lamented these lawsuits, and characterized them, along with the United States Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (which recognized that the ACA's contraceptive coverage requirement violated the Religious Freedom Restoration Act (RFRA) for certain religious employers) as a "dangerous, slippery slope." Exh. 2 at 433.

13.     Metzger declared that the purpose of SB 660 was to prevent employers' religious exercise, and their "personal and political beliefs," from "encroach[ing]" on the decisions of employees as to reproductive health services. Exh. 2 at 433-434.

14.     Further proof of SB 660's stark animus toward, and its intentional targeting of, religion is provided by the complete absence of any religious exemptions, even for churches.

15.     SB 660's drafters and sponsors knew the law would unconstitutionally sweep into its ambit religious organizations who have the autonomy to make employment decisions without state interference. *See* Assembly Transcript at 127, available at http://www2.assembly.state.ny.us/write/upload/transcripts/2019/1-22-19.pdf#search= %22584%22. A copy of the relevant Assembly testimony is excerpted and attached as Exhibit 3.

16.     Yet rather than exempt such organizations up front—in accord with controlling law—

SB 660 leaves them exposed to costly litigation and/or potential enforcement actions by state officials, forcing them to defend themselves from such unconstitutional attacks by pleading well known and established constitutional rights.

17.     Planned Parenthood, the nation's largest abortion provider, has for years supported and pushed for the passage of the Boss Bill, including similar bills from previous years. *See, e.g.*, Planned Parenthood Empire State Acts, Legislative Agenda 2019, available at https://bit.ly/33yQ1at (last accessed Nov. 4, 2019); Planned Parenthood Empire State Acts, Memorandum of Support, 2017, available at https://bit.ly/2p17cm0 (last accessed Nov. 4, 2019).

18.     SB 660 intentionally and by design sacrifices the associational, speech, and religious freedom of employers in New York State—including religious non-profits, churches, and schools—to the government's desire to promote abortion rights by gutting the ability of pro-life employers to hire to their pro-life missions.

19.     Plaintiffs are CompassCare Pregnancy Services, a pro-life pregnancy care center located in Rochester, New York (CompassCare); National Institute of Family and Life Advocates, a national non-profit, religious pro-life pregnancy care center membership organization with 41 member centers in New York (NIFLA); and First Bible Baptist Church, located in Hilton, New York (First Bible).

20.     CompassCare and NIFLA's member centers provide free medical and non-medical support, along with comprehensive information, to women facing unplanned pregnancies, consistent with their religious and pro-life missions and beliefs.

21.     First Bible, as both a church and through its various ministries, including Northstar Christian Academy, is a Bible-based organization which exists to carry out Jesus's mission to bring more people to God. It emphasizes the importance in holding true to the tenets of the Christian faith in both belief and action.

22.     To fulfill their missions, Plaintiffs hire employees who agree with, personally adhere to, and effectively convey organizational beliefs regarding reproductive health decisions, including but not limited to decisions related to abortion, contraceptive use, and sexual morality.

23.     SB 660, however, directly interferes with the respective missions of Plaintiffs by forbidding them from making employment decisions based upon the "reproductive health decision making" of their employees. Exh. 1.

24.     Such decisions may include, among other things, not only the decision to have an abortion, but also "accessing birth control, an LGBT couple adopting, a person having a child outside of marriage, using in vitro fertilization or having a vasectomy." Exh. 3 at 134 (detailing comments by Assemblywoman Simon).

25.     SB 660 applies even when such decisions run counter to the core religious and pro-life missions and beliefs—and the stated and agreed-to expectations—of Plaintiffs as employers.

26.     SB 660 further prohibits Plaintiffs from operating their organizations in accord with their missions and beliefs by preventing them from requiring the compliance of their employees with, among other things, their statements of faith, codes of conduct, and employee handbooks.

27.     Finally, SB 660 adds insult to injury by compelling Plaintiffs' speech, requiring them to advertise and normalize SB 660's unconstitutional provisions to prospective and current employees.

28.     SB 660 is therefore unconstitutional under the First Amendment to the United States Constitution. More specifically, SB 660 violates Plaintiffs' rights to expressive association, free speech, religious autonomy, and the free exercise of religion.

29.     SB 660 is also impermissibly vague under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

30.     CompassCare and First Bible are directly regulated by SB 660 and subject to the harms imposed by SB 660's various enforcement mechanisms and penalties.

31.     NIFLA asserts organizational standing on behalf of its New York members, which are pregnancy care centers throughout New York State that, just like CompassCare, are regulated by SB 660 and subject to its unconstitutional requirements. As discussed below, NIFLA's claims fit comfortably within the Supreme Court's doctrine of organizational standing, thereby permitting it to obtain judicial relief for its members.

32.     SB 660 went into effect on November 8, 2019.

33.     Preliminary injunctive relief is needed immediately in order to prevent irreparable harm to Plaintiffs, including NIFLA's New York members.

## JURISDICTION AND VENUE

34.     This action arises under 42 U.S.C. § 1983 et seq. (the "Civil Rights Act") and the First and Fourteenth Amendments to the United States Constitution.

35.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

36.     The Court has jurisdiction to issue the requested declaratory relief under 28 U.S.C. §§ 2201 & 2202, and Federal Rule of Civil Procedure 57.

37.     The Court has jurisdiction to award the requested injunctive relief under 28 U.S.C. § 1343(a)(3), and Federal Rule of Civil Procedure 65.

38.     This Court has authority to award reasonable costs and attorneys' fees under 42 U.S.C. § 1988(b).

39.     Venue lies in this district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims detailed here occurred in this district, and Defendants reside in this district.

## PARTIES

### Plaintiffs

40.     Plaintiff CompassCare is a religious non-profit duly incorporated under the laws of the State of New York, with its principal place of business at 2024 West Henrietta Rd, Suite 6D, Rochester, NY 14623.

41.     CompassCare provides pregnancy-related medical and non-medical services and comprehensive pregnancy- and abortion- related information without charge to its patients under the supervision of its President, James R. Harden. Medical services are provided under the supervision of its Medical Director, Dr. Katherine S. Lammers, M.D.

42.     Plaintiff NIFLA is a religious non-profit corporation duly incorporated under the laws of Virginia, with its principal place of business at 10333 Southpoint Landing Blvd, #107, Fredericksburg, VA 22407.

43.     NIFLA is comprised of member pregnancy care centers from across the nation, including 41 member centers in New York State, that provide pregnancy related medical and/or non-medical information and services without charge to their clients.

44.     Plaintiff First Bible is a non-profit Christian church organized exclusively for religious purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Its church is located at 990 Manitou Rd., Hilton, NY 14468, and its school is located at 332 Spencerport Rd., Rochester, NY 14606.

### Defendants

45.     Defendant Andrew Cuomo is the Governor of the State of New York. He is sued in his official capacity. Governor Cuomo is the chief executive of the State of New York and must "take care that the laws are faithfully executed." N.Y. Const. art. IV, § 3.

46.     Governor Cuomo has final decision making authority over the law challenged herein.

47.     Defendant Roberta Reardon is the Commissioner of the New York State Department of Labor. She is sued in her official capacity.

48.     Commissioner Reardon is required and empowered by Section 21 of New York's Labor Law to enforce SB 660, which is part of the Labor Law.

49.     Defendant Letitia James is the Attorney General of New York State. She is sued in her official capacity.

50.     Attorney General James oversees the Labor Bureau, which "investigates violations of minimum wage, overtime, prevailing wage, and other basic labor laws throughout the state and brings civil and criminal actions against employers who violate these laws." *Labor Bureau*, NY Attorney General, https://ag.ny.gov/bureau/labor-bureau (last visited Nov. 4, 2019).

51.     The Labor Law provides that "[a]ny person who violates or does not comply with any provision of the labor law, any rule, regulation or lawful order of the [Labor Commissioner] . . . [is] guilty of a misdemeanor and upon conviction shall be punished . . . by a fine of not more than one hundred dollars." N.Y. Lab. Law § 213.

52.     Section 214 of New York's Labor Law provides that "[t]he attorney-general may prosecute every person charged with the commission of a criminal offense in violation of this chapter, or of any rule, regulation or order made thereunder, or in violation of the laws of this state, applicable to or arising out of any provision of this chapter or any rule, regulation or order made thereunder."

