**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

COMPASSCARE, a New York nonprofit
corporation; NATIONAL INSTITUTE OF
FAMILY AND LIFE ADVOCATES d/b/a
NIFLA, a Virginia corporation; FIRST BIBLE
BAPTIST CHURCH, a New York nonprofit
corporation,

                              Plaintiffs,

      vs.

ANDREW M. CUOMO, in his official capacity as
the Governor of the State of New York; ROBERTA
REARDON, in her official capacity as the
Department of Labor Commissioner of the State of
New York; LETITIA JAMES, in her official
capacity as the Attorney General of the State of New
York,

                              Defendants.

1:19-cv-01409 (TJM/DJS)

**COMBINED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

INTRODUCTION ...............................................................................................1

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS..................................3

LEGAL STANDARD...........................................................................................3

ARGUMENT....................................................................................................4

I.      Plaintiffs have alleged Defendants targeted religion, which states a plausible free
        exercise claim. .......................................................................................4

        A.      The State targeted religious employers when it enacted SB 660. ....................6

        B.      The circumstances surrounding SB 660's passage point to religious targeting. ...........6

                1.      Sponsor statements and the official legislative justifications for SB 660
                        evince religious targeting............................................................6

                2.      SB 660's lack of any governmental interest, and the legislature's refusal
                        to exempt religious organizations from its ambit, cements religious
                        targeting. ..............................................................................10

II.     Plaintiffs have alleged facts that state a plausible expressive association claim. ......................11

        A.      Plaintiffs engage in expressive activity.................................................11

        B.      SB 660 significantly impairs Plaintiffs' pro-life advocacy. ...........................13

        C.      *Our Lady's Inn v. City of St. Louis* found an expressive association violation on
                almost identical facts. .................................................................14

III.    Plaintiffs have alleged facts that state a plausible religious autonomy claim. ..........................17

IV.     Plaintiffs have alleged facts that state a plausible free speech claim...........................................19

        A.      The Notice Provision unconstitutionally compels speech. .............................20

                1.      The Notice Provision is a content-based speech regulation............................20

                2.      Plaintiffs' employee handbooks are their speech, not mere conduits to
                        transmit the state's speech. ..........................................................21

                3.      Defendants' invitation to create a new category of unprotected speech
                        should be rejected. ...................................................................23

B.      SB 660 restricts Plaintiffs' speech..................................................................24

V.      Plaintiffs have alleged facts that state a plausible vagueness claim. ...........................27

VI.     SB 660 cannot survive strict scrutiny. ..............................................................30

A.      SB 660 does not serve a compelling interest. ................................................30

B.      SB 660 is not narrowly tailored.....................................................................31

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION ...................................................................33

LEGAL STANDARD.................................................................................................33

ARGUMENT.............................................................................................................34

I.      Plaintiffs are likely to succeed on the merits of their claims.........................................34

II.     Plaintiffs will suffer irreparable harm absent an injunction. ........................................34

III.    The balance of hardships tips in favor of Plaintiffs, and an injunction is in the public
        interest.......................................................................................................38

CONCLUSION...........................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

*American Civil Liberties Union v. Ashcroft*,
  322 F.3d 240 (3d Cir. 2003) ...................................................................................39

*American Civil Liberties Union v. Clapper*,
  804 F.3d 617 (2d Cir. 2015) ...................................................................................33

*American Freedom Defense Initiative v. Metropolitan Transportation Authority*,
  880 F. Supp. 2d 456 (S.D.N.Y. 2012) .....................................................................35

*Anderson News, L.L.C. v. American Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) .....................................................................................3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................3

*Bell Atlantic Corporation v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................................3

*Bery v. City of New York*,
  97 F.3d 689 (2d Cir. 1996) ......................................................................................35

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) .......................................................................................11-14, 16

*Brown v. Entertainment Merchant Association*,
  564 U.S. 786 (2011) ...........................................................................................27, 30

*Brush & Nib Studio v. City of Phoenix*,
  448 P.3d 890 (Ariz. 2019) .......................................................................................26

*Buck v. Gordon*,
  2019 WL 4686425 (W.D. Mich. Sept. 26, 2019) ......................................................8

*Burson v. Freeman*,
  504 U.S. 191 (1992) .................................................................................................30

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ................................................................................6, 7, 10, 11

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ..................................................................................................4

*Carey v. Population Services, International*,
  431 U.S. 678 (1977) ..................................................................................................2

*Chrysler Corporation v. Brown*,
  441 U.S. 281 (1979) ..................................................................................................9

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
        508 U.S. 520 (1993) ........................................................................... 4-6, 8, 10, 30

*Citigroup Global Markets, Inc., v. VCG Special Opportunities Master Fund Ltd.,*
        598 F.3d 30 (2d Cir. 2010) ........................................................................................33

*Citizens Union of City of New York v. Attorney General of New York,*
        269 F. Supp. 3d 124 (S.D.N.Y. 2017) ..........................................................................9

*City of Boerne v. Flores,*
        521 U.S. 507 (1997) .................................................................................................30

*City of Chicago v. Morales,*
        527 U.S. 41 (1999) ...................................................................................................29

*Claybrooks v. American Broadcasting Companies Inc.,*
        898 F. Supp. 2d 986 (M.D. Tenn. 2012) ...............................................................24-25

*CTIA-The Wireless Association v. City of Berkeley,*
        928 F.3d 832 (9th Cir. 2019) .....................................................................................24

*DiFolco v. MSNBC Cable L.L.C.,*
        622 F.3d 104 (2d Cir. 2010) .......................................................................................3

*Elrod v. Burns,*
        427 U.S. 347 (1976) .................................................................................................35

*Employment Division v. Smith,*
        494 U.S. 872 (1990) ...................................................................................................5

*Frisby v. Schultz,*
        487 U.S. 474(1988) ..................................................................................................31

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
        546 U.S. 418 (2006) .............................................................................................30-31

*GoTo.com, Inc. v. Walt Disney Co.,*
        202 F.3d 1199 (9th Cir. 2000) ...................................................................................36

*Grayned v. City of Rockford,*
        408 U.S. 104 (1972) .............................................................................................27-29

*Haitian Centers Council, Inc. v. McNary,*
        969 F.2d 1326 (2d Cir. 1992) .....................................................................................33

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.,*
        565 U.S. 171 (2012) .............................................................................................17-19

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
  515 U.S. 557 (1995) ............................................................................................ 12, 21, 22

*In re Electronic Books Antitrust Litigation,*
  859 F. Supp. 2d 671 (S.D.N.Y. 2012) ................................................................................ 3

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Division of the Supreme Court of New York,*
  852 F.3d 178 (2d Cir. 2017) ............................................................................................ 16

*Jolly v. Coughlin,*
  76 F.3d 468 (2d Cir. 1996) .............................................................................................. 35

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,*
  344 U.S. 94 (1952) .......................................................................................................... 19

*Lawrence v. Texas,*
  539 U.S. 558 (2003) .......................................................................................................... 2

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
  138 S.Ct. 1719 (2018) ............................................................................................ 6, 8, 30

*McDermott v. Ampersand Publishing, LLC,*
  593 F.3d 950 (9th Cir. 2010) .......................................................................................... 24

*Miami Herald Publishing Company v. Tornillo,*
  418 U.S. 241 (1974) ........................................................................................................ 21

*Morel v. Giuliani,*
  927 F. Supp. 622 (S.D.N.Y. 1995) ................................................................................. 28

*Murphy v. Empire of America, FSA,*
  746 F.2d 931 (2d Cir. 1984) ............................................................................................. 9

*National Electrical Manufacturers Association v. Sorrell,*
  272 F.3d 104 (2d Cir. 2001) ........................................................................................... 24

*National Institute of Family & Life Advocates v. Becerra,*
  138 S. Ct. 2361 (2018) ...................................................................................... 20, 23, 24, 31

*New York Progress & Protection PAC v. Walsh,*
  733 F.3d 483 (2d Cir. 2013) ...................................................................................... 33, 39

*Nielsen v. Pioneer Bank,*
  2016 WL 4768798 (N.D.N.Y. Sept. 13, 2016) ................................................................. 3

*Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services,*
  769 F.3d 105 (2d Cir. 2014) ........................................................................................... 33

*Our Lady's Inn v. City of St. Louis,*
    349 F. Supp. 3d 805 (E.D. Mo. 2018) .......................................................14, 15, 16, 27

*Pacific Gas & Electric Company v. Public Utilities Commission of California,*
    475 U.S. 1 (1986) ................................................................................................ 21, 22

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ................................................................................................21

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015).......................................................................................... 25, 31

*Restaurant Law Center v. City of New York,*
    360 F. Supp. 3d 192 (S.D.N.Y. 2019)................................................................... 22, 24

*Riley v. National Federation of the Blind of North Carolina,*
    487 U.S. 781 (1988).......................................................................................20, 23, 32

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ............................................................................................ 11, 16

*Roe v. Wade,*
    410 U.S. 113 (1973) .................................................................................................2

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ................................................................................................25

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
    547 U.S. 47 (2006) .................................................................................13, 22, 25, 26

*Smith v. Fredrico,*
    2013 WL 122954 (E.D.N.Y. Jan. 8, 2013) ...............................................................35

*Statharos v. New York City Taxi & Limousine Commission,*
    198 F.3d 317 (2d Cir. 1999) ....................................................................................35

*Tabbaa v. Chertoff,*
    509 F.3d 89 (2d Cir. 2007) .....................................................................................14

*Telescope Media Group v. Lucero,*
    936 F.3d 740 (8th Cir. 2019)...........................................................................22, 26, 27

*Turley v. Giuliani,*
    86 F. Supp. 2d 291(S.D.N.Y. 2000) ........................................................................35

*Turner Broadcasting System Inc. v. F.C.C.,*
    512 U.S. 622 (1994)................................................................................................30

*Union Free School District No. 6 of Towns of Islip & Smithtown v. New York State Human Rights Appeal Board*,
  35 N.Y.2d 371 (1974) ........................................................................................................... 32

*United States v. O'Brien*,
  391 U.S. 367 (1968) ............................................................................................................... 9

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000) ............................................................................................................. 30

*Virginia v. American Booksellers Association, Inc.*,
  484 U.S. 383 (1988) ............................................................................................................. 39

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ....................................................................................................... 21-23

## *Rules and Regulations:*

N.Y. Labor Law § 2 ............................................................................................................... 28

N.Y. Labor Law § 203-e .................................................................................................... 2, 25

*Religious Exemptions and Accommodations for Coverage of Certain Preventative Services
  Under the Affordable Care Act*,
  83 Fed. Reg. 57,536 (November 15, 2018) ....................................................................... 7

## *Other:*

Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*,
  101 CORNELL L. REV. 981 (2016) ................................................................................... 26

**INTRODUCTION**

SB 660, affectionately known as the "Boss Bill,"[1] is nothing if not aptly named. The legislature, alarmed by the attempt by religious employers throughout the country to protect themselves from having to pay for abortifacient drugs under the ACA's contraceptive mandate, passed this coercive and unnecessary measure to advance a political agenda. SB 660 solves no actual problem—not one instance of employment discrimination on the basis of "reproductive health decision making" makes an appearance in the record. What SB 660 does do, however, is single out New York's religious employers for disfavored treatment. It tells them, in no uncertain terms, that their time is up, and that the State will now decide how they run their organizations.