53.     The Attorney General is also required to "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state." N.Y. Exec. Law § 63(1).

54.     The Attorney General therefore has the authority and duty to enforce SB 660.

# FACTUAL ALLEGATIONS

## CompassCare Pregnancy Services

55.     CompassCare is a pregnancy care center which exists to serve women considering abortion and their unborn children. It strives to provide the compassion, concern, and support necessary to enable women to carry their unborn children to term.

56.     CompassCare is a non-profit that offers its assistance free of charge and does not discriminate on the basis of age, sex, marital status, race, or religious preference.

57.     Compass Care receives no government funding.

58.     CompassCare provides clinical pregnancy testing to confirm the existence of pregnancy; ultrasound exams; gestational age determinations; complete pregnancy, abortion, and adoption options consultations; STD testing and treatment; abortion pill reversal services; and medical, insurance, and community support referrals.

59.     CompassCare provides accurate and comprehensive information concerning prenatal development, pregnancy and childbirth, abortion procedures and risks, and alternatives to abortion.

60.     In addition to its rigorous and consistent treatment and counseling protocol, it offers its patients a wealth of informational resources covering pregnancy, abortion, post-abortion care and expectations, contraception, and STDs.

61.     In order to provide the most accurate, comprehensive, and current information to its patients, CompassCare crafts its brochures by drawing on and citing a multitude of peer-reviewed medical journal articles and various meta-analyses of the peer reviewed literature.

62.     CompassCare is committed to meeting a woman's need at the point of decision regarding an unplanned or unwanted pregnancy.

63.     Through emotional support and practical assistance, CompassCare provides women with the knowledge and ability to face the future with hope, and to plan constructively for themselves

and their babies.

64.     CompassCare believes all human life is equally valuable and deserving of blessing and protection, from fertilization to natural death.

65.     CompassCare believes that every abortion claims an innocent life.

66.     CompassCare believes that every life is inherently valuable, because it is a gift from God and made in His image. CompassCare therefore believes that such life should not be destroyed.

67.     CompassCare believes that abortion compounds actual and perceived problems and difficulties for a woman, rather than resolving them.

68.     CompassCare believes the purpose of medical care is to heal and maintain the health of the individual and that abortion does neither for either the woman or the baby.

69.     As a result, CompassCare does not recommend, provide, or refer for abortions or abortifacient drugs or devices, holding it immoral for anyone to participate in these services.

70.     CompassCare supports adoption as an excellent alternative to abortion for women experiencing unplanned and unwanted pregnancies, and provides referrals to adoption agencies and attorneys for those who want such assistance.

71.     CompassCare believes that the popular societal acceptance of a birth control mentality violates the purpose of sexuality as revealed in the Bible and results in an increase in adolescent promiscuity, pregnancy, abortion, and disease.

72.     As a result, CompassCare, in accord with its faith beliefs, works to teach young adults that sex can only be meaningful and safe within the context of a loving, permanent marital relationship between one man and one woman.

73.     CompassCare provides accurate and complete information on birth control, distinguishing between methods that prevent conception on the one hand and abortifacient drugs and devices on the other. CompassCare does not, however, provide or refer patients for birth control in

any form.

74.     CompassCare is committed to encouraging sexual abstinence among those who are single, and sexual fidelity within a marital relationship between one man and one woman for those who are married.

75.     CompassCare's Christian faith and religious beliefs motivate and permeate its mission and all of its activities. In fact, CompassCare views itself as an outreach ministry of Jesus Christ through His church.

76.     During every interaction with a patient, CompassCare staff offer to share the Gospel message of God's love and hope to those who wish or agree to hear it. Staff will only share the Gospel with those who express a willingness to hear it.

77.     Per its mission statement, CompassCare is a Christ-centered agency dedicated to empowering women and men to erase the need for abortion by transforming a woman's fear into confidence.

78.     CompassCare believes God desires to use the organization to transform the communities it serves in western New York into a place where abortion is no longer needed or wanted. In an effort to accomplish this mission, CompassCare seeks to not only reach and effectively serve at-risk women in its communities, but also to help other pregnancy care centers, near and far, to do the same.

79.     CompassCare believes that the very existence of abortion represents the coercive circumstances inherent in many unplanned pregnancies, wherein most women feel they have no other choice but abortion.

80.     CompassCare is a religious organization that provides its services to women in unplanned pregnancies pursuant to its pro-life and religious viewpoint, desiring to empower the women it serves to say "no" to abortion.

81.	In order to fulfill its religious and pro-life mission, CompassCare requires that all who serve the organization—whether staff, board members, or volunteers—know Jesus Christ as their Lord and Savior.

82.	All who work at Compass Care must support CompassCare's religious mission, and must personally conduct themselves consistent with the Christian faith and belief that guides that mission.

83.	CompassCare requires all who serve the organization in any capacity to believe in and agree to abide by its positional statements on abortion, birth control, religious faith, and organizational principles.

84.	These statements are contained in CompassCare's employee handbook, which each person who serves the organization is required to sign.

85.	Staff members at CompassCare are not only required to agree to such statements from the outset of their involvement with CompassCare, but also to personally uphold them, unwaveringly, throughout their tenure with the organization.

86.	In pertinent part, CompassCare's positional statements require all those who serve the organization to agree that the Bible is the inspired—and the only— infallible, authoritative Word of God; that there is one God, eternally existent in three persons: Father, Son, and Holy Spirit; that every abortion claims an innocent life; that sexual relationships outside of marriages between one man and one woman result in great numbers of unplanned pregnancies, sexually transmitted diseases, and broken lives; and that sexual abstinence, rather than contraception, is the proper means to combat such results.

87.	For staff, volunteers, and board members, assent to CompassCare's mission and beliefs necessarily entails living a life consistent with that mission and those beliefs.

88.	All those who serve the organization must agree to never refer or advise any woman

to have an abortion and to uphold the organization's policy on birth control, which is abstinence only for unmarried patients.

89. All who serve the organization must themselves refrain from having, and helping others to procure, abortions.

90. All who serve the organization must themselves refrain from using, or helping others to procure, abortifacient drugs or devices, and to commit to maintain a monogamous relationship if married, or to remain sexually abstinent if unmarried.

91. All those who serve the organization also must agree to pray for CompassCare staff, volunteers, and patients.

92. CompassCare requires its staff, board members, and volunteers to assent to its beliefs and mission and to personally live by them because it believes they comport with God's Will and Word.

93. CompassCare also requires such assent because it believes that by associating with like-minded individuals, it will be able to spread an authentic message of love and hope that will be received more readily by patients, which will ultimately save more lives and reduce the perceived need for abortion.

94. CompassCare's statistics reveal that in 2018, the lives of 225 babies—whose mothers were abortion inclined when they arrived for their appointments—were saved through the efforts of its pregnancy care center.

95. In addition to functioning as a standalone pregnancy care center facilitating medical and other assistance to women facing unplanned pregnancies, CompassCare provides training and tools to other pregnancy care centers, by which it seeks to optimize and standardize treatment and counseling procedures throughout the industry.

96. CompassCare also maintains a number of websites and a blog through which it

regularly communicates its pro-life message and its positions regarding various laws and cultural developments dealing with life, pregnancy, abortion, contraception, and other issues. CompassCare also broadcasts its pro-life message through radio segments and television spots.

**National Institute of Family and Life Advocates (NIFLA)**

97.     NIFLA is a non-profit membership organization comprised of a network of both medical and non-medical pregnancy care centers providing pro-life services and information to women facing unplanned pregnancies.

98.     NIFLA is incorporated as a religious organization.

99.     NIFLA provides both medical and non-medical pro-life pregnancy centers with legal resources and counsel, with the aim of developing a network of life-affirming ministries in every community across the nation in order to achieve an abortion-free America.

100.     NIFLA also sponsors and holds various conferences aimed at educating individuals and organizations as to best practices regarding the provision of pro-life services and advocacy on behalf of the unborn.

101.     NIFLA's mission is to empower the choice for life by: equipping pregnancy centers with legal counsel and support; enabling pregnancy centers to convert to medical clinic status where possible; and energizing pregnancy centers with a renewed vision for the future.

102.     NIFLA has 41 member centers in New York.

103.     Many of NIFLA's New York member centers are religious organizations that pursue their pro-life mission and spread their pro-life message as an exercise of their religious beliefs.