Given the unabashed religious targeting which precipitated its passage, the constitutional problems with SB 660 are obvious. Plaintiffs have plausibly alleged that SB 660 violates their First Amendment rights to the free exercise of religion, expressive association, religious autonomy, and free speech, and their Fourteenth Amendment right to due process. They have also established that they are entitled to a preliminary injunction, because they are likely to succeed on the merits of these claims and will be irreparably harmed absent one. In response, Defendants filed a motion to dismiss in which they improperly quarrel with Plaintiffs' factual allegations and tempt this Court to draw factual inferences in their favor. Defendants' opposition to Plaintiffs' Motion for Preliminary Injunction proves equally ineffectual—they have proffered no evidence of their own to counter Plaintiffs' entitlement to relief, and they simply deny that their patent violations of Plaintiffs' First Amendment rights constitutes harm, an argument foreclosed by controlling law.

Perhaps sensing SB 660's inherent vulnerability, Defendants resort to one final gambit by repeatedly suggesting this Court must police a conflict between "the fundamental right[ ] [to privacy]

---

[1] Dkt. 1-3 at 132, 134; Dkt. 1-2 at 434.

of New York citizens" and the "religious beliefs of the plaintiff employers." Defendants' Motion to Dismiss (Defs.' MTD) 4.[2] But no such conflict exists. Defendants' paean to that "right to privacy" notwithstanding, it is not threatened in this case, either generally or by Plaintiffs.[3] The record is bereft of any evidence that New York citizens cannot access their right to obtain abortions, use contraceptives, or to keep private their medical records and related information, or that they were in any way so restricted leading up to SB 660's passage.[4] The employees that the State claims to be protecting through the passage of SB 660 continue to enjoy their right to privacy in full, and no one seeks to undo it.[5] Defendants' protestations aside, the question presented to this Court is whether the State can compel persons of faith to abandon their rights under the First Amendment, or put another way, whether the State's view on abortion and contraception as "sacrosanct" means that even religious, pro-life non-profits must be made over in its image and forced to pledge fealty to its orthodoxy on such matters. Defs.' MTD 1. For the reasons already presented in Plaintiffs' Verified Complaint and their Memorandum in Support of Motion for Preliminary Injunction (MPI Memo), and for those reasons discussed in Plaintiffs' Combined Opposition and Reply below, the answer is a resounding "No."

---

[2] *See also* Defs.' MTD 9, 11, 21, 26-28, 35.

[3] *See* Defs.' MTD 4-5.

[4] Plaintiffs do not even challenge the portion of SB 660 which restricts the ability of an employer to access an "employee's personal information regarding the employee's or the employee's dependent's reproductive health decision making." N.Y. Labor Law § 203(e)(1). Defendants repeated references to that provision are immaterial to resolving the pending motions.

[5] Defendants cite a multitude of cases to support the existence of a right to privacy, Defs.' MTD 4-5, but they ignore the fact that those precedents emanated from contexts involving state efforts to ban or restrict abortion, contraception, and certain sexual activity. *See, e.g., Roe v. Wade*, 410 U.S. 113 (1973); *Carey v. Population Services, Int'l*, 431 U.S. 678 (1977); *Lawrence v. Texas*, 539 U.S. 558 (2003).

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**LEGAL STANDARD**

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Nielsen v. Pioneer Bank*, 2016 WL 4768798, at *5 (N.D.N.Y. Sept. 13, 2016). "[A] district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Defendants' motion to dismiss is plagued by a near-total misapplication of these standards. Indeed, for each claim plausibly alleged by Plaintiffs, Defendants contest the factual validity of Plaintiffs' allegations, proffer alternative explanations, press this Court to draw inferences in their favor, and then make substantive legal arguments against *Defendants'* version of Plaintiffs' factual allegations.[6] This is improper. *See Anderson News*, 680 F.3d at 185 (a complaint cannot be dismissed "merely because the court finds a different version more plausible"); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 686 (S.D.N.Y. 2012) (emphasis in original) (denying motion to dismiss where "defendants improperly dr[e]w inferences against the plaintiffs from those facts that *are* in the Complaint"). Contrary to Defendants' motion, Plaintiffs' complaint states plausible claims

---

[6] Indeed, Defendants have essentially conflated their motion to dismiss and opposition to Plaintiffs' Motion for Preliminary Injunction. *See* Defs.' MTD 32 (stating that Defendants incorporate their motion to dismiss arguments into their opposition for purposes of opposing Plaintiffs' arguments that they are likely to succeed on the merits of their claims). For the sake of clarity in this combined opposition/reply, Plaintiffs respond to Defendants' motion to dismiss arguments in Plaintiffs' opposition, and to Defendants' opposition arguments in Plaintiffs' Reply in Support of Motion for Preliminary Injunction.

throughout, and establishes that Defendants deprived them of their First and Fourteenth Amendment rights. Defendants' motion to dismiss must therefore be denied.

## ARGUMENT

### I. Plaintiffs have alleged Defendants targeted religion, which states a plausible free exercise claim.

The Free Exercise Clause of the First Amendment, applied to the states via the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), precludes laws that prohibit the free exercise of religion, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533. The "effect of a law in its real operation is strong evidence of its object," and "there are many ways of demonstrating that the object or purpose of a law is the suppression of . . . religious conduct." *Id.* at 533, 535. Even "subtle departures from neutrality" and "covert suppression of particular religious beliefs" are prohibited. *Id.* at 534 (cleaned up). A law that is "underinclusive" to the government's asserted interest is not generally applicable. *Id.* at 543. Finally, "a law targeting religious beliefs as such is never permissible." *Id.* at 533.

The complaint more than sufficiently establishes a free exercise claim. It alleges that Plaintiffs are Christian organizations who believe that all human life is made in the image of God and therefore sacred. *See* Dkt. No. 1 ¶¶ 40, 42, 44, 64-66, 98, 100-101, 103, 118, 121, 123, 301. It alleges that they oppose abortion, abortifacient drugs, and other drugs, devices, and practices inconsistent with a biblical ethic. *Id.* at ¶¶ 67-69, 72-74, 80, 97, 99-101, 103, 121-123. It alleges that they exist to promote life and oppose abortion in both word and deed, and to accomplish that mission they hire and associate with only those who share their worldview. *Id.* at ¶¶ 6, 22, 81-83, 85, 87-90, 93, 106, 130-132, 140. It alleges that in passing SB 660 the legislature targeted Plaintiffs and other religious employers in order to suppress their ability to run their ministries in accord with their religious beliefs, *id.* at ¶¶ 10-16, 18, 156-175, 190, 303, 311-12, 316, and that it chose not to provide a religious exemption even though it

knew SB 660 would infringe on religious employers. *Id.* at ¶¶ 14, 167-75. The complaint establishes that although the legislature sold SB 660 as imperative, it failed to make its strictures applicable in all its aspects to all employers in the state. *Id.* at ¶¶ 147-48, 313. The complaint further alleges that Plaintiffs cannot comply with SB 660 because that would constitute a betrayal of their religious beliefs and missions. *Id.* at ¶¶ 197-98, 207, 212, 220. But because SB 660 may be enforced against them at any time by either the State or private individuals deputized to bring suit, they are presently imperiled. *Id.* at ¶¶ 176-188, 200-206; Defs.' MTD 17 (admitting that private litigants deputized by SB 660 to bring suit may bring suits in violation of the Constitution, and failing to disavow state enforcement outside the confines of what state officials deem to be protected space occupied by the ministerial exception). Plaintiffs' allegations show religious targeting and establish that SB 660 is neither neutral nor generally applicable, so at the very least it must face strict scrutiny, if not outright invalidation. Dkt. 1 ¶¶ 299-325. These allegations must be taken as true at this stage of the proceedings, and all reasonable inferences drawn in Plaintiffs' favor. Defendants' attempt to quarrel with or recast them therefore do nothing to defeat the vitality of Plaintiffs' free exercise claim.

Despite this axiomatic standard, however, Defendants invoke *Employment Division v. Smith*, 494 U.S. 872 (1990), and claim that SB 660 is neutral and generally applicable and therefore constitutional. Defs.' MTD 8. First, Plaintiffs have made extensive factual allegations to support a reasonable inference that SB 660 targets religion and is therefore neither neutral nor generally applicable—that is more than sufficient to sustain their free exercise claim. Second, Defendants misstate the law. They contend that SB 660's "plain text" means it is neutral, and its coverage of "**all** reproductive health decisions made by employees" means it is generally applicable. Defs.' MTD 8-9 (emphasis in original). But SB 660's substantive application to all reproductive decisions is immaterial—its failure to impose its notice requirement on all employers means it is not generally applicable. *See Lukumi*, 508 U.S. at 543 (a law "underinclusive" to the government's asserted interest is not generally applicable).

5

Moreover, "[f]acial neutrality is not determinative," and is only the "minimum requirement of neutrality." *Lukumi*, 508 U.S. at 533-534. The complaint's allegations, taken as true here, reveal religious targeting and a lack of neutrality.

### A.  The State targeted religious employers when it enacted SB 660.

Defendants argue that Plaintiffs "have not pointed to any circumstances that call into question the statute's neutrality." Defs.' MTD 9. But the complaint contains myriad factual allegations showing that SB 660's interference with Plaintiffs' religious messages and missions was no mere accident. In fact, the complaint definitively alleges that SB 660 was the product of impermissible religious targeting. Dkt. 1 ¶¶ 10-16, 18, 156-175, 311-12. Indeed, in the wake of the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), which found that closely held businesses could exercise religion, the legislature passed SB 660 to prevent religious employers from operating in accord with their faith. Such targeting dooms SB 660 without the need for further inquiry. *See Lukumi*, 508 U.S. at 533 ("law targeting religious beliefs as such is never permissible"); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018) (religious hostility meant application of law was not neutral, and this required per se invalidation of law). At the very least these allegations establish that SB 660 is not neutral, and therefore must face strict scrutiny, *Lukumi*, 508 U.S. at 546, which it cannot survive. *See infra* at 30-32.