104.     NIFLA emphasizes the importance of statements of faith and codes of conduct to its member centers and strongly encourages that its centers implement such documents in their daily operations.

105.     NIFLA offers an employee handbook template to its centers and encourages them to

adapt it for their use as circumstances dictate.

106.     Many of NIFLA's New York member centers require their employees and all who serve them in any capacity to assent to and personally live by, among other things, their organizational codes of conduct, positional statements, and/or statements of faith regarding pregnancy, abortion, contraceptive use, and sexual conduct outside the context of a marriage between one man and one woman. At such centers employees are required to assent to and/or sign these operative documents to signal their agreement with their contents and their intention to live by and model the beliefs contained therein.

107.     Many of NIFLA's New York member centers maintain an employee handbook.

108.     NIFLA's own religious mission includes helping its member centers advance their religious missions and beliefs.

109.     NIFLA's New York members are regulated under SB 660 and subject to its requirements.

110.     NIFLA has organizational standing to represent all of its member pregnancy centers in the State of New York. *See New York State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988).

111.     The New York member centers of NIFLA would otherwise have standing to sue in their own right in this case.

112.     The interests that NIFLA seeks to protect are germane to NIFLA's purpose, including the purpose to support its pro-life pregnancy center members and enable them to carry out their missions consistent with their religious and pro-life viewpoints.

113.     Neither the claims asserted nor the relief requested requires the participation of all of NIFLA's individual members in this suit, but can be awarded to NIFLA's members as a group.

**First Bible Baptist Church (First Bible)**

114.     First Bible is a church serving the town of Hilton, NY and the suburban area of

Rochester more generally. It has been spreading the Word of God and making disciples for Christ for over 50 years.

115. In addition to spreading the Gospel in the greater Rochester area, First Bible has a thriving missionary purpose and practice, through which it seeks to spread God's message throughout the world.

116. Kevin Pestke is Lead Pastor of First Bible.

117. First Bible believes the Bible is the inerrant Word of God and the final authority for human conduct. As such its mission, message, and statement of faith are in direct alignment with the Bible.

118. First Bible holds and actively professes historic and orthodox Christian beliefs on the sanctity of human life, including the belief that each human life, from the moment of conception, is formed by God and bears His image.

119. First Bible operates according to its Constitution. Contained in that Constitution are First Bible's beliefs regarding human sexuality and abortion.

120. First Bible believes that God has commanded that no intimate sexual activity be engaged in outside of marriage between a man and a woman.

121. First Bible believes and teaches that human life begins at conception and that the unborn child is a living human being. It further believes that abortion constitutes the unjustified, unexcused taking of unborn human life, which violates the Bible's command against the intentional destruction of innocent human life.

122. First Bible believes and teaches that participation in, facilitation of, or payment for abortion in any circumstance is a grave sin.

123. Consistent with its religious beliefs, First Bible seeks to recognize and preserve the sanctity of human life from conception until natural death.

124. First Bible—both internally and publicly—promotes and supports its pro-life mission with a variety of events, ministries, and partnerships.

125. First Bible partners with CompassCare by providing certain goods and monthly financial support. First Bible also participates in the local walk for life organized by CompassCare.

126. First Bible partners with Mission Share Outreach Center, which provides, among other things, pro-life pregnancy care services, food and clothing support, and training classes in life skills.

127. First Bible also partners with and provides ongoing monthly financial support to Lifesaver Ministries, a pregnancy care center in Gloversville, NY.

128. First Bible also operates a foster care ministry called HIS Ministry. Through this ministry First Bible gives out clothes, diapers, and toys, along with gift cards for new foster parents. First Bible also works to provide respite care to foster parents through this ministry, and has prayer teams that lift up each of the foster families and their needs in prayer on a regular basis. This ministry extends not only to foster parents that are members of the church but also to those outside of First Bible.

129. First Bible employs 14 pastors and directors, has 24 full-time and part-time employees, and has 900+ volunteers.

130. First Bible expects its pastors, directors, employees, and volunteers—in other words all who minister or assist in any capacity—to abide by and agree with the church's moral and ethical standards, including its religious beliefs and teachings on human sexuality and abortion, in both their work life and private life.

131. First Bible will not hire or retain any pastor, director, employee, or volunteer who refuses to assent to its statement of faith, or refuses to live out that statement of faith in his or her personal life.

132. First Bible makes institutional decisions, including those related to hiring and employee retention, in light of its statement of faith. Pastors, directors, employees, and volunteers who violate the principles contained in First Bible's statement of faith can be subject to disciplinary action, up to and including termination.

133. First Bible's ministry includes Northstar Christian Academy, a traditional curriculum school educating approximately 350 students from preschool/daycare through 12th grade. Northstar Academy currently has 6 administrators, 33 teachers, and myriad volunteers

134. It is the mission of Northstar Christian Academy to glorify God; establish the scriptures as the final, absolute authority; provide a distinctly Christian environment for its student body; teach traditional course offerings from a biblical worldview; encourage excellence in all aspects of life; encourage the student body to be conformed to Christ; and prepare its students to be servant disciples of Christ.

135. Northstar Christian Academy stresses the inculcation of Christian character, virtues, and morality. This includes the belief that every child is made in the image and likeness of God, the belief that abortion is the unjustified taking of an innocent human life, and the belief that sexual activity should be reserved for a marriage between one man and one woman.

136. Northstar Christian Academy follows First Bible's statement of faith in all respects.

137. First Bible also owns and operates Grace and Truth Athletics and Sports Park (G&T Athletics), which offers recreational sports programs for children and adults alike that teach good sportsmanship, teamwork, fundamental skill development, and positive Christian values.

138. Through G&T Athletics First Bible employs one director and ten part-time employees.

139. G&T Athletics follows First Bible's statement of faith in all respects.

140. First Bible follows the same employment practices at Northstar Christian Academy and G&T Athletics that it does at the church proper. It will not hire or retain any director, teacher,

18

employee, or volunteer who refuses to assent to its statement of faith, or refuses to live out that statement of faith in his or her personal life. Further, First Bible makes institutional decisions, including those related to hiring and employee retention, in light of its statement of faith. Staff, faculty, volunteers, or board members at its school or sports program and facility who violate the principles contained in First Bible's statement of faith can be subject to disciplinary action, up to and including termination.

**SB 660**

The Text and Requirements of SB 660

141.    As relevant to this complaint, SB 660 provides, inter alia, that "[a]n employer shall not . . . discriminate nor take any retaliatory personnel action against an employee with respect to compensation, terms, conditions, or privileges of employment because of or on the basis of the employee's or dependent's reproductive health decision making, including, but not limited to, a decision to use or access a particular drug, device or medical service." Exh. 1 at §203-e(2)(a), 2019-2020 Reg. Sess. (N.Y. 2019).

142.    SB 660 further provides that "[a]n employer shall not . . . require an employee to sign a waiver or other document which purports to deny an employee the right to make their own reproductive health care decisions, including use of a particular drug, device, or medical service." Exh. 1 at §203-e(2)(b).

143.    Finally, SB 660 provides that "[a]n employer that provides an employee handbook to its employees must include in the handbook notice of employee rights and remedies under this section." Exh. 1 at §203-e(3).

144.    SB 660 went into effect immediately upon the governor signing it into law on November 8, 2019. Exh. 1 at §2.

145.    The legislature passed a bill purporting to amend the employee handbook notice

provision only, so that that provision would take effect "on the sixtieth day after" SB 660 took

effect. *See* SB 4413 at §3, https://www.nysenate.gov/legislation/bills /2019/s4413.

146.    But as of the date of this filing, SB 4413 has neither been delivered to the governor

nor signed by him, *see id.*, so SB 660 is currently operative and applies to Plaintiffs in its entirety.[2]

<u>SB 660 is a Remedy for a Nonexistent Problem</u>

147.    The New York State Assembly and the New York State Senate both stated in their

respective legislative memoranda that SB 660 would "ensure[]that employees or their dependents are

able to make their own reproductive health care decisions without incurring adverse employment

consequences." *See* New York State Assembly Bill A584 Bill Summary, A00584 Memo,

https://bit.ly/2YyMabi (last visited Nov. 4, 2019), attached as Exhibit 4; Senate Bill S660 Bill

Summary, Sponsor Memo, https://bit.ly/2CIhJ9o (last visited Nov. 4, 2019), attached as Exhibit 5.