### B.  The circumstances surrounding SB 660's passage point to religious targeting.

#### 1.  Sponsor statements and the official legislative justifications for SB 660 evince religious targeting.

Defendants concede that in assessing whether a law is neutral, courts consider "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." Defs.' MTD 8 (quoting *Lukumi*, 508 U.S.

at 540). But despite this concession, they ignore or simply deny factual allegations in the complaint which show that these factors establish a claim for religious targeting.

For instance, the complaint alleges that main sponsor Senator Jennifer Metzger openly criticized the Supreme Court's decision in *Hobby Lobby* and bemoaned the Court's holding that certain religious employers had the right to operate according to their faith. *See* Dkt. 1 ¶ 12. It further alleges that Metzger characterized this recognition as creating a "dangerous, slippery slope" and announced that the purpose of SB 660 was to prevent "further encroachment[s]" like *Hobby Lobby* and the exercise of religion by religious employers from interfering with what the State termed the "right to privacy and autonomy." *Id.* at ¶¶ 12-13, 159, 165-66. In other words, the complaint establishes that the legislature targeted religious employers in passing SB 660.

Defendants argue that Metzger's testimony merely restated the State's interest in "protect[ing] individual rights of privacy and autonomy." Defs.' MTD 11. But that attempted recasting of the facts is improper on a motion to dismiss, and untrue to boot. None of the challenges to the ACA's contraceptive mandate threatened the right to privacy or autonomy, sought confidential medical records (not challenged by Plaintiffs anyway), or involved an employer's attempt to hire or fire based on an employee's decision to have an abortion or use contraceptives, so they could not have *properly* informed the legislature in passing SB 660. *See* Dkt. 1 ¶¶ 12, 161-66. As the complaint shows, religious employers simply sought relief from the ACA's contraceptive mandate, which would otherwise have required them to provide abortifacient drugs to their employees. *Id.* at ¶ 164; *Hobby Lobby*, 573 U.S. at 696-705; *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act* 83 Fed. Reg. 57,536, 57,539-40, (November 15, 2018). Defendants' alternative explanation of Plaintiffs' allegations is neither permitted nor availing.[7]

---

[7] That *Hobby Lobby* implicated the federal Religious Freedom Restoration Act and not a state statute is not material to this Court's review of Defendants' motion to dismiss Plaintiffs' free exercise claim.

Doing an about-face, Defendants next seek to ignore these alleged facts and discount the import of Metzger's comments by claiming she is just an outlier. *See* Defs.' MTD 10-12 (Metzger is only "one Legislator"). Again, the complaint alleges that Metzger's comments show religious targeting, and it controls despite Defendants repeated attempt to argue those allegations away. In any event, however, Defendants are wrong on the law here, too. *Lukumi* looked at "contemporaneous statements made by members of the decisionmaking body," 508 U.S. at 540, and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018), recently confirmed that this factor is directly "relevant to the assessment of governmental neutrality." *Id.* at 1732. *Masterpiece* also confirmed that the comments of one official, especially when consistent with "the view[s] [of others] that religious beliefs cannot legitimately be carried into the public sphere or commercial domain," were sufficient to conclude the attempted application of the state's anti-discrimination ordinance to the plaintiff was not neutral, and was in fact the product of "hostility to a religion or religious viewpoint." *Id.* at 1721[8]; *see also Buck v. Gordon*, 2019 WL 4686425 (W.D. Mich. Sept. 26, 2019) (finding religious targeting was the basis of state action where eventual attorney general made comments critical of legislation designed to protect rights of religious adoption agencies to operate according to their faith principles). Metzger's testimony is not that of a rogue legislator at the periphery, but that of a sponsor detailing the genesis and purpose of SB 660. And much like *Masterpiece*, where no one objected to the commissioner's comments, here the Senate voted overwhelmingly—56-6—to pass SB 660 right after Metzger spoke. Dkt. 1-2 at 434. The complaint also shows that main Assembly sponsor Ellen Jaffee echoed Metzger's comments, in claiming that SB 660 was necessary to prevent employers from using "their personal [read religious] beliefs to discriminate against their employees," even though she could not cite one

---

*See* Defs.' MTD 11-12, n.7. The legislature repeatedly cited *Hobby Lobby* and the ACA lawsuits to justify coercing religious employers to operate in conflict with their beliefs and missions, so it is directly relevant to Plaintiffs' targeting claim.

[8] Those comments led to a per se invalidation of the ordinance. *Masterpiece*, 138 S. Ct. at 1732.

instance of any such discrimination. Dkt. 1-3 at 132. The complaint's allegations regarding Metzger's testimony and the legislature's acquiescence in it show religious targeting.[9]

Finally, Defendants attempt to pivot to the official legislative justifications to salvage SB 660, but that fares no better than their attempt to reformulate or explain away the facts regarding Metzger's comments. Defs.' MTD 13. As the complaint shows, there is no daylight between those rationales and Metzger's comments—they are one and the same. The complaint alleges that both invoked religious employers' challenges to the ACA's contraceptive mandate, both viewed that development as ominous, and both determined to put an end to the exercise of religion by religious employers. Dkt. 1 ¶¶ 11-13, 147-49, 156. Metzger talked about eradicating such "encroachment[s]." Dkt. 1 ¶ 165; Dkt. 1-2 at 434. And the legislature in its official legislative memoranda similarly sought to stop religious employers from fighting for their free exercise rights, because it collectively and officially viewed their religious beliefs regarding abortion and contraception to be mere "discriminat[ion] and interfere[nce]" with "reproductive health care decisions." Dkt. 1 ¶ 156; Dkt. 1-4 (N.Y.S. Assembly Memorandum) at 5; Dkt. 1-5 (N.Y.S. Senate S660 Sponsor Memo) at 7. The complaint alleges therefore that the legislature openly conceived of SB 660 as a way to close what it tellingly termed the "legal loopholes" represented by the meritorious lawsuits filed by religious employers against the ACA's contraceptive mandate. Dkt. 1 ¶ 148; Dkt. 1-4 at 5; Dkt. 1-5 at 7. Remarkably, Defendants do not even attempt to

---

[9] Defendants' citation to *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) does not change this conclusion. *Chrysler* did not deal with the question of how to ascertain religious animus, and it merely stated that the sponsor's comments must be viewed collectively with other comments and legislative reports. *Id.* Here Metzger's comments are on all fours with the legislative memoranda and both reveal religious animus prompted SB 660. For similar reasons, *Citizens Union of City of New York v. Attorney Gen. of New York*, 269 F. Supp. 3d 124, 147 (S.D.N.Y. 2017), *Murphy v. Empire of Am., FSA*, 746 F.2d 931, 935 (2d Cir. 1984), and *United States v. O'Brien*, 391 U.S. 367, 385, (1968), are unavailing. As to *Citizens Union*, Metzger's testimony mirrored the "motivation of the entire legislature," 269 F. Supp. 3d at 147. As to *Murphy*, Metzger's testimony is neither "isolated," "unclear," or "conflicting"—it was in fact the floor speech version of the legislative memoranda adopted by the entire legislature. 746 F.2d at 935. And as to *O'Brien*, it is not "well[ ] settled" that New York can enact laws animated by religious animus, so Metzger's testimony is not insulated from review. 391 U.S. at 385.

deny this or argue it away, but rather double down on the legislature's religious animus in their brief, citing to this same justification as a compelling interest warranting dismissal of Plaintiffs' claim. Defs.' MTD 13. This official justification for SB 660, and Defendants' continued reliance on it even for litigation purposes, constitutes the very type of "animosity to religion or distrust of its practices" that states a claim under the Free Exercise Clause. *Lukumi*, 508 U.S. at 547.

### 2. SB 660's lack of any governmental interest, and the legislature's refusal to exempt religious organizations from its ambit, cements religious targeting.

The complaint alleges that the legislative record reveals not one instance of employment discrimination based on the "reproductive health decision making" of any New York employee. Dkt. 1 at ¶ 8. Defendants confirm this failure in their brief—but curiously, and again, improperly—seek to turn it to advantage, arguing that "when over 100 lawsuits have been filed in this country by employers seeking to infringe on employee's fundamental constitutional rights to privacy and autonomy, New York is not required to wait for an actual violation of the rights of its citizens to protect them." Defs.' MTD 10. As already established, however, neither those cases, nor this one, have anything to do with the right to privacy and autonomy, and the legislature's repeated contortion of *Hobby Lobby* into a case about their denial reveals that the only plausible justification for SB 660 is religious targeting.[10] This conclusion is bolstered by allegations in the complaint that the legislature refused to exempt any religious employers, even churches, despite knowledge on its part that SB 660 would trench upon the rights of those employers. Dkt. 1 ¶¶ 14-15, 167-175. The complaint shows that the legislature knew how to craft exemptions and did so in its Human Rights Law, but it deliberately refused to do so for SB 660, instead secreting it away in the Labor Law. *Id.* at ¶ 170. The State's considered decision in this

---

[10] Notably, Defendants cite to none of these ostensibly alarming cases. That is no surprise, however, because even a cursory review would reveal they have nothing to do with the supposed evil Defendants claim SB 660 remedies.

vein should dispel any doubt that it meant to burden religious employers when it passed SB 660. *Id.* at ¶¶ 10-16, 156-75. In fact this burden was its main feature, not a mere bug, as Defendants would have it. Defs.' MTD 8 (arguing that SB 660's impact on religious employers is "merely incidental").

In sum, Defendants would have this Court ignore complaint allegations showing the hostile comments of Senator Metzger and Assemblywoman Jaffee, the formal adoption of religious hostility by the entire Legislature, and the lack of any justification for SB 660 apart from patent legislative displeasure with the *Hobby Lobby* decision. They also appear to want this Court to entertain the merits of their substantive arguments in light of their improper modifications of Plaintiffs' actual complaint. Plaintiffs' factual allegations, however, plausibly establish a claim for religious targeting and demand that Defendants' motion to dismiss their free exercise claim be denied.

## II.   <u>Plaintiffs have alleged facts that state a plausible expressive association claim.</u>

The First Amendment protects the right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "Forcing a group to accept certain members [that] impair the ability of the group to express [their] views, and only those views, . . . infringes the group's freedom of expressive association." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Only where a government shows that a law is narrowly tailored to serve a compelling interest, unrelated to the suppression of ideas, may it abridge this freedom. *Id.* Because Plaintiffs have plausibly alleged they "engage[ ] in expressive activity," that SB 660 "significantly affect[s] [their] ability to advocate public or private viewpoints," and that SB 660 cannot survive strict scrutiny, their expressive association claim cannot be dismissed. *Dale*, 530 U.S. at 648, 650, 657-58.

### A.   **Plaintiffs engage in expressive activity.**

The complaint alleges that Plaintiffs join together to "transmit … a system of values," *Dale*, 530 U.S. at 650, namely the communication of their religiously-informed pro-life worldview. *See* Dkt.