148.    The Assembly and the Senate both claimed that SB 660 was necessary to "ensure that

legal loopholes are corrected to ensure that employees' decisions about pregnancy, contraception, and

reproductive health are . . . protected under state law." Exhs. 4 &5.

149.    Nowhere in the legislative history, however, does either the Assembly or the Senate

give any description of the genesis or provenance of such asserted legal loopholes, and neither body

deigned to give any example of any instance in which such a loophole operated to deprive an employee

of his or her rights based on that employee's reproductive health decisions, whether in New York or

elsewhere.

150.    Additionally, nowhere in the legislative history does either the Assembly or the Senate

cite any examples of "adverse employment consequences" precipitated by any employer decisions in

---

[2] Plaintiffs are entitled to injunctive relief regardless of whether SB 4413 is delivered to and signed by the governor. Regardless of SB 4413's status, the state is in violation of Plaintiffs' rights under the First and Fourteenth Amendments.

light of employee reproductive health decisions. To the contrary, SB 660 would create the conditions for adverse employment consequences by forcing organizations to hire without respect to their core beliefs and missions.

151.    The text of SB 660 similarly fails to give any information to substantiate the claim that legal loopholes exist, or that they require closing or remedial action.

152.    The text of SB 660 similarly fails to give any examples of "adverse employment consequences" brought on as a result of an employee's reproductive health decisions.

153.    When directly questioned by Assemblyman Andrew Goodell as to whether discrimination on the basis of reproductive health decisions was actually occurring in New York State, Assemblywoman Ellen Jaffee, the main sponsor of SB 660 in the Assembly, could cite no examples of past or present discrimination on the basis of reproductive health decisions. *See* Exh. 3 at 123.

154.    Instead, Assemblywoman Jaffee responded with a non-sequitur, noting that "Illinois, Michigan, North Carolina, Ohio, and the District of Columbia have all introduced similar legislation in the last few years to prohibit employment discrimination based on reproductive health decisions." *Id.* The mere recitation of similar laws being passed in other jurisdictions does not constitute examples of actual employment discrimination in New York State.

155.    During her own floor speech, Senate sponsor Senator Jennifer Metzger was also unable to cite to any examples of employer discrimination based upon the reproductive health decisions of employees.

SB 660 Targets Religion for Disfavored Treatment

156.    Both the Assembly and the Senate characterized the legal challenges to the federal Affordable Care Act's contraceptive coverage requirement—filed principally by employers with religious beliefs opposed to providing such contraceptives, which included abortifacient drugs—as "discriminat[ion] or interfer[ence] in employees' personal medical decisions." Exhs. 4 &5.

157.    SB 660 was passed to remedy this imagined "problem" by preventing religious employers from managing their employment relationships consistent with their religious missions and beliefs.

158.    SB 660 intentionally forces religious employers to betray—upon pain of government sanction and the deputizing of private individuals to visit litigation havoc upon them—their religious missions and beliefs by forcing them to employ and associate with persons who do not share their beliefs regarding abortion, contraception, and sexual morality.

159.    In explaining her vote for SB 660 in the Senate, sponsor Senator Jennifer Metzger stated that "[w]e are on a dangerous, slippery slope in this country when it comes to protecting an individual's right to privacy and autonomy on decision-making about family planning and reproductive health." Exh. 2 at 433.

160.    As proof of that supposed danger, Senator Metzger cited to the very same source the Assembly and Senate collectively predicated SB 660 upon—the "over 100 lawsuits . . . filed by employers" since the "enactment of the Affordable Care Act." *Id.*

161.    As further proof of that supposed danger, Senator Metzger cited the Supreme Court's decision in *Hobby Lobby*, 573 U.S. 682. *Id.* Senator Metzger openly lamented during her floor speech that "[i]n its 2014 decision in the Hobby Lobby case, the Supreme Court for the first time recognized a qualification for a religious exemption by a corporation." *Id.*

162.    The vast majority of the lawsuits Senator Metzger deemed problematic and dangerous were filed by employers who for reasons of religious belief objected to complying with the ACA's contraceptive mandate. *See, e.g.*, *Hobby Lobby*, 573 U.S. at 697-705; 83 Fed. Reg. 57,536, 57,539, *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act* (November 15, 2018).

163.    In *Hobby Lobby*, the United States Supreme Court held that closely held for-profit

corporations could exercise religion, that the Affordable Care Act's contraceptive coverage requirement substantially burdened the exercise of the plaintiff corporations' religion, and that the requirement, "as applied to [such] closely held corporations, violates RFRA." *Hobby Lobby*, 573 U.S. at 736.

164. Senator Metzger equated the attempt by religious employers and organizations to protect their constitutional and statutory rights by filing lawsuits against the ACA's contraceptive coverage requirement to the denial of "reproductive health services and products." Exh. 2 at 433.

165. Going even further, Senator Metzger characterized those lawsuits—and the Supreme Court's decision in *Hobby Lobby*—as "encroachment[s] by employers" into reproductive health matters. *Id.* at 434

166. Senator Metzger explained that SB 660 was designed to "prevent" such "encroachment[s]." *Id.* at 434.

167. The legislature's targeting of religion through SB 660 is further illustrated by the fact that it decided to intentionally expose religious employers to potentially costly litigation without the need to do so, by refusing to include exemptions for them in the law.

168. SB 660's legislative history reveals that the refusal to grant a religious exemption was not an oversight, but was rather an intentional choice made by legislators.

169. The legislature made this choice despite the fact that controlling law provides that religious employers cannot be so burdened, consistent with constitutional requirements.

170. The New York State Legislature placed SB 660 in the Labor Law, and chose not to include a religious exemption like the one contained in the Human Rights Law, N.Y. Exec. Law § 296 (11), even though it knew the law would unconstitutionally impinge on the autonomy of religious organizations.

171. Indeed, when questioned as to whether SB 660 contained any exemptions,

Assemblywoman Jaffee responded in the negative, explaining that the "legislation does not contain any mention of religious beliefs. The First Amendment's ministerial exception may be used as a defense in court, but it's not a jurisdictional bar . . . for bringing a discrimination claim against an employer." Exh. 3 at 125.

172.    Assemblywoman Jaffee further explained that any religious employer haled into court as a result of SB 660 could have a "court . . . determine whether or not the employee is considered a minister for the purposes of a religious organization that is being accused of this . . . kind of a discrimination." *Id.* at 127.

173.    The New York State Legislature thus knew when it passed SB 660 that the law swept too broadly by interfering with the autonomy of certain religious employers to manage their internal affairs without state meddling.

174.    Yet the legislature nonetheless chose to expose religious employers to the threat of discrimination lawsuits and state enforcement actions anyway, imposing potentially crippling litigation costs on them in the process just to vindicate their constitutional rights, rights known and acknowledged in legislative testimony by SB 660's main sponsor in the Assembly.

175.    The legislature's conscious choice not to respect constitutional requirements in the first instance by providing a religious exemption in SB 660, but rather to force religious employers to defend their rights through costly litigation, evinces religious targeting forbidden by the U.S. Constitution.

SB 660's Enforcement Mechanisms and Penalties

176.    Although SB 660 essentially adds a new protected class based upon an employee's "reproductive health decision making," similar to the protected classes already contained in New York's Human Rights Law, SB 660 is contained in New York's Labor Law. *See* Exh. 1 (providing that "the labor law is amended by adding a new section 203-e").

177.     Section 21 of New York's Labor Law provides that "[t]he commissioner . . . shall enforce all the provisions of [Chapter 31, the Labor Law] and may issue such orders as he finds necessary directing compliance with any provision of this chapter, except as in this chapter otherwise provided." N.Y. Lab. Law § 21.

178.     The Commissioner of Labor therefore has the duty and authority to enforce SB 660 against Plaintiffs and other similarly-situated employers.

179.     The New York State Attorney General oversees the Labor Bureau, which "investigates violations of minimum wage, overtime, prevailing wage, and other basic labor laws throughout the state and brings civil and criminal actions against employers who violate these laws." *Labor Bureau*, NY Attorney General, https://ag.ny.gov/bureau/labor-bureau (last visited Nov. 4, 2019).