No. 1 ¶¶ 20-22, 70-76, 78, 80, 82, 93, 96, 99-101, 108, 112, 118, 121-28, 135, 241, 244-47. Despite these allegations and their patent sufficiency in establishing Plaintiffs as expressive associations, Defendants astonishingly deny the obvious, ignoring myriad allegations showing that Plaintiffs' entire *raison d'etre* is to ensure a pro-life, biblical worldview is lived and *communicated* to the broader world. *See* Defs.' MTD 24 (contending that CompassCare is not an expressive association because it runs a pregnancy clinic, NIFLA is not because it is a membership organization, and First Bible is not because it supports a school and a sports complex).[11] While these allegations are sufficient to show Plaintiffs are expressive associations, Defendants are also wrong on the law. *Dale* teaches that if a group "engage[s] in *some form* of expression, whether it be public or private," it is protected by the right to expressive association. 530 U.S. at 648 (emphasis added). In light of the ubiquity and clarity of Plaintiffs' allegations, Defendants' assertion that Plaintiffs "do not constitute groups comprised of members who come together to convey a message," Defs.' MTD 24, is not only improper but also risible in the extreme. Defendants' assertion therefore must be rejected.[12]

Doubling-down on their quixotic attempt, Defendants next argue that Plaintiffs cannot assert an expressive association claim because they engage in only a "kernel of expression." *Id.* This argument is foreclosed by Plaintiffs' allegations. The complaint alleges that Plaintiffs exist to spread the Gospel and to broadcast their beliefs that abortion is never necessary and hurts women and their unborn children. Dkt. 1 ¶¶ 76, 78, 80, 93, 96, 99-101, 103, 108, 114-115, 123-128. Plaintiffs perform acts of charity and service on a daily basis, and everything they say and do as part of that process advances their pro-life messages and missions. Plaintiffs are thus inherently communicative ministries, not

---

[11] By Defendants' logic neither the Boy Scouts in *Dale* nor the parade organizers in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995), would qualify as expressive associations.

[12] It also represents an improper attempt, as is typical of many arguments in Defendants' motion to dismiss, to quarrel with Plaintiffs' factual allegations and to have this Court draw factual inferences in Defendants' favor, the precise opposite of what axiomatic, blackletter law requires at this stage.

employers who accidentally communicate every so often, as Defendants argue. Indeed, taking cognitive dissonance to new heights, Defendants deny that Plaintiffs "convey a particularized message," Defs.' MTD 24, at the same time they admit that Plaintiffs allege that CompassCare "maintains websites and a blog . . . and broadcasts its pro-life message through radio segments and television spots." Defs.' MTD 3 n.1 (quoting Dkt. 1 ¶ 96). Plaintiffs' allegations thoroughly defeat Defendants' "kernel of expression" argument.[13]

### B.  SB 660 significantly impairs Plaintiffs' pro-life advocacy.

The complaint alleges that SB 660 will significantly impair Plaintiffs' ability to associate with others to advance their pro-life viewpoints. Dkt. 1 ¶¶ 23-27, 189, 193-94, 197-98, 225, 242-43. Despite the fact that these allegations establish impairment, Defendants summarily conclude that SB 660's infringement on Plaintiffs is "merely incidental" and therefore insufficient to support Plaintiffs' claim. Defs.' MTD 25. Defendants do not get to recharacterize Plaintiffs' complaint like this on a motion to dismiss, as Plaintiffs' well-pled allegations must be taken as true and therefore control here. In any event, this argument fails just like Defendants' "kernel of expression" argument does.

The complaint alleges that SB 660, by design, forces Plaintiffs to associate with and employ those who are diametrically opposed to their pro-life beliefs and missions. Dkt. 1 ¶¶ 3, 158, 189, 234-261. This "forced inclusion," *Dale*, 530 U.S. at 648, necessarily dilutes Plaintiffs' beliefs and compromises their missions. Dkt. 1 ¶¶ 3-6, 197-98, 252. Where Plaintiffs would speak with one pro-life voice and collectively act in accord with those beliefs, SB 660 requires them to speak with forked tongue and act as if beliefs and conduct could be divorced from one another without consequence.[14]

---

[13] Plaintiffs would merit First Amendment protection even if they did not "associate for the purpose of disseminating" their pro-life message. *Dale*, 530 U.S. at 655 (internal quotation marks and citation omitted). All that is required is that they "join together and speak." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006). That Plaintiffs do.

[14] Of course, SB 660 requires Plaintiffs to hire dissenters not only in conduct but in advocacy and message as well.

*Id.* Defendants assert that Plaintiffs remain free because they can still hire those "who agree with their sincerely held beliefs," but in the next breath they confirm that SB 660 requires them to hire and retain those who insist on obtaining abortions and taking abortifacient medications in direct contravention of those beliefs.[15] Defs.' MTD 25. The distinction drawn by Defendants is not only improper on a motion to dismiss, but flatly refuted by Plaintiffs' complaint, which alleges that employees who refuse to abide by Plaintiffs' beliefs and in fact directly oppose them by definition do not share their beliefs. Dkt. 1 ¶¶ 81-85, 87-93, 104, 106, 130-32, 140, 289, 308. In sum, Plaintiffs' complaint establishes that SB 660 represents a "direct," "substantial," and "significant" interference with Plaintiffs' associational rights. *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007). Plaintiffs have pled as much, *see* Dkt. 1 ¶¶ 249-254, and their allegations as to "what would impair [their] expression," "must [be] give[n] deference." *Dale*, 530 U.S. at 653.

### C. *Our Lady's Inn v. City of St. Louis* found an expressive association violation on almost identical facts.

In seeking to have Plaintiffs' expressive association claim dismissed, Defendants mischaracterize the import of *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 819 (E.D. Mo. 2018), which Plaintiffs cited in support of this claim in their Memorandum in Support of Motion for Preliminary Injunction. Dkt. 17-1 at 11. This is yet another failed attempt by Defendants to capitalize on their recasting of Plaintiffs' allegations in a light favorable to the State.

Indeed, once Plaintiffs' allegations are accepted as true, the district court's rationale in *Our Lady's Inn* directly undermines Defendants' attempt to escape liability for their expressive association violation. *Our Lady's Inn* presented nearly identical facts to those here. The offending statute prohibited employers from taking "any adverse employment action against an employee based on a reproductive

---

[15] Defendants' assertion that SB 660 does not extend to beliefs or abortion advocacy is hardly self-evident, given that the legislature did not define what "reproductive health decision making" means. *See infra* at 27-29 (establishing that Plaintiffs have pled a plausible vagueness claim).

health decision by an employee or employee's dependent." *Id.* at 810. Plaintiff Our Lady's Inn was a nonprofit "provid[ing] housing for pregnant, low-income women seeking an alternative to abortion" which "actively engage[d] in expressive activities aimed at raising awareness of its pro-life mission" and required employment "applicant[s] to support the pro-life mission of the organization." *Id.* at 812. Plaintiffs Archdiocesan Elementary Schools of St. Louis was a group of Catholic elementary schools which "instilled Catholic, pro-life values in young people" and required its employees to sign a "Witness Statement" pledging compliance with "the Catholic Church's longstanding and widely known opposition to abortion." *Id.* at 813, 821.

On these facts the Court had no trouble concluding that both Our Lady's Inn and the Archdiocesan Schools were expressive associations. *Id.* at 821 ("Our Lady's Inn squarely fits the description of an expressive association . . . the Archdiocesan Elementary Schools engage in the instruction of the young, which is an expressive activity"). It also had no trouble concluding that the ordinance would significantly impair plaintiffs' expressive association. *Id.* at 821-22 ("the forced inclusion of individuals who do not share Our Lady's Inn's commitment against abortion would significantly affect [its] ability . . . to advocate for its services and encourage women to forgo abortion"; "Our Lady's Inn['s] ability to organize its staff and circulate expressive materials with their views on controversial reproductive rights issues would be hindered if they were required to employ dissenters from their pro-life message"; the Archdiocesan Schools "impose upon their teachers a code of religious moral conduct and expect them to follow, in their personal life and behavior, the recognized moral precepts of the Catholic Church," so "the forced inclusion of teachers or other staff who do not adhere to those values would significantly affect the Archdiocesan Elementary Schools' ability to advocate their viewpoints, through its teachers and staff, to their students"). And finally, it had no trouble concluding that the City lacked a compelling interest because it only proffered "in general terms" "concern[s] about discrimination on the basis of reproductive health decisions." *Id.* at 822. The

court therefore found that the ordinance violated the First Amendment right to expressive association and enjoined it.

Defendants attempt to distinguish *Our Lady's Inn* by claiming that SB 660 does not require Plaintiffs to employ dissenters from their messages and missions like the St. Louis ordinance did. But they are mistaken—the complaint clearly alleges that SB 660 forces Plaintiffs to hire and retain those who insist on having abortions and using abortifacient drugs, even though Plaintiffs exist to prevent that behavior and to communicate alternatives to it. Dkt. 1 ¶¶ 3, 6, 77, 80, 99, 103, 112, 118, 123-28, 158. And the complaint further makes it clear that under these circumstances there is no way such dissenting employees can "espouse [Plaintiffs'] message," as Defendants suggest. Defs.' MTD 27; Dkt. 1 ¶¶ 6, 197-99, 205, 252. Defendants also claim that while the St. Louis ordinance lacked a compelling interest, SB 660 has one because it was conceived in response to over 100 cases filed by religious employers seeking to protect themselves from having to pay for others' abortifacient drugs under the ACA. Defs.' MTD at 27-28. But as already established by the complaint's allegations, that justification reveals religious targeting, not a compelling interest. *See supra* at 4-11. Even more importantly, at this stage on a motion to dismiss, this Court need only assess whether a claim has been stated, not whether Defendants can ultimately satisfy the applicable test.