180.     The Labor Law provides that "[a]ny person who violates or does not comply with any provision of the labor law, any rule, regulation or lawful order of the [Labor Commissioner] . . . [is] guilty of a misdemeanor and upon conviction shall be punished . . . by a fine of not more than one hundred dollars." N.Y. Lab. Law § 213.

181.     The Labor Law further provides that "[t]he attorney-general may prosecute every person charged with the commission of a criminal offense in violation of this chapter, or of any rule, regulation or order made thereunder, or in violation of the laws of this state, applicable to or arising out of any provision of this chapter or any rule, regulation or order made thereunder." N.Y. Lab. Law § 214.

182.     The Attorney General is also required to "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state." N.Y. Exec. Law § 63(1).

183.     Based upon her oversight of the Labor Bureau, her authority to prosecute violations of the Labor Law, and her duty to enforce the laws of New York State, the Attorney General has the

legal authority and duty to enforce SB 660 against Plaintiffs and other similarly-situated employers.

184.     SB 660 also provides employees a private right of action to enforce its requirements against employers alleged to have violated its provisions.

185.     SB 660 provides that "[a]n employee may bring a civil action in any court of competent jurisdiction against an employer alleged to have violated the provisions of this section." Exh. 1 at § 203-e(4).

186.     SB 660 authorizes a court to "award damages, including, but not limited to, back pay, benefits and reasonable attorneys' fees and costs incurred to a prevailing plaintiff." *Id.* at § 203-e(4)(a).

187.     SB 660 further authorizes a court to "afford injunctive relief against any employer that commits or proposes to commit a violation of the provisions of this section." *Id.* at § 203-e(4)(b).

188.     SB 660 also permits courts to "order reinstatement" and to "award liquidated damages equal to one hundred percent of the award for damages . . . unless an employer proves a good faith basis to believe that its actions in violation of this section were in compliance with the law." *Id.* at § 203-e(4)(c-d)

<u>SB 660's Effect on Plaintiffs/Plaintiffs' Intentions with Regard to SB 660</u>

189.     SB 660 restricts Plaintiffs' freedom to associate with like-minded individuals by forbidding them from enforcing employment standards of conduct in accordance with organizational beliefs regarding abortion, contraception, and sexual morality.

190.     SB 660 interferes with Plaintiffs' ability and autonomy to conduct their affairs in accordance with their Christian beliefs.

191.     SB 660 targets the religious beliefs of Plaintiffs for disfavored treatment.

192.     SB 660 imposes an impermissible penalty and chill on Plaintiffs' speech.

193.     SB 660 prohibits Plaintiffs from spreading their message to their employees regarding, among other things, abortion, contraception, and sexual morality.

194. SB 660 further deters Plaintiffs from spreading their religious and pro-life messages to potential employees and the public more generally.

195. SB 660 compels Plaintiffs to speak the government's message regarding abortion, contraception, and sexual morality by requiring them to give notice of SB 660 to their employees to the extent Plaintiffs maintain employee handbooks.

196. Enforcement of SB 660 will irreparably harm Plaintiffs by infringing on their First Amendment rights to expressive association, free exercise of religion, religious autonomy, and free speech, as well as their Fourteenth Amendment right to due process, because the law is void for vagueness.

197. If Plaintiffs were to comply with SB 660, it would undermine and compromise their pro-life and religious missions, messages, and purposes, and compel Plaintiffs to associate with employees who do not share such missions, messages, and purposes.

198. If Plaintiffs were to comply with SB 660, they would be required to permit employees who did not share their beliefs to act as their messengers to third parties, which would necessarily dilute and change Plaintiffs' messages.

199. SB 660 hinders Plaintiffs' ability to hire new employees due to the uncertainties surrounding how to find, recruit, and hire new employees consistent with their pro-life and religious missions, messages, and purposes.

200. Plaintiffs' refusal to comply with SB 660 will subject them to enforcement actions by Defendants, to include potential fines and prosecution.

201. SB 660 will subject Plaintiffs to suits by private litigants pursuant to its private right of action, which enforcement mechanism threatens to saddle Plaintiffs with crippling litigation costs, damages (including liquidated damages), and attorneys' fees and costs.

202. SB 660 also permits courts to order reinstatement as a remedy, which would perversely

permit the state and private litigants to dictate to religious organizations who they must associate with and employ well into the future, despite the fact that certain employees may believe and act inimically to the mission and beliefs of those religious organizations.

203.     CompassCare has a small budget and relies on donor funding to do its work in the community. The remedies contained in SB 660 constitute an existential threat to CompassCare.

204.     The vast majority of NIFLA's New York members are non-profit organizations with limited funding and small budgets. The remedies contained in SB 660 therefore also constitute an existential threat to many, if not all, of NIFLA's member centers.

205.     In addition to posing potentially crippling litigation costs, complying with SB 660 would bring other severe financial harm to Plaintiffs. If Plaintiffs were to agree to hire and employ those who have abortions, use abortifacient drugs, or flout Plaintiffs' beliefs regarding sexual morality, donor funding—which is predicated upon Plaintiffs' continuing dedication to the pro-life cause— would be severely compromised.

206.     Donors would hesitate to give to Plaintiffs if they comply with SB 660, because by complying they would compromise donors' religious beliefs regarding pregnancy, abortion, contraceptive use, and sexual morality.

207.     Notwithstanding the fact that SB 660 applies to them, CompassCare and NIFLA's New York member organizations intend to continue to require their employees, volunteers, board members (and any other persons who serve their organizations) to comply with, among other things, their respective employee handbooks, codes of conduct, positional statements, and statements of faith regarding reproductive health decisions, including, but not limited to, pregnancy, abortion, contraceptive use, and sexual morality.

208.     CompassCare desires to require prospective and current employees to waive SB 660's provisions and will refuse to hire or retain any employees if they refuse to agree to waive SB 660.

209.     CompassCare will not include a notice of the employee rights and remedies under SB 660 in its employee handbook, even though SB 660 requires such compliance.

210.     NIFLA's New York member centers desire to require prospective and current employees to waive SB 660's provisions and will refuse to hire or retain any employees if they refuse to agree to waive SB 660.

211.     NIFLA's New York member centers who maintain employee handbooks will not include a notice of the employee rights and remedies under SB 660 in those handbooks, even though SB 660 requires such compliance.

212.     CompassCare and NIFLA's New York member organizations have no choice but to continue to operate in a manner consistent with their mission and beliefs, because complying with SB 660 would compel them to violate their core principles and would force them to speak the government's message, all of which they cannot do.

213.     First Bible currently does not maintain an employee handbook and does not require its pastors, directors, employees, or volunteers to sign any employee handbooks, codes of conduct, positional statements, and/or statements of faith regarding reproductive health decisions or any other issue.

214.     First Bible does, however, expect its pastors, directors, employees, and volunteers to agree to abide by its mission and beliefs in the conduct of their work for First Bible and in their personal lives.

215.     First Bible is in the process of creating an employee handbook which outlines its faith positions, and once that is complete it intends to have all current pastors, directors, employees, and volunteers sign that handbook, thereby expressing agreement with and fealty towards First Bible's faith positions.

216.     Going forward, First Bible intends to require the assent and signature of all applicants

for employment (whether a potential pastor, director, employee, volunteer, or anyone who serves in any capacity) and all employees (whether a pastor, director, employee, volunteer, or anyone who serves in any capacity) to its statement of faith.

217. First Bible desires to include the following language in its employee handbook pertaining to reproductive health decisions and SB 660: "All applicants and employees, as a condition of hiring and continued employment, must agree to personally abide by First Bible's beliefs regarding reproductive health decisions and sexual morality. More specifically, no employee or prospective employee may have an abortion, help another to obtain an abortion, use abortifacient drugs or devices, or engage in sexual activity outside the context of a marriage between one man and one woman. Engaging in such activities may result in discipline or termination. Moreover, as a condition of employment, all employees must agree to waive the protections regarding reproductive health decisions contained in SB 660."

218. If not for SB 660's penalties and enforcement mechanisms, First Bible would immediately place into operation its employee handbook once it is completed.

219. Once its employee handbook is operative, First Bible does not intend to include therein any notice of the rights laid out in SB 660.

220. Plaintiffs intend to take adverse employment action against employees who choose to procure abortions or otherwise violate their organizational policies regarding pregnancy, abortion, contraceptive use, and sexual morality.