In sum, Plaintiffs have pled factual allegations comfortably stating an expressive association claim under the principles enunciated in *Dale.* SB 660 must therefore face strict scrutiny. *Roberts*, 468 U.S. at 623. Plaintiffs have pled allegations showing it cannot survive that rigorous examination. *See infra* at 30-32.[16]

---

[16] Defendants cite to *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Div. of the Supreme Court of New York*, 852 F.3d 178, 191 (2d Cir. 2017), to support the proposition that rational basis review applies because SB 660's burden on Plaintiffs is not "severe." First, to the extent *Jacoby* conflicts with *Dale*, *Dale* controls. Second, just as in *Dale*, where the Supreme Court found the forced inclusion of a gay scoutmaster would "significantly affect[ ]" the Boy Scouts' "ability to disseminate its message," 530 U.S. at 654, Plaintiffs have plausibly alleged that the forced

**III.**     <u>**Plaintiffs have alleged facts that state a plausible religious autonomy claim.**</u>

In *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, the Supreme Court unanimously held that the Religion Clauses bar the government from applying even a neutral and generally applicable nondiscrimination law (SB 660 is neither) to a religious organization when doing so would interfere with the organization's selection of its teachers and ability to operate consistently with its faith convictions. 565 U.S. 171 (2012). The complaint alleges that Plaintiffs are pro-life religious organizations dedicated to protecting unborn life and making abortion unnecessary. Dkt. 1 ¶¶ 64-71, 75, 80, 98-101, 103, 114, 118, 121, 124-28. Spreading the Gospel message of life and hope is part of their religious missions. Dkt. 1 ¶¶ 76, 114-115, 117. It alleges that to effectively spread their messages and accomplish their missions, Plaintiffs hire only those who believe and comply with their religious, pro-life worldview. Dkt. 1 ¶¶ 22, 81-93, 106, 131-32, 140, 289. Further, the complaint alleges that SB 660 actively interferes with Plaintiffs' internal religious affairs by requiring them to hire and retain employees who dissent from Plaintiffs' beliefs and missions. Dkt. 1 ¶¶ 3, 15, 18, 23, 26, 158, 173, 190, 290-93. Under the teaching of *Hosanna-Tabor*, these complaint allegations comfortably plead a claim that by telling them who they must employ, SB 660 impermissibly trenches upon Plaintiffs' right to order their internal affairs free from government interference.

In seeking to dismiss Plaintiffs' claim, Defendants concede the existence of a ministerial exception, as they must, but they curiously go on to argue that because "the applicability of the exemption is fact-specific, requiring the analysis of the mission of the employer, and the specific primary duties of the employee at issue in a particular set of circumstances," Plaintiffs' claim must be dismissed. Defs.' MTD 16. Quite the opposite is true. Any factual inferences must be drawn in Plaintiffs' favor on a motion to dismiss. And where as here the complaint alleges facts showing that Plaintiffs' employees are

---

employment of active dissenters would wreak havoc on Plaintiffs' communicative enterprises. If that is not severe nothing is.

responsible for passing on their religious, pro-life messages that all life comes from God and should be protected, their religious autonomy claim cannot be dismissed. Dkt. 1 ¶¶ 76, 85-90, 93, 96, 100-01, 103, 112, 118, 121, 122, 244. A motion to dismiss is not the place for Defendants to quarrel with complaint allegations establishing that Plaintiffs consider their employees ministers.[17] *Hosanna-Tabor*, 565 U.S. at 196 (J. Thomas, concurring) (expressing the view that "the Religion Clauses require civil courts to apply the ministerial exception and to defer to a religious organization's good-faith understanding of who qualifies as its minister"). To the extent that Defendants contest Plaintiffs' allegations or contend that Plaintiffs' ministries do not warrant the protection granted the educational ministry in *Hosanna-Tabor*, those represent factual disputes not appropriate for resolution here.

Additionally, and notwithstanding the fact that Plaintiffs' factual allegations establish a religious autonomy claim, Defendants' legal arguments miss the mark. They proffer a crabbed interpretation of the ministerial exception that should be rejected. They essentially admit that SB 660 cannot be applied to "the pastor of First Bible, or the principal of Northstar Christian Academy," Defs.' MTD 16, but they argue that otherwise it raises no autonomy problem. In fact, they argue that the ministerial exception does not apply to a religious pro-life organization managing its employment affairs, even when the organization exists to spread a pro-life message, and hiring those who insist on having abortions would defeat that message and mission. *See* Defs.' MTD 16 (arguing that "the exemption . . . would likely not protect a medical provider at CompassCare"). To state this argument is to refute it. Indeed, "religious organizations" enjoy an "independence from secular control or manipulation" and have the "power to decide for themselves, free from state interference, matters of church

---

[17] Defendants further argue that because Plaintiffs' "complaint fails to identify any particular employee that [they] wish to take employment action against," the complaint must be dismissed. They are mistaken. Defs.' MTD 17. Plaintiffs have alleged facts showing that they consider their employees to be ministers "communicating the faith," and the spreading of their pro-life message is part of that faith. *Hosanna-Tabor*, 565 U.S. at 199 (J. Alito, concurring). Dkt. 1 ¶¶ 75-76, 80, 82-83, 85, 87-93, 98, 103, 106, 130-40.

government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952). This means that religious employers like Plaintiffs are free to "communicat[e] the faith" and "to choose the personnel who are essential to the performance of th[at] function[ ]." *Hosanna-Tabor*, 565 U.S. at 199 (J. Alito, concurring). That freedom includes not only the right to hire but also to fire. *See id.* (when "a religious group believes that the ability of [ ] an employee to perform [ ] key functions has been compromised, then the constitutional guarantee of religious freedom protects the group's right to remove the employee from his or her position").

In sum, the complaint alleges that Plaintiffs consider their employees to be ministers for purposes of spreading their pro-life messages and accomplishing their missions, and it further alleges that SB 660 actively interferes with Plaintiffs' religious autonomy by forcing them to hire and retain dissenters from their pro-life worldview. This more than amply states a religious autonomy claim, and neither Defendants' disagreement with Plaintiffs' allegations, nor their alternative interpretation of *Hosanna-Tabor*, warrants dismissal.

## IV. Plaintiffs have alleged facts that state a plausible free speech claim.

The complaint alleges that SB 660's "notice" provision compels Plaintiffs to convey speech that they would not otherwise convey. Dkt. 1 ¶¶ 27, 143, 195, 265, 267. Meanwhile, its "no waiver" provision restricts and chills speech by prohibiting Plaintiffs from asking their employees to signify compliance with their employee handbooks, statements of faith, and codes of conduct. *Id.* at ¶¶ 26, 142. The complaint further alleges that SB 660's no waiver provision also prohibits Plaintiffs from spreading their pro-life messages to their employees, prospective employees, and the public in general. *Id.* at ¶¶ 192-194, 264, 266. Finally, it alleges that because SB 660's notice provision compels speech, and because both its notice and no waiver provisions regulate speech based on its content and viewpoint, SB 660 must face strict scrutiny. *Id.* at ¶¶ 274-283. Plaintiffs have adequately pled a free speech claim.

Defendants, however, disagree. They argue that SB 660 does not compel speech but only requires Plaintiffs to transmit the State's speech, and even if it does compel speech it only compels the speaking of factual and objective information; that SB 660 regulates conduct, not speech; and that SB 660's requirements in no way affect Plaintiffs' speech anyway. Once again, however, Defendants' factual quarrels and legal arguments do not defeat Plaintiffs' well-pled complaint allegations.

### A.  The Notice Provision unconstitutionally compels speech.

The complaint alleges that Plaintiffs inculcate their religious values and describe their pro-life missions to their employees through their employee handbooks. Dkt. 1 ¶¶ 4, 84-86, 105-107. It also establishes that SB 660 requires them to tell their employees—in their own handbooks—that they are free to act contrary to those values and missions. *Id.* at ¶¶ 5, 26, 143, 195. Defendants admit that the notice provision "may not be something that the plaintiffs would voluntarily include" in their handbooks, but then remarkably assert that "it is not unconstitutionally-compelled speech." Defs.' MTD 21. Defendants' arguments in favor of SB 660's notice provision fail, because the First Amendment prohibits compelled speech like this.

### 1.  The Notice Provision is a content-based speech regulation.

Defendants argue that compelling employers to tell employees that they can obtain abortions without employment consequences is not a content-based regulation of speech, because the law "applies to all employers." Defs.' MTD 21. That is beside the point—"[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech" and is therefore "a content-based regulation of speech." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795 (1988). The Supreme Court recently applied this principle in condemning a law requiring a similar disclosure. In *Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2371 (2018) (internal quotations and citation omitted), the Court explained that requiring pro-life pregnancy centers "to inform women how they can obtain state-subsidized abortions—at the same time [the pregnancy

centers] try to dissuade women from choosing that option— . . . plainly 'alters the content'" of their speech. So too here—requiring Plaintiffs to tell their employees they may have abortions at the same time Plaintiffs exist to communicate the message to everyone that abortion is wrong, alters Plaintiffs' speech and violates their "autonomy to choose the content of [their] own message." *Hurley*, 515 U.S. at 573. Plaintiffs have stated a claim that SB 660 regulates speech based on its content and must face strict scrutiny, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

### 2. Plaintiffs' employee handbooks are their speech, not mere conduits to transmit the state's speech.

Defendants suggest that no free speech claim has been stated regarding the notice provision because transmitting the speech of another is not the same as speaking yourself. Supreme Court jurisprudence counsels otherwise under these circumstances. *See, e.g., Miami Herald Publ'g. Co. v. Tornillo*, 418 U.S. 241, 256 (1974) (government could not force newspaper publisher to "print that which it would not otherwise print"); *Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (holding that the state could not require objecting individuals to display the state motto on a state-issued vehicle license plate); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 15 (1986) (plurality opinion) (government could not compel utility to "assist in disseminating [another] speaker's message").

Defendants cite *Rest. Law Ctr. v. City of N.Y.*, 360 F. Supp. 3d 192 (S.D.N.Y. 2019), to support the proposition that free-speech protections do not apply here because SB 660 only requires the transmission of the state's speech. Defs.' MTD 21. But that decision, which is on appeal, is inapposite. It involved an association of restaurant owners who challenged a law requiring a payroll-deduction scheme allowing employees to donate a portion of their own wages to certain nonprofit organizations. *Id.* at 200. The court explicitly distinguished Supreme Court cases striking down requirements to disseminate the speech of others, explaining that the plaintiffs "are not required to distribute a message they oppose alongside their own messages." *Id.* at 213-14. That distinction falls apart here, where the complaint clearly alleges that SB 660 mandates that Plaintiffs express the State's objectionable message

in the Plaintiffs' own employee handbooks. Dkt. 1 ¶¶ 5, 27, 143, 195, 267. *Rest. Law* does not justify SB 660 but rather indicts it, because it requires Plaintiffs to speak in ways that cut against its own message, which is a far cry from requiring it to merely "perform the 'ministerial act' of administering payroll deductions." *Id.* at 214.

Defendants acknowledge that a First Amendment violation obtains when "the complaining speaker's own message [is] affected by the speech it was forced to accommodate." Defs.' MTD 21 (quoting *Rumsfeld*, 547 U.S. at 63) (cleaned up). Yet SB 660 is guilty of such forced accommodation. The complaint plainly alleges that Plaintiffs wish to impress their pro-life worldview on their employees and need it to be lived out by those employees, but the State requires them to tell those employees that it is okay to act contrary to that worldview—by getting an abortion, for example. Dkt. 1 ¶¶ 3-6, 22, 26-27, 81-93, 103-106, 130-32, 140. The complaint further alleges that this compulsion necessarily changes Plaintiffs' desired message. Dkt. 1 ¶¶ 5-6, 197-98, 252; *Cf. Hurley*, 515 U.S. at 576 ("[W]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised."); *see also Telescope Media Grp. v. Lucero*, 936 F.3d 740, 758 (8th Cir. 2019) (distinguishing "serving as a forum for the speech of others" from "interfer[ing] with [a speaker's] message by requiring them to say something they otherwise would not"). And nothing Plaintiffs can say about their disagreement with the compelled speech can remedy the constitutional violation, as Defendants suggest,[18] because free speech protections would be "empty" if the government could "require speakers to affirm in one breath that which they deny in the next." *PG&E*, 475 U.S. at 20-21 (1986) (plurality opinion). Indeed, "[a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts."