221. To the extent they do not currently have employee handbooks, and to the extent they desire to create them, Plaintiffs will create them without including any mention of SB 660's rights and remedies.

222. To the extent they do not already contain such language in their respective employee handbooks, websites, or prospective employee/board member/volunteer job announcements,

Plaintiffs desire to include language that those persons must agree to comply with organizational beliefs regarding pregnancy, abortion, contraceptive use, and sexual morality if they wish to serve Plaintiffs in any capacity, notwithstanding SB 660's requirements. If they were to comply with SB 660 Plaintiffs would not be able to include such new, additional language in any internal or publicly accessible document.

223.    Plaintiffs desire to discourage employees from resorting to SB 660 by distributing emails and other materials discussing why SB 660 is improper, unbiblical, unconstitutional, and contrary to their organizations' pro-life views.

224.    Plaintiffs fear the harms of prosecution, enforcement actions, and private suit under SB 660 if they fail to comply.

225.    SB 660's penalties would significantly harm Plaintiffs' ability to continue their religious, pro-life, and expressive operations.

226.    SB 660 imposes untenable choices on Plaintiffs: succumb to their fear of prosecution and comply with SB 660 in violation of their expressive views, religious beliefs, and free speech rights; continue their expressive views, speech, and services without complying with SB 660 and be prosecuted, penalized, and injured in their ability to pursue their religious and expressive operations; or cease their expressive activities and services altogether.

227.    Plaintiffs face a credible threat of adverse state action because of SB 660.

228.    Defendants are vested with enforcing SB 660 against Plaintiffs.

229.    The passage of SB 660 into law represents an imminent, concrete, and reliable threat that Defendants will enforce SB 660 against Plaintiffs.

230.    Plaintiffs also face a credible threat of suits by private parties, who are deputized by SB 660 to enforce the law against Plaintiffs.

231.    Enjoining Defendants and private parties from enforcing SB 660 against them is

necessary to protect Plaintiffs from the violation of their constitutional rights and from the punishments unconstitutionally permitted by SB 660.

232.     Each and all of the real and threatened enforcement actions alleged of the Defendants, their officers, agents, servants, employees, or persons acting at their behest or direction, or pursuant to the private right of action contained in SB 660, were done, are continuing to be done, and will be done under the color of state law, including the statutes, regulations, customs, policies, and usages of the State of New York.

233.     Plaintiffs have no adequate remedy at law.

**CLAIMS FOR RELIEF**

**First Claim: Violation of First Amendment Freedom of Expressive Association**

234.     Plaintiffs repeat and re-allege each allegation contained in Paragraphs 1–233 of this Complaint as if fully set forth here.

235.     The First Amendment to the United States Constitution recognizes and protects the right to freedom of association.

236.     The First Amendment protects the right of persons to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

237.     The First Amendment protects Plaintiffs' rights to speak and to freely associate, and their right not to speak and not to associate.

238.     Freedom of association necessarily protects Plaintiffs' right to exclude individuals from their organizations.

239.     The First Amendment bars the government from compelling persons to expressively associate with others in the process of creating and disseminating speech.

240.     The First Amendment prohibits the government from banning people from expressively associating with others in the process of creating and disseminating speech.

241. Plaintiffs hold views affirming the dignity and sanctity of human life, including opposition to abortion in all forms, and they associate with others for the purpose of more effectively expressing and inculcating that viewpoint.

242. SB 660 restricts the freedom of organizations such as those operated by Plaintiffs to form expressive associations of those who share a common commitment to the equal value of human life, without qualification, from fertilization to natural death.

243. SB 660 restricts Plaintiffs' freedom of association by forbidding them from requiring their employees to adhere to Plaintiffs' standards of conduct regarding reproductive health choices.

244. Plaintiff CompassCare engages in expressive association when it treats and counsels patients, ministers to them by offering to share the Gospel, guides other pregnancy care centers to operate in accord with industry best practices, and comments upon pro-life and cultural issues through its blog, websites, and other media. Plaintiff CompassCare also engages in expressive association when it builds and maintains a team of like-minded employees who are committed to advancing its pro-life mission throughout the community.

245. Plaintiff NIFLA engages in expressive association by providing to its member pregnancy care centers legal resources and counsel, with the aim of developing a network of life-affirming ministries in every community across the nation in order to achieve an abortion-free America. NIFLA also engages in expressive association when it sponsors and holds various conferences aimed at advancing the pro-life cause.

246. NIFLA's New York member centers engage in expressive association when they provide medical and non-medical support to pregnant women, provide comprehensive pregnancy and abortion counseling, and pursue their pro-life missions and spread their pro-life messages in their communities. NIFLA's New York member centers also engage in expressive association when they build and maintain teams of like-minded employees who are committed to advancing their pro-life

mission throughout the community.

247.     Plaintiff First Bible engages in expressive association as a church, a religious school, and a sports ministry. In all endeavors it has a strong theological interest in engaging in communal expression that reflects fidelity to biblical teachings on the inherent dignity and sanctity of all human life without qualification, as well as God's plan for the family as laid out in His teachings on marriage and human sexuality as the basis for a sustainable civilized order.

248.     First Bible further engages in expressive association when it hires ministers and teachers, admits and teaches students, conducts Bible studies, hosts discipleship gatherings, engages in missionary activity, and otherwise seeks to maintain a religious community formed around shared theological convictions and standards of conduct.

249.     Because they wish to carry out their respective missions and spread their pro-life messages successfully, Plaintiffs only hire and employ individuals who share their beliefs and values and personally adhere to such beliefs and values in every aspect of their lives.

250.     For Plaintiffs, the messenger is, in many instances, as important as the message.

251.     SB 660 forces Plaintiffs to hire and employ those who will misrepresent their views and standards to third parties, including women who come into pregnancy care centers seeking help with an unplanned pregnancy, and church members and students expecting to be taught Biblical Christian doctrine.

252.     Forcing Plaintiffs to include staff or employees who do not share Plaintiffs' beliefs regarding abortion and reproductive health decisions, as SB 660 does, would compromise Plaintiffs' pro-life message and mission. Such compulsion is tantamount to compelling Plaintiffs to speak a message directly contrary to their core religious beliefs and mission.

253.     SB 660 violates Plaintiffs' right to expressive association by denying them the right to organize their staffs consistent with their values, by compelling them to alter their employee

handbooks and other documents that teach that abortion is a grave moral wrong, and by forcing them to instead spread the state's message that the reproductive health choices of their staff have nothing to do with the mission and message of Plaintiffs.

254. SB 660 harms Plaintiffs' ability to promote their beliefs about the equal value of all human life and related issues by requiring them to either decline to associate with or hire individuals who share Plaintiffs' expressive purpose of protecting and promoting unborn life, or to willingly associate with or hire individuals who desire to promote a view of life that directly contradicts Plaintiffs' own.

255. SB 660 imposes severe coercive pressure on Plaintiffs—up to and including state enforcement actions and potentially crippling private lawsuits—to change who they associate with and to change or violate their pro-life and religious missions and beliefs.

256. Because SB 660 violates Plaintiffs' right to expressive association, it must further a compelling interest in a narrowly tailored way to survive constitutional scrutiny.

257. The application of SB 660, which forces Plaintiffs to associate to express messages they do not want to express, does not further any compelling, substantial, legitimate, or rational interest, and Defendants lack any evidence to demonstrate the existence of such an interest.

258. SB 660 is overbroad. It is not tailored at all, much less narrowly tailored, to further any governmental interest, and even if the state could proffer an interest of some kind, the law does not represent the least restrictive means of achieving any such interest.

259. SB 660, both facially and as applied to Plaintiffs, violates the right to expressive association under the First Amendment to the United States Constitution, as incorporated and applied to the States through the Fourteenth Amendment.

260. Absent declaratory and injunctive relief against the application and enforcement of SB 660, Plaintiffs will suffer irreparable harm.

261. WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**Second Claim: Violation of the Free Speech Clause of the First Amendment to the United States Constitution**

262. Plaintiffs repeat and re-allege each allegation contained in Paragraphs 1–233 of this Complaint as if fully set forth here.