---

[18] Defs.' MTD 20, 23 ("[e]mployers are free to include whatever messages they want in a handbook").

*Wooley*, 430 U.S. at 714. A free speech claim is stated when the State forces Plaintiffs to foster views opposed to their reason for being. *See id.* at 714-15.

### 3. Defendants' invitation to create a new category of unprotected speech should be rejected.

Defendants also argue that the notice provision need only satisfy rational-basis review because it only requires Plaintiffs "to state purely factual and accurate information." Defs.' MTD 21. First, that is not true—as the complaint alleges, the notice provision thwarts Plaintiffs' messages and missions by telling employees they can view abortion and other objectionable activities as permissible options. Dkt. 1 ¶¶ 5-6, 143, 195, 197-98, 252. Second, controlling law forbids the compulsion. In *Riley* the Supreme Court considered a law requiring "that professional fundraisers disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity." 487 U.S. at 795. The Court refused to distinguish between "compelled statements of opinion" and "compelled statements of 'fact'" and applied "exacting First Amendment scrutiny," striking down the required disclosure of factually accurate information. *Id.* at 798-99, 803. And in *NIFLA*, which is conspicuously absent from Defendants' brief, the Supreme Court struck down a factual notice imposed by California on pro-life pregnancy centers, requiring them to inform their clients that the state provides family planning services, including abortion. *NIFLA*, 138 S. Ct. at 2369. The Court stated that because the disclosure "in no way relate[d] to the services" the employers provided and required the provision of information about topics like abortion, which was "anything but . . . 'uncontroversial,'" the state could not "co-opt [the pro-life pregnancy centers] to deliver its message for it." *Id.* at 2372, 2376.

*Riley* and *NIFLA* demonstrate Plaintiffs have stated a free speech claim. They also defeat Defendants' argument for rational basis review, which essentially boils down to an invitation to this Court to unilaterally create a new category of unprotected speech. *See* Defs.' MTD 22 ("[c]ompelled disclosures of . . . accurate factual information should be subject to the same standard as those in the

commercial context"). Defendants reliance on *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), Defs.' MTD 21-22, is misplaced, because that case involved commercial speech and only addressed the "disclosure of factual commercial information," which "present[ed] little risk that the state [was] forcing speakers to adopt disagreeable state-sanctioned positions." *Id.* at 114 & n.5.[19] Those risks have produced real harm here, in that SB 660 forces Plaintiffs to adopt the State's position and "interfer[es] with [their] right to define and express" themselves. *Id.* at 114; Dkt. 1 ¶¶ 5-6, 143, 195, 197-98, 252. Like *Rest. Law*, *Sorrell* indicts rather than justifies SB 660. Plaintiffs' employee handbooks are not commercial speech, and neither is SB 660's notice provision. And given the Supreme Court's "reluctan[ce] to mark off new categories of speech for diminished constitutional protection," Defendants' attempt to break new ground here should be rejected. *NIFLA*, 138 S. Ct. at 2372 (internal quotations and citation omitted).

###   B.   SB 660 restricts Plaintiffs' speech.

The complaint alleges that Plaintiffs are religious ministries created to spread pro-life messages. Dkt. 1 ¶¶ 77-78, 99, 123. Unlike a sandwich shop, an automotive repair facility, or a nationwide retailer, their uniquely expressive nature means that the people Plaintiffs hire affect their message. Just as a film company must be able to choose its actors and producers and a news company must be able to choose its editors and writers to convey the desired message, Plaintiffs must also be able to select their staffs to convey their desired message. *See, e.g.*, *McDermott v. Ampersand Publ'g., LLC*, 593 F.3d 950, 962 (9th Cir. 2010) ("Telling the newspaper that it must hire specified persons . . . as editors and reporters . . . is bound to affect what gets published. To the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice."); *Claybrooks v. Am. Broad. Cos., Inc.*, 898 F. Supp. 2d 986, 997, 999-1000 (M.D. Tenn. 2012)

---

[19] *CTIA-The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 841 (9th Cir. 2019), is similarly inapposite, as it involved "a regulation of commercial speech." *See* Defs.' MTD 34.

(dismissing claim of racial discrimination in television casting to protect "the producers' freedom of speech," because "defendants are entitled to select the elements (here, cast members) that support whatever expressive message the Shows convey or are intended to convey"). Without that ability, Plaintiffs have alleged that their messages and missions would be compromised. Dkt. 1 ¶¶ 197-98, 252. Defendants argue that because SB 660 prevents employers from taking adverse employment actions against employees that it only regulates conduct, not speech. But Plaintiffs have clearly alleged that SB 660 does regulate, and in fact restricts, Plaintiffs' speech. Dkt. 1 ¶¶ 264-66, 276, 278, 283. Indeed, the complaint alleges that SB 660's no waiver provision (§203-e(2)(b)) prevents Plaintiffs from telling their employees they must act consistently with organizational beliefs on a variety of topics, including abortion, contraceptives, and sexual morality. *Id.*

Because it "applies to particular speech because of the topic discussed or the idea or message expressed," SB 660 is therefore a content-based speech regulation. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). Even worse, because it doesn't ban *all* speech about certain topics, but only the pro-life perspective, it engages in viewpoint discrimination, "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). And while the State's motives in adopting SB 660 evince religious targeting, even the purest motives could not save speech restrictions like these. *Id.* at 2228 (internal quotation and citation omitted) (noting that content-based laws must face "strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech"). Defendants offer only one defense for SB 660's content and viewpoint-based speech ban. They contend that it regulates only conduct, not speech. Defs.' MTD 18-20. But this argument flows from courts treating words as conduct when those words accomplish *illegal, constitutionally unprotected conduct*. Defendants point to the Supreme Court's observation that a law prohibiting race-based hiring "'will require an employer to take down a sign reading "White Applicants Only,"'" and from this they conclude that this does not

mean that "'the law should be analyzed as one regulating the employer's speech rather than conduct.'" MTD 19 (quoting *Rumsfeld*, 547 U.S. at 62). But the state's reliance on this narrow doctrine is misplaced. *Cf.* Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 CORNELL L. REV. 981, 1011 (2016) (explaining the doctrine). As already explained, multiple constitutional protections ensure Plaintiffs' right to make employment decisions to further their religious beliefs and the messages they aim to spread. *See supra* at 4-19. Because Plaintiffs have the constitutionally protected autonomy to make employment decisions consistent with their religious beliefs and missions, they must also be free to explain their employment standards to their employees, and require compliance with those standards. That requires speech, and SB 660 directly interferes with that speech through its no waiver provision.

This is not to say that the State cannot restrict statements that effectuate illegal and *constitutionally unprotected* conduct. But it cannot restrict speech related to Plaintiffs' constitutionally protected ability to set and enforce their employment standards. The Eighth Circuit's recent decision in *Telescope Media Group* clarifies this crucial distinction. In that case a family-owned film-production company challenged a law prohibiting sexual-orientation discrimination because it would force them to produce films celebrating same-sex weddings—i.e., to speak a message that violated their beliefs. 936 F.3d at 747-49. The court explained that even though antidiscrimination laws are important, they "must yield to the Constitution," *id.* at 755, and it then rejected Minnesota's view that the plaintiffs could not "advertise what they have in mind for their wedding videos." *Id.* at 757 n.5. Put simply, because it could not regulate the plaintiffs' underlying video production, Minnesota could not regulate plaintiffs' speech pursuant to that video production either. *Id.* ("Minnesota cannot compel the Larsens to speak, so it cannot force them to remain silent either."); *see also Brush & Nib Studio v. City of Phx.*, 448 P.3d 890, 926 (Ariz. 2019) (explaining that, despite an antidiscrimination law to the contrary, "because Plaintiffs' intended refusal to make custom wedding invitations celebrating a same-sex

wedding is legal activity under Arizona's free speech clause [and free exercise protections], Plaintiffs are entitled to post a statement . . . indicating this choice").[20] Defendants' argument, which mirrors Minnesota's, also fails. The State cannot force Plaintiffs to employ people who act against their beliefs and missions, and it cannot ban them from explaining and enforcing those standards either.

The allegations in Plaintiffs' complaint plausibly allege that SB 660 both compels and restricts their speech, and regulates it based on content and viewpoint. As a result, SB 660 must face strict scrutiny, which Plaintiffs have plausibly alleged it cannot survive. *See infra* at 30-32. Defendants' motion to dismiss this claim must therefore be denied.

**V.   <u>Plaintiffs have alleged facts that state a plausible vagueness claim.</u>**

The Due Process Clause proscribes impermissibly vague statutes. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). And when a vague statute, like SB 660, implicates First Amendment rights, "a heightened vagueness standard" applies. *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 793 (2011). The complaint alleges that SB 660 is impermissibly vague and invites Defendants to arbitrarily and discriminatorily enforce it. *See* Dkt. 1 ¶¶ 29, 196, 328-341. It alleges that at the same time it grants such unbridled discretion, Plaintiffs and others like them have no way to know whether and to what extent their speech or conduct actually violates the law. *Id.* at ¶¶ 338-340. For example, Plaintiffs allege that SB 660 does not define its central term, "reproductive health decision making," it does not define "employee" or "employer," and it does not define the phrase "proposes to commit

---

[20] The State points to *Our Lady's Inn* to support its argument that it is regulating conduct, not speech. MTD 18-19. In that case, the court did not find a free-speech violation because it determined that any speech restriction was only incidental to regulating conduct. 349 F. Supp. 3d at 819-20. This analysis was flawed and conflicts with the *Telescope Media Group* decision, which postdates *Our Lady's Inn*. Because *Our Lady's Inn* upheld the plaintiffs' expressive association rights, the plaintiffs' speech should also have been protected, because it could not be incidental to any illegal conduct.

a violation of the provisions of this section" either, even though punishment flows from such "proposals." *Id.* at ¶¶ 187, 332, 333, 335. These allegations plausibly make out a due process violation.