263. The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech."

264. SB 660 unconstitutionally restricts Plaintiffs' right to free speech because it forbids them from maintaining and communicating employment standards of conduct in accordance with organizational beliefs regarding reproductive health services, including but not limited to abortion, contraceptives, and sexual morality.

265. SB 660 further restricts Plaintiffs' right to free speech because it compels them to speak a message contrary to their beliefs not only to their current employees, but also to prospective employees and the public in general.

266. The speech prohibitions contained in SB 660 require Plaintiffs to limit and censor their constitutionally guaranteed speech regarding the impropriety of abortion and other reproductive health choices, including but not limited to contraceptives and sexual conduct outside the context of marriage between one man and one woman.

267. In addition, SB 660 unconstitutionally compels Plaintiffs' speech by requiring them to include in their employee handbooks "notice of employee rights and remedies under this section." In so doing SB 660 unconstitutionally compels Plaintiffs to encourage their employees to utilize the statute.

268. SB 660 requires employers to give notice of its provisions to their employees only when they maintain employee handbooks.

269. CompassCare has an employee handbook and requires its employees to assent to and sign off on the beliefs and positions stated therein if those employees want to begin or continue work there.

270. A significant proportion of NIFLA's New York members maintain employee handbooks, and require their employees to assent to and sign off on the beliefs and positions stated therein if those employees want to begin or continue to work there.

271. But for SB 660, First Bible would include in the employee handbook it is in the process of completing an express requirement that all who serve or work for the organization in any capacity must agree to and personally abide by its religious beliefs on reproductive health choices.

272. But for SB 660, Plaintiffs, who do not have employee handbooks but intend to create them or are in the process of creating them, would include in them an express requirement that all staff must agree to and personally abide by their respective organizations' policies on reproductive health choices.

273. No Plaintiff intends to give notice of SB 660 in its employee handbook or in any other document.

274. SB 660 is a content-based regulation of speech because it applies based on the topic discussed or the idea or message expressed, here the reproductive health choices of employees.

275. SB 660 is also a content-based regulation of speech because it alters the speech and message Plaintiffs would otherwise engage in.

276. SB 660 unconstitutionally discriminates against Plaintiffs' speech based on their viewpoint as well, because it permits speech indicating approval of abortion and speech communicating the idea that reproductive health choices should have nothing to do with employment, while it prohibits speech critical of abortion and speech communicating the idea that employees must personally abide by pro-life codes of conduct while they are employed by pro-life organizations.

277.     Because it is content-based and viewpoint-based SB 660 is subject to strict scrutiny.

278.     SB 660's prohibition and compulsion of Plaintiffs' speech does not further any compelling, substantial, legitimate, or rational interest, and Defendants lack any evidence to demonstrate the existence of such an interest.

279.     SB 660 is not tailored at all, much less narrowly tailored, to further any governmental interest, and even if the state could proffer an interest of some kind, SB 660 is not the least restrictive means of achieving any such interest.

280.     SB 660 is unconstitutionally and substantially overbroad, and at the same time underinclusive.

281.     SB 660 violates Plaintiffs' rights to free speech under the First Amendment to the United States Constitution, as incorporated and applied to the States through the Fourteenth Amendment.

282.     SB 660 is unconstitutional as applied to Plaintiffs, and on its face.

283.     SB 660 imposes an unconstitutional chill and penalty on Plaintiffs' speech, and without declaratory and injunctive relief, will continue to do so.

284.     WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**Third Claim: Violation of Religious Autonomy Guaranteed by the Religion Clauses of the First Amendment to the United States Constitution**

285.     Plaintiffs repeat and re-allege each allegation contained in Paragraphs 1–233 of this Complaint as if fully set forth here.

286.     SB 660 violates Plaintiffs' rights under the Religion Clauses of the First Amendment to the United States Constitution.

287.     The Free Exercise and the Establishment Clauses of the First Amendment, together, invest in churches and religious organizations the power to ordain their own affairs, including to decide

for themselves, free from state interference, matters of government, faith, and doctrine; the communication of that doctrine; and the operation of their own institutions and organizations.

288.     This freedom extends to Plaintiffs' ability to hire and employ only those individuals who believe—and live out—the beliefs of the organization regarding reproductive health decisions such as abortion, contraception, and sexual morality.

289.     Plaintiffs have determined that they must employ only those individuals who assent to and agree to personally live out the religious beliefs of their respective organizations. Plaintiffs cannot therefore hire or employ those who obtain abortions, use abortifacient drugs or devices, or engage in sexual conduct outside the context of a marriage between one man and one woman.

290.     SB 660 directly and substantially interferes with Plaintiffs' First Amendment right to order their own internal affairs in matters involving the government of their religious organizations.

291.     SB 660 prevents Plaintiffs from enforcing statements of faith and standards of conduct consistent with their missions and beliefs.

292.     SB 660 forces Plaintiffs to speak the state's message by requiring them to give notice of SB 660 in their employee handbooks, thereby altering the priorities Plaintiffs set in ordering and managing their internal affairs.

293.     SB 660 imposes severe coercive pressure on Plaintiffs—up to and including state enforcement actions and potentially crippling private lawsuits—to change the manner in which they order and manage those internal affairs.

294.     SB 660 does not further any compelling, substantial, legitimate, or rational interest, and Defendants lack any evidence to demonstrate the existence of such an interest.

295.     In fact, Defendants have failed to offer any justification sufficient to interfere with Plaintiffs' religious autonomy by means of SB 660.

296.     SB 660 is not tailored at all, much less narrowly tailored, to further any governmental

interest, and even if the state could proffer an interest of some kind, the law does not represent the least restrictive means of achieving any such interest.

297.     SB 660, as applied to Plaintiffs, violates the right to religious autonomy guaranteed by the Religion Clauses of the First Amendment to the United States Constitution, as incorporated and applied to the States through the Fourteenth Amendment.

298.     WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**Fourth Claim: Violation of the First Amendment's Free Exercise of Religion Clause**

299.     Plaintiffs repeat and re-allege each allegation contained in Paragraphs 1–233 of this Complaint as if fully set forth here.

300.     The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law . . . prohibiting the free exercise of religion."

301.     Plaintiffs are pro-life and religious organizations that can and do exercise religion, including by promoting their pro-life message and services.

302.     The First Amendment to the United States Constitution protects Plaintiffs' rights to speak about, publish, and freely exercise their religious beliefs.

303.     The First Amendment prevents the government from interfering with Plaintiffs' mission and religious beliefs.

304.     The First Amendment requires Defendants to act in a neutral and generally applicable manner toward Plaintiffs and their religious beliefs and practices, and bars even subtle departures from neutrality on matters of religion. This First Amendment protection applies upon even slight suspicion that state actions stem from animosity to religion or distrust of its practices.

305.     The First Amendment protects Plaintiffs from government hostility, targeting, and discrimination because of their religious beliefs and practices.

306. Plaintiffs have sincerely held religious beliefs that motivate and require them to operate their organizations in accordance with biblical teachings, which they view as authoritative.

307. Plaintiffs exercise their religion in their provision of pro-life medical services, counseling, and the communication of comprehensive information regarding pregnancy, abortion, contraception, adoption, and other related issues; and in the spreading of the Word of God and the teaching of students regarding biblical truths.

308. Plaintiffs' exercise of religion includes employing individuals who share and live out Plaintiffs' organizational beliefs regarding reproductive health decisions, and seeking to hire employees who share and live out Plaintiffs' organizational beliefs regarding reproductive health decisions.

309. Plaintiffs' religious beliefs, which permeate and define Plaintiffs' organizational purposes, require that employees adhere to standards of conduct regarding reproductive health decisions, including, but not limited to, refraining from personally procuring and facilitating abortions and using certain abortion-causing drugs and devices misrepresented as "contraceptive," and abstaining from sexual conduct outside the context of marriage between one man and one woman.

310. SB 660 is not neutral or generally applicable.

311. SB 660 is not neutral or generally applicable because it disfavors Plaintiffs' religious beliefs and targets them for punishment, imposing special disabilities on the basis of Plaintiffs' stating or exercising those disfavored religious views.

312. SB 660 is not neutral or generally applicable because its legislative history reveals that it is intended to target religious organizations by prohibiting them from maintaining employment policies and standards of conduct in accordance with their religious beliefs.

313. SB 660 is not neutral or generally applicable because it imposes its notice requirement only upon employers who maintain an employee handbook.