Defendants summarily assert, however, that these terms are "sufficiently specific." Defs.' MTD 29. That is not the standard. Indeed, "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108. The complaint plausibly alleges that SB 660 does not do that, and Defendants' assurances to the contrary give no cause for this Court to dismiss Plaintiffs' claim. Those assurances in any event are wrong. For instance, SB 660 states that "reproductive health decision making" "includ[es] . . . the decision to use or access a particular drug, device or medical service." Dkt. 1-1.[21] But by SB 660's own language the term is "not limited to" those decisions, making it broad enough to encompass not only the dimly intimated medical decisions, which are few in number and not even themselves specifically rendered, but also political speech and abortion advocacy. Defendants are wrong to suggest that the term "reproductive health decision making" is "clear and unambiguous." Defs.' MTD 29. Defendants' failure to define "proposes to commit a violation" only compounds the problems faced by Plaintiffs and other like employers. Does this term encompass employers contemplating aloud whether they can comply with SB 660, even if they eventually decide to do so? Does it apply to those who seek legal protection from having to comply with SB 660 like Plaintiffs? Does it expose to liability those who merely discuss with prospective or current employees their views on "reproductive health decision making"? Defendants citation to *Morel v. Giuliani*, 927 F. Supp. 622, 634 (S.D.N.Y. 1995), is ineffectual, because in that case everyone knew what was "proposed." Here the problem is that no one has any idea what type of

---

[21] Plaintiffs have had to assume for purposes of this action that they are "employers" and those who work for them "employees," but the citation to the Labor Law by Defendants still doesn't definitively conclude the matter. *See* N.Y. Labor Law § 2 at ¶¶ 5-6 (defining an "employee" as a "mechanic, workingman or laborer working for another for hire" and an "employer" as "the person employing any such mechanic, workingman or laborer, whether the owner, proprietor, agent, superintendent, foreman or other subordinate").

"proposal" will run them into trouble, and the possibilities for mischief are endless because the term appears to permit punishment for conduct never taken. Defendants' claim that there is "no ambiguity" in this phrase thus cannot be taken seriously. Defs.' MTD 30.

All of this uncertainty leaves Plaintiffs "unsure what conduct [SB 660] prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). This is particularly troublesome because, as the complaint alleges, SB 660 contemplates criminal penalties for noncompliance. *See* Dkt. 1 ¶¶ 50, 52, 179, 181; *Morales*, 527 U.S. at 55 (concluding that where "vagueness permeates" a criminal law which "infringes on constitutionally protected rights," a facial challenge is appropriate).   What is more, SB 660 leaves Plaintiffs at the mercy of both private actors, who may disagree with them and choose to use SB 660 as a political cudgel, and the State, which has not disavowed enforcement in any way and whose enforcement mechanisms are not clearly spelled out.[22] Dkt. 1 ¶¶ 158, 184, 201-02, 230-231, 340; *see Morales*, 527 U.S. at 56 (stating that a law may be invalidated where it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement"). Finally, because Plaintiffs will have no way of knowing what "decisions" will trigger liability and how any perceived "violations" may be alleged by private parties or handled by state officials, they will be forced to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109. The vagueness doctrine is designed to prevent these very harms.

In sum, Defendants' pat rejections of Plaintiffs' well-pled factual allegations regarding vagueness do not entitle them to the dismissal of this claim. Plaintiffs' allegations are to be taken as true here, and given that the complaint sets out facts showing SB 660 is impermissibly vague, Defendants' motion as to this claim must be denied.

---

[22] *See* Defs.' MTD 30-31. Contrary to Defendants' arguments, the Labor Law's enforcement provisions are hardly clear and well defined.

## VI.    SB 660 cannot survive strict scrutiny.

The complaint alleges facts indicating the State impermissibly targeted religion for disfavored treatment in passing SB 660. Taking these facts as true, the measure is per se invalid and this Court need undertake no further inquiry to deny the motion to dismiss. *See supra* at 4-11; *Lukumi*, 508 U.S. at 533 ("a law targeting religious beliefs as such is never permissible"); *Masterpiece*, 138 S. Ct. at 1732 (religious hostility required per se invalidation of law). Even apart from religious targeting, however, SB 660 cannot be saved. Because Plaintiffs state a claim that SB 660 infringes on expressive association and both compels and restricts their speech, SB 660 must face strict scrutiny, the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). To succeed on their motion to dismiss, Defendants must show that, taking all the facts as true, the law is "narrowly tailored to promote a compelling government interest." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *Boerne*, 521 U.S. at 534 (government must show it "adopted the least restrictive means of achieving [compelling] interest"). "[I]t is the rare case in which . . . a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992). This is not a rare case.

### A.    SB 660 does not serve a compelling interest.

An interest is compelling only if it serves interests "of the highest order." *Lukumi*, 508 U.S. at 546. The government "must do more than simply posit the existence of the disease sought to be cured," and "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (internal quotations and citations omitted); *see also Brown*, 564 U.S. at 799 (government must show an "actual problem in need of solving," and must further show the law in question is "actually necessary to the solution" of the supposed problem). Finally, the government must look "beyond broadly formulated interests" to justify the application of the challenged law to

"particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006).

The complaint establishes that SB 660 satisfies none of these criteria. *See* Dkt. 1 at ¶¶ 8-9, 147-155. It alleges that not one instance of employment discrimination based on "reproductive health decision making" prompted the law, *id.* at ¶¶ 8-9, 150, 153, 155, and the State instead could proffer no more than a generic interest in eradicating discrimination to justify it. *See* Dkt. 1-3 ("New York has a long history in protecting individuals from discrimination in the workplace") Dkt. 1-4 ("Employees must be protected from discrimination based on the reproductive health care decisions they make."). This is insufficient, and SB 660's further failure to universally require that all employers give notice to their employees of the law's provisions cements the conclusion that it serves no compelling interest.[23] Dkt. 1 ¶¶ 143, 312. *NIFLA*, 138 S. Ct. at 2375 (noting that a "wildly underinclusive" law "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint"); *Reed*, 135 S. Ct. at 2232 (a "law cannot be regarded as protecting an interests of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited"). Lacking such an interest, SB 660 will fail strict scrutiny. Plaintiffs' claims must therefore be allowed to proceed.

## B. SB 660 is not narrowly tailored.

The complaint also alleges that SB 660 also fails strict scrutiny because it is not narrowly tailored and is not the least restrictive means of achieving the State's asserted interest. Dkt. 1 ¶¶ 14, 167-68, 170, 175, 258, 279, 296, 324, 334. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy" *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (internal citations omitted). Plaintiffs have alleged that the legislature ignored this guidance and

---

[23] *See* Defs.' MTD 23. (SB 660 "does not require employers who do not have handbooks . . . to say anything about [the law] to employees").

imposed its "cure" for nonexistent discrimination even on religious and pro-life organizations for whom compromise regarding beliefs about abortion and contraception is impossible. The complaint further establishes that the legislature could have exempted Plaintiffs, just as it has similar religious groups before. *See* Dkt. 1 at ¶¶ 170 (discussing religious exemption in the Human Rights Law, N.Y. Exec. Law § 296(11)). And it also could have relied on the ban on sex discrimination already in its Human Rights Law, which covers pregnancy discrimination. *See Union Free Sch. Dist. No. 6 of Towns of Islip & Smithtown v. N.Y. State Human Rights Appeal Bd.*, 35 N.Y.2d 371, 375 (1974) (finding pregnancy discrimination covered by ban on sex discrimination in state human rights law). Instead, where "[p]recision of regulation" was required, the legislature opted for "[b]road prophylactic rules," *Riley*, 487 U.S. at 801, deliberately leaving Plaintiffs a casualty. SB 660 is not narrowly tailored and it does not use the least restrictive means. Defendants' motion to dismiss must be denied in its entirety.

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

In their opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. 17), Defendants introduce no new facts or evidence to counter the record established by the Plaintiffs. What they do offer are assurances that Plaintiffs are not harmed by SB 660 and arguments seeking to convince this Court that the equities weigh in the State's favor. But given the unchanged record and the controlling law, Defendants' opposition does nothing to diminish Plaintiffs' entitlement to a preliminary injunction.

## LEGAL STANDARD

Plaintiffs can obtain a preliminary injunction by showing "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the balance of hardships tips in their favor; and (4) an injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). Moreover, if they can show that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation," and the "balance of hardships tip[s] decidedly toward" them, that too is sufficient. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Where, as here, First Amendment rights are at issue, "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

Defendants object that the "second less rigorous 'serious questions' standard" is not open to Plaintiffs because they seek relief from "government action taken in the public interest pursuant to a statutory or regulatory scheme," but they are mistaken. Defs.' MTD 31(quoting *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014)). First, "the 'likelihood of success' prong . . . 'need not always be followed merely because a movant seeks to enjoin government action.'" *Id.* at 111 (quoting H*aitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d Cir.1992)). Second, here a "novel issue" is presented, to wit, whether the government may compel religious pro-life

employers to hire dissenters from their messages and missions, where the record lacks any instances of employment discrimination in the first place. *Id.* at 111. Third, given the patent religious targeting which animated the passage of SB 660, the State is not "entitled to a higher degree of deference." *Id.* at 110. Plaintiffs may therefore satisfy either standard. But regardless of which standard this Court applies, Plaintiffs merit a preliminary injunction.

## ARGUMENT

### I.  Plaintiffs are likely to succeed on the merits of their claims.

For the sake of brevity and judicial economy, and because Defendants incorporated their motion to dismiss arguments into their opposition to Plaintiffs' Motion for Preliminary Injunction, Plaintiffs will not rehash their likelihood of success arguments here. Rather, Plaintiffs hereby incorporate by reference their Verified Complaint (Dkt. 1), their Memorandum in Support of Motion for Preliminary Injunction and supporting materials (Dkt. 17(1-8)), and their Memorandum in Support of their Opposition to Defendants' Motion to Dismiss, *see supra* at 1-32. These establish that Plaintiffs are likely to succeed on the merits of their claims, or at the very least have raised "sufficiently serious questions going to the merits." Given the dispositive centrality of this factor in the analysis, Plaintiffs merit a preliminary injunction even before any other factors are considered.

### II.  Plaintiffs will suffer irreparable harm absent an injunction.

Defendants argue that Plaintiffs have offered only speculative harm and "seek[ ] a preliminary injunction to protect them in case they need it." Defs.' MTD 33. But the controlling law, the record facts, and Defendants' own concessions show that Plaintiffs have been harmed and continue to be harmed.

First, the State targeted religious employers like Plaintiffs when it conceived and passed SB 660. The law is therefore void ab initio and should be enjoined on this basis alone. *See supra* at 4-11.