314. SB 660 is not neutral or generally applicable because its legislative history reveals that

it was passed to prevent religious employers from having any say in whether their employees could have abortions and use contraceptives—including abortifacient drugs—without suffering any employment consequences.

315.    In other words, SB 660 was designed to prevent Plaintiffs and other like religious organizations from operating their organizations in accord with their pro-life missions and beliefs.

316.    The application of SB 660 to Plaintiffs interferes with their ability as religious non-profits to carry out their respective missions and spread their religious beliefs, precisely because they hold pro-life views regarding abortion and contraception, and believe that sexual relations outside the context of a marriage between one man and one woman are inconsistent with true human flourishing as revealed in Scripture.

317.    The application of SB 660 to Plaintiffs imposes a substantial burden on their religious exercise and coerces them to change or violate their religious beliefs, upon pain of state enforcement actions and potentially crippling private lawsuits.

318.    Forcing Plaintiffs to revise their statements of faith, positional statements, codes of conduct, employee handbooks and other like policy documents also substantially burdens Plaintiffs' exercise of their religious beliefs because such a requirement undermines Plaintiffs' religious messages and their ability to save the lives of babies whose mothers are contemplating abortion, and undermines their ability to teach the biblical truth that all human lives, without qualification and including unborn lives, are of inestimable value worthy of protection and blessing.

319.    SB 660 also infringes on the hybrid of Plaintiffs' free exercise, free speech, and expressive association rights.

320.    The First Amendment's Free Exercise Clause requires the government to satisfy strict scrutiny before it may burden the exercise of religion.

321.    Because SB 660 violates Plaintiffs' free exercise rights, it must further a compelling

interest in a narrowly tailored way.

322.    SB 660 does not further any compelling, substantial, legitimate, or rational interest, and Defendants lack any evidence to demonstrate the existence of such an interest.

323.    In fact, Defendants have failed to offer any justification sufficient to burden Plaintiffs' free exercise of religion by means of SB 660.

324.    SB 660 is not tailored at all, much less narrowly tailored, to further any governmental interest, and even if the state could proffer an interest of some kind, the law does not represent the least restrictive means of achieving any such interest.

325.    SB 660, as applied, violates Plaintiffs' rights under the Free Exercise Clause, as well as the hybrid of its free exercise, free speech, and expressive association rights under the First Amendment, as incorporated and applied to the States through the Fourteenth Amendment.

326.    WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**Fifth Claim: Violation of the Due Process Clause of the Fourteenth Amendment (Void for Vagueness)**

327.    Plaintiffs repeat and re-allege each allegation contained in Paragraphs 1–233 of this Complaint as if fully set forth here.

328.    The Due Process Clause of the Fourteenth Amendment prohibits the government from outlawing behavior or censoring speech pursuant to vague standards that fail to give speakers and actors sufficient notice whether their actions or speech violate the law, and grant unbridled discretion to government officials to arbitrarily prohibit some actions and expression.

329.    The Due Process Clause of the Fourteenth Amendment further protects against the government imposition of penalties based on such vague terms.

330.    Laws like SB 660, which trench upon First Amendment rights, require a particularly high degree of specificity.

331.     SB 660 prohibits employers from taking adverse action based on the reproductive health decisions of their employees, nullifies employment policies and agreements requiring compliance with organizational beliefs, and requires employment handbooks to contain notifications of SB 660's provisions, all of which directly interfere with Plaintiffs' ability to operate according to their religious beliefs.

332.     Yet SB 660 does not define "reproductive health decision making," its central term.

333.     SB also fails to define "employee," "employer," and a number of other key terms which are central to understanding its requirements.

334.     SB 660 does contain some legislative discussion suggesting that it may not be enforceable in certain instances, namely those implicating a "ministerial exception," but the text of the law itself makes no reference to who and what such an exception would cover. Instead SB 660 requires even those who should be exempt from the law under controlling precedent to prove that they merit an exemption. The fact the New York State Legislature itself was unwilling or unable to say who is legally exempt from the law by virtue of controlling precedent is powerful evidence of its vagueness.

335.     SB 660 does not define the phrase "proposes to commit a violation of the provisions of this section," at the same time it permits significant punishment and penalties for an employer who "proposes" to do so.

336.     SB 660 also fails to adequately define the means by which it is to be enforced by state officials.

337.     Because of SB 660's vagueness, Plaintiffs have no way of knowing whether and when the law applies to them, or how it can and will be enforced.

338.     Plaintiffs are instead left to guess, among other things, as to what employee decisions may implicate the law, which employees and which employers are covered by the law and which may be excepted, how state officials can and may enforce the law, and what penalties may apply in the

event they are found to have violated the law pursuant to state enforcement actions.

339. SB 660's vagueness as to the employee decisions covered, employees and employers covered, and the enforcement mechanisms permitted of state officials violates and chills the expressive association, free speech, religious autonomy, and free exercise rights of Plaintiffs, who must assume that SB 660 applies to them and accept SB 660's burdens on their protected constitutional rights.

340. SB 660's vagueness gives government officials unbridled discretion to determine whether the Plaintiffs are covered under the law and to punish them for officially-perceived violations, and deputizes private individuals to bring suit against pro-life and religious entities who have the constitutional right to employ only those who hew to their beliefs.

341. Accordingly, SB 660 violates the Fourteenth Amendment's guarantee of due process, both facially and as applied to Plaintiffs.

342. WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

A. Declare SB 660 unconstitutional under the United States Constitution, in its entirety, on its face, and as applied to Plaintiffs, on their expressive association, free speech, and vagueness claims;

B. Declare SB 660 unconstitutional under the United States Constitution, in its entirety, as-applied to Plaintiffs, on their religious autonomy and free exercise claims;

C. Enter preliminary and permanent injunctions against the enforcement of SB 660 by Defendants, and any person acting in concert with them or pursuant to the private right of action contained in the law;

D. Award Plaintiffs the costs of the litigation, including reasonable attorneys' fees and

expenses under 42 U.S.C. § 1988;

E.      That this Court adjudge, decree, and declare the rights and other legal relations of the

parties to the subject matter in controversy here so that these declarations shall have the force and

effect of a final judgment;

F.      That this Court retain jurisdiction of this matter for the purpose of enforcing its

orders;

G.      That this Court issue the requested injunctive relief without a condition of bond or

other security being required of Plaintiffs; and

H.      That this Court grant any other relief that it deems equitable and just in the

circumstances.

Respectfully submitted this 14th day of November, 2019.

*s/  David A. Cortman*

| | |
|---|---|
| David A. Cortman | James P. Trainor, Bar No. 505767 |
| GA Bar No. 188810 | Trainor Law PLLC |
| dcortman@ADFlegal.org | 2452 US Route 9, Suite 203 |
| Alliance Defending Freedom | Malta, NY 12020 |
| 1000 Hurricane Shoals Road, N.E. | (518) 899-9200 |
| Suite D-1100 | (518) 899-9300 (Fax) |
| Lawrenceville, GA  30043 | jamest@trainor-lawfirm.com |
| (770) 339-0774 | *Local Counsel* |
| (770) 339-6744 (Fax) | |

Kevin Theriot, AZ Bar No. 30446*
ktheriot@ADFlegal.org
Kenneth J. Connelly, AZ Bar No. 25420*
kconnelly@ADFlegal.org
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (Fax)
*Pro Hac Vice applications forthcoming*

*Attorneys for Plaintiff*

## **VERIFICATION OF COMPLAINT**

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing factual allegations as they pertain to CompassCare Pregnancy Services are true and correct to the best of my knowledge.

Executed this _11th_ day of November, 2019, at _Rochester_, New York.

James R. Harden
President, CompassCare Pregnancy Services

## VERIFICATION OF COMPLAINT

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing factual allegations as they pertain to the National Institute of Family Life Advocates (NIFLA) are true and correct to the best of my knowledge.

Executed this _12_ day of November, 2019, at Fredericksburg, Virginia.

Thomas Glessner
President, NIFLA
On Behalf of NIFLA

**VERIFICATION OF COMPLAINT**

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing factual allegations as they pertain to First Bible Baptist Church are true and correct to the best of my knowledge.

Executed this __11__ day of November, 2019, at __Hilton__, New York.

Kevin Pestke
Lead Pastor, First Bible Baptist Church