Second, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And where as here Plaintiffs have established a likelihood of success on the merits of their constitutional claims, they have also satisfied the irreparable harm requirement. *See, e.g.*, *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000) (plaintiff can show irreparable harm if he "show[s] likelihood of success on the merits"); *Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (emphasis in original) ("it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm"); *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996) ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."); *Smith v. Fredrico*, 2013 WL 122954, at *6 (E.D.N.Y. Jan. 8, 2013) ("there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights"); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 465 (S.D.N.Y. 2012) (stating that "[w]here infringement of free speech is claimed, irreparable harm may normally be presumed" and doing so for purposes of considering Plaintiffs' First Amendment challenge). Defendants ignore this line of cases and cite authorities supporting the unremarkable proposition that harm cannot be too remote in order for injunctive relief to issue. Defs.' MTD 32-33. But none of their cases deal with plaintiffs who have shown a likelihood of success on the merits of their constitutional claims, and they are therefore both inapposite and unavailing.

Third, and finally, Plaintiffs have shown various present and ongoing harms going to the core of their religious and expressive enterprises. Astonishingly, despite arguing that Plaintiffs have shown only "possible harm," Defs.' MTD 33, Defendants contradict themselves in the very next breath, admitting that SB 660's notice requirement presently "require[s] certain employers to take immediate action" *Id.* at 34. Plaintiffs are among those "certain employers" who must take such action because

35

they maintain employee handbooks. *See* Dkt. 1 ¶ 195; Dkt. 17-2 ¶ 16 (establishing that CompassCare maintains an employee handbook); Dkt. 1 ¶ 270; Dkt. 17-7 ¶ 11 (establishing the same for NIFLA's New York member centers).[24] Defendants try to excuse the compulsion by arguing that the notice requirement only involves "objective, factual and accurate information," Defs.' MTD 34, but their justification fails. *See supra* at 19-24. SB 660's notice provision therefore unconstitutionally compels Plaintiffs' speech, which constitutes irreparable harm. And there is much more.

SB 660 also interferes with Plaintiffs' ability to expressively associate with others of like mind to accomplish their pro-life missions, impedes their ability to manage their internal affairs free from government interference as religious organizations are entitled to do, and restricts and chills their speech. *See* MPI Memo at 7-10, 18-20; Dkt. 1 ¶¶ 3, 15, 18, 23-27, 158, 173, 190, 189, 193-94, 197-98, 225, 242-43, 290-93. More specifically:

- SB 660 requires Plaintiffs to associate with those who disagree with their beliefs and missions, undermining their reason for being. *See* Dkt. 17-2 ¶¶ 20, 33; 17-7 ¶¶ 13-15; 17-8 ¶¶ 23-24; Dkt. 1 ¶¶ 242-55.
- SB 660 hampers Plaintiffs' ability to recruit and hire new employees because it subjects Plaintiffs to legal liability for requiring and gaining assent to their religious beliefs and codes of conduct. *See* Dkt. 17-2 ¶¶ 20, 31, 33; 17-7 ¶¶ 6, 10, 12; 17-8 ¶¶ 22-24; Dkt. 1 ¶¶ 141-43, 189, 199-202.
- SB 660 prevents Plaintiffs from taking any adverse employment actions against even those employees who persistently and publicly defy Plaintiffs' religious beliefs and codes of conduct. *See* Dkt. 1 ¶¶ 141-42.
- SB 660 prevents Plaintiffs from counseling current employees for personally having abortions or using abortifacient medications, or for encouraging or facilitating the

---

[24] Defendants' argument that SB 660's notice provision does not affect First Bible fails. The church is in the process of creating an employee handbook and does not want to include SB 660's notice provision in it. Dkt. 17-8 ¶¶ 19-21. SB 660 compels First Bible's speech because it wants to put that document into effect as soon as it is completed. SB 660 also chills its speech, because the law's enforcement mechanisms and penalties act to dissuade First Bible from putting the handbook into operation. That constitutes irreparable harm. Additionally, Defendants' argument that First Bible is somehow stuck with the unconstitutional status quo brought on by SB 660's passage is erroneous. *See, e.g., GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (internal quotation marks and citation omitted) (holding that the "status quo . . . refers . . . to the last uncontested status which preceded the pending controversy," and rejecting the contention that it refers to situation after "infringing conduct had begun," which would "lead to absurd situations[ ] in which plaintiffs could never bring suit").

same for others, all of which are violations of Plaintiffs' employee handbooks, codes of conduct, and statements of faith. *See* Dkt. 17-2 ¶¶ 15-17, 20; 17-7 ¶¶ 5, 10, 15; 17-8 ¶¶ 6, 11, 12, 15, 17, 23; Dkt. 1 ¶¶ 141-43, 187, 335.

- SB 660 hinders Plaintiffs from communicating their religious pro-life message to women facing unplanned pregnancies, to church members, to school students, and to the public, because it requires them to hire and retain employees who dissent from their beliefs. *See* Dkt. 17-2 ¶¶ 29-34; 17-7 ¶¶ 12-15; 17-8 ¶¶ 20-21, 24; Dkt. 1 ¶¶ 189-94.

- SB 660 exposes Plaintiffs to unnecessary legal liability by deputizing private individuals to sue them, when those individuals may not know about Plaintiffs' right to religious autonomy, and in so doing threatens to tie them up in costly litigation, damaging their ability to focus on their pro-life missions. *See* Dkt. 17-2 ¶ 34; 17-7 ¶ 13; 17-8 ¶¶ 22, 24; Dkt. 1 ¶¶ 158, 184, 201-02, 230, 340.

- SB 660 prevents Plaintiffs from requiring compliance with their employee handbooks, statements of faith, and codes of conduct, when that compliance is necessary to the accomplishment of Plaintiffs' religious missions. *See* Dkt. 17-2 ¶¶ 14-18, 33; 17-7 ¶¶ 9-12; 17-8 ¶¶ 6, 11-13, 18; Dkt. 1 ¶¶ 83-85, 93, 130-32, 140-143, 193-95.

- SB 660 prevents Plaintiffs from continuing to discuss their religious beliefs and required codes of conduct with their current employees, or from broaching the same with prospective employees, because that could be considered "propos[ing] to commit a violation" of SB 660. *See supra* at 27-28; Dkt. 17-2 ¶ 20; 17-7 ¶¶ 10, 15; 17-8 ¶¶ 11, 17; Dkt. 1 ¶¶ 187, 335.

SB 660 accomplishes all this by imposing potentially crippling legal liability—including criminal penalties—upon Plaintiffs for simply continuing to operate their religious organizations as they have done for years, without harm to anyone. Dkt. 1 ¶¶ 52, 176-88 (outlining enforcement mechanisms and penalties). Given all this, Defendants' argument that Plaintiffs have failed to show irreparable harm fails.  By Defendants' own admission, SB 660 compels speech. And it forcibly remakes Plaintiffs' religious organizations in the State's own image by telling them who they must hire and who they cannot fire. These decisions are central to Plaintiffs' beliefs and missions, and the State's meddlesome interference with them qualifies as irreparable harm.[25]

---

[25] Defendants are wrong in arguing that Plaintiffs' "First Amendment rights will not be affected unless or until an employee has an abortion or uses contraception, and [P]laintiffs learn about it." Defs.' MTD 33. Defendants erroneously circumscribe Plaintiffs' complaint as challenging only SB 660's prohibition on "plaintiffs . . . taking adverse actions against . . . an employee." *Id.* As even a cursory review of their complaint reveals, however, Plaintiffs allege that SB 660 prohibits them from running their organizations consistent with their religious beliefs and in so doing violates multiple

**III.**   **The balance of hardships tips in favor of Plaintiffs, and an injunction is in the public interest.**

Plaintiffs will continue to suffer the harms described above unless SB 660 is enjoined. Defendants have done nothing to disavow enforcement,[26] and SB 660's enabling of private litigants to sue at any time for reasons that may prove frivolous further supports the conclusion that Plaintiffs merit immediate relief. Defendants assert that they "can be expected to enforce [SB 660] within the confines of clearly established constitutional law," but admit that "employees bringing private suit may be unaware of the rights of religious organizations to govern themselves without state involvement." Defs.' MTD 17. In other words, SB 660 unleashes a "process as punishment" on Plaintiffs by permitting meritless suits to go forward. *See* MPI Memo 5-6. Against these real hardships Defendants posit phantom interests they say are presently imperiled. For instance, Defendants argue that an injunction would "subject workers to discrimination by their employers." Defs.' MTD 35. But the State has never been able to give any examples of "adverse employment consequences" resulting from "reproductive health decision making," either before passing SB 660 or even now in opposing Plaintiffs' motion. Dkt. 1 ¶¶ 8, 152. Defendants next argue that an injunction would "chill workers' exercise of their deeply-held rights to control their own body and health." Defs. MTD 35. That claim too is unsupported. Employees in New York can get abortions and obtain abortifacient medications now without impediment, and enjoining SB 660 will not affect that. If a chill existed Defendants presumably would have brought forth evidence of it here—that they have not speaks volumes. Given all this, the balance of hardships tips sharply in Plaintiffs' favor. The State will suffer no harm if Plaintiffs are granted the injunction they merit, because it has no "interest in the enforcement of an

---

constitutional rights in the process. That no employee has yet had an abortion does not mean Plaintiffs have not been harmed.

[26] Defs.' MTD 30 (admitting that violations of SB 660 are subject to the Labor Law's "enforcement provisions").

unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) (internal quotations

and citations omitted). Finally, because "securing First Amendment rights is in the public interest,"

*Walsh*, 733 F.3d at 488, that factor too supports granting Plaintiffs an injunction.[27]

**CONCLUSION**

For all these reasons, Plaintiffs' Motion for Preliminary Injunction (Dkt. 17) should be granted,

and Defendants' Motion to Dismiss (Dkt. 19) should be denied.

Respectfully submitted this 14th day of February, 2020.

David A. Cortman
GA Bar No. 188810
dcortman@ADFlegal.org
Alliance Defending Freedom
1000 Hurricane Shoals Road, N.E.
Suite D-1100
Lawrenceville, GA  30043
(770) 339-0774
(770) 339-6744 (Fax)

*s/ Kenneth J. Connelly*
James P. Trainor, Bar No. 505767
Trainor Law PLLC
2452 US Route 9, Suite 203
Malta, NY 12020
(518) 899-9200
(518) 899-9300 (Fax)
jamest@trainor-lawfirm.com
Local Counsel

Kevin Theriot, AZ Bar No. 30446*
ktheriot@ADFlegal.org
Kenneth J. Connelly, AZ Bar No. 25420*
kconnelly@ADFlegal.org
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (Fax)
*Admitted Pro Hac Vice

Attorneys for Plaintiffs

To: Adrienne J. Kerwin (via ECF)

---

[27] Defendants' argument that Plaintiffs should wait until an employee has an abortion or uses contraception in violation of their policies ignores the real, ongoing harms Plaintiffs have described. It is also at odds with the law. Plaintiffs are not required to wait to file suit, especially where Defendants have not disclaimed enforcement and the nature of Plaintiffs' harms are such that they "can be realized even without an actual prosecution." *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit.").