**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**COMPASSCARE, a New York nonprofit corporation,**
**NATIONAL INSTITUTE OF FAMILY AND LIFE**
**ADVOCATES, d/b/a NIFLA, a Virginia Corporation,**
**FIRST BIBLE BAPTIST CHURCH, a New York**
**nonprofit corporation,**

                                        **Plaintiffs,**

    **v.**                                                    **1:19-CV-1409**
                                                              **(TJM/DJS)**

**ANDREW M. CUOMO, in his official capacity**
**as the Governor of the State of New York;**
**ROBERTA REARDON, in her official capacity**
**as Commissioner of the Labor Department of**
**the State of New York, and LETITIA JAMES, in**
**her official capacity as Attorney General of the**
**State of New York,**

                                        **Defendants.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

### DECISION & ORDER

Plaintiffs, religious organizations opposed to abortion, seek a preliminary injunction

enjoining enforcement of a labor law promulgated by the State of New York.  See dkt. #

17.  Plaintiffs contend that the law, which purports to prevent employer discrimination

against women because of their reproductive health care choices, is actually aimed at

undermining their ability to carry out their anti-abortion mission and violate their First

Amendment rights.  Defendants, New York State officials, oppose the request for a

preliminary injunction and have filed a motion to dismiss the Complaint for failure to state

1

a claim.  <u>See</u> dkt. # 19.  The parties have briefed the issues and the Court has determined to decide the motion without oral argument.

I.      **BACKGROUND**

      **A.      Facts Alleged in the Complaint**

Plaintiffs describe this case as a "pre-enforcement federal civil rights action[.]" Complaint ("Complt."), dkt. # 1, at ¶ 1.  They raise their claims pursuant to 42 U.S.C. § 1983.  Plaintiffs seek to enjoin enforcement of the "Boss Bill," which they describe as "the third in a trio of abortion-protective and abortion-advancing laws passed by the New York State Legislature on January 22, 2019."  <u>Id.</u> at ¶ 2.[1]  The first two laws addressed when in the gestational period abortions could be performed and the second addressed the cost of contraceptives and other family planning drugs in health plans.  <u>Id.</u>

        **i.      The Plaintiffs**

          **a. CompassCare**

Plaintiff CompassCare Pregnancy Services ("CompassCare") is a religious non-profit incorporated under New York law, with a principal place of business in Rochester, New York.  <u>Id.</u> at ¶ 40.  CompassCare "provides pregnancy-related medical and non-medical services and comprehensive pregnancy- and abortion-related information without cost to its patients[.]"  <u>Id.</u> at ¶ 41.  CompassCare has both a president and a medical director.  <u>Id.</u>  As a "pregnancy care center," CompassCare "exists to serve women considering abortion and their unborn children."  <u>Id.</u> at ¶ 55.  CompassCare aims "to

---

[1]As a motion to dismiss Plaintiffs' Complaint is before the Court, the Court will relate the facts as alleged in the Complaint.  The Court does not adopt any of the characterizations of the facts or legal standards offered by the parties. The Court quotes them to demonstrate the tenor of the arguments in this matter.

provide the compassion, concern, and support necessary to enable women to carry their unborn children to term." Id. CompassCare does not seek to earn a profit, does not charge for its aid, and does not discriminate because of "age, sex, marital status, or religious preference." Id. at ¶ 56. CompassCare operates without funding from the government. Id. at ¶ 57. CompassCare provides a number of services, including "clinical pregnancy testing . . . ; ultrasound exams; gestational age determinations; complete pregnancy, abortion, and adoption options consultations; STD testing and treatment; abortion pill reversal services; and medical, insurance, and community support referrals." Id. at ¶ 58. Plaintiff also offers "accurate and complete comprehensive information concerning prenatal development, pregnancy and childbirth, abortion procedures and risks, and alternatives to abortion." Id. at ¶ 59. Beyond this "rigorous and consistent treatment and testing protocol," CompassCare also offers "informational resources" on "pregancy, abortion, post-abortion care and expectations, contraception, and STDs." Id. at ¶ 60.

Plaintiffs further describe the aim of CompassCare's programs and the beliefs that underlie those aims. CompassCare, they say, "is committed to meeting a woman's need at the point of decision regarding an unplanned or unwanted pregnancy." Id. at ¶ 62. By providing "emotional support and practical assistance," Plaintiff "provides women with the knowledge and ability to face the future with hope, and to plan constructively for themselves and their babies." Id. at ¶ 63. CompassCare "believes all human life is equally valuable and deserving of blessing and protection, from fertilization to natural death." Id. at ¶ 64. To Compass Care, "every abortion claims an innocent life." Id. at ¶ 65. Since "every life is inherently valuable" as "a gift from God and made in His image,"

3

Plaintiff "believes that such life should not be destroyed. Id. at ¶ 65. Rather than solving women's problems, CompassCare alleges "that abortion compounds actual and perceived problems and difficulties[.]" Id. at ¶ 67. CompassCare sees "the purpose of medical care [as] to heal and maintain the health of the individual[.]" Id. at ¶ 68. Abortion, CompassCare claims, "does neither for either women or the baby." Id. CompassCare does not, therefore, "recommend, provide, or refer for abortions or abortifacient drugs or devices." Id. at ¶ 69. Plaintiff finds "it immoral for anyone to participate in those services." Id. Instead, CompassCare finds adoption "an excellent alternative" and offers "referrals to adoption agencies and attorneys for those who want such assistance." Id. at ¶ 70.

CompassCare also has specific beliefs related to sexuality and birth control. Plaintiff "believes that popular . . . acceptance of a birth control mentality violates the purpose of sexuality as revealed in the Bible." Id. at ¶ 71. That acceptance "results in an increase in adolescent promiscuity, pregnancy, abortion, and disease." Id. at ¶ 71. CompassCare therefore "works to teach young adults that sex can only be meaningful and safe within the context of a loving, permanent marital relationship between one man and one woman." Id. at ¶ 72. CompassCare provides information on birth control, offering a distinction between contraceptives and "abortifacient drugs and devices on the other." Id. While CompassCare provides information on contraceptives, the Plaintiff does not "refer patients for birth control in any form." Id. at ¶ 73. CompassCare also promotes abstinence among single people and "sexual fidelity within a marital relationship." Id. at ¶ 74. Such marriages, CompassCare states, are "between one man and one woman." Id.

Plaintiff CompassCare further alleges that its "Christian faith and religious beliefs motivate and permeate its mission and all its activities" Id. at ¶ 75. CompassCare

4

considers "itself as an outreach ministry of Jesus Christ through His church." Id. "During every interaction with a patient," Plaintiff contends, "CompassCare staff offer to share the Gospel message of God's love and hope to those who wish to agree to hear it." Id. at ¶ 76. Staff only share that gospel message with people who agree to hear it. Id. CompassCare's mission statement describes the Plaintiff as "a Christ-centered agency dedicated to empowering women and men to erase the need for abortion by transforming a woman's fear into confidence." Id. at ¶ 77. God's desire, CompassCare believes, is "to use [CompassCare] to transform the communities it serves in western New York into a place where abortion is no longer needed and wanted." Id. at ¶ 78. To achieve that end, CompassCare seeks to aid both "at-risk women," and also to assist other "pregnancy care centers" in doing the same. Id.

Plaintiff contends that "CompassCare is a religious organization that provides its services . . . pursuant to its pro-life and religious viewpoint[.]" Id. at ¶ 80. It hopes "to empower the women it serves to say 'no' to abortion." Id. To meet this "religious and pro-life mission," the Plaintiff "requires all who serve the organization–whether staff, board members, or volunteers–to know Jesus Christ as their Lord and Savior." Id. at ¶ 81. Further, "[a]ll who work at CompassCare must support CompassCare's religious mission, and must personally conduct themselves consistent with the Christian faith and belief that guides that mission." Id. at ¶ 82. Thus, "all who serve the organization in any capacity" must "believe in and agree to abide by its positional statements on abortion, birth control, religious faith, and organizational principles." Id. at ¶ 83. Those views are found in an employee handbook. Id. at ¶ 84. All persons "serv[ing] the organization" must sign the handbook. Id. Employees are not only required to agree to "such statements" when they

5

begin their work, but must also "uphold them, unwaveringly, throughout their tenure with the organization." Id. at ¶ 85.

The CompassCare "positional statements" mandate that "all those who serve the organization" must "agree that the Bible is the inspired–and the only–infallible, authoritative Word of God; [and] that there is only one God, eternally existent in three persons, Father, Son and Holy Spirit[.]" Id. at ¶ 86.  They must also agree "that every abortion claims an innocent life; that sexual relationships outside of marriages between one man and one women results in great numbers of unplanned pregnancies, sexually transmitted diseases, and broken lives[.]" Id.  Finally, they must believe "that sexual abstinence, rather than contraception, is the proper means" to prevent unplanned pregnancies and sexually transmitted diseases. Id.  CompassCare contends that "[f]or staff, volunteers, and board members, assent to CompassCare's mission and beliefs necessarily entails living a life consistent with that mission and those beliefs." Id. at ¶ 87.

As part of living consistently with the organization's beliefs, CompassCare alleges, "[a]ll those who serve the organization must agree to never refer or advise any woman to have an abortion[.]" Id. at ¶ 88.  They also must pledge "to uphold the organization's policy on birth control, which is abstinence only for unmarried patients." Id.  They must also "refrain from having, and helping other to procure, abortions." If. at ¶ 89.  Such persons are also to "refrain from using, or helping others procure, abortifacient drugs or devices[.]" Id. at ¶ 90.  They must also remain monogamous if married, and be sexually abstinent if not married. Id.  They must also "agree to pray for CompassCare staff, volunteers, and patients." Id. at ¶ 91.

CompassCare's requirements [are] for staff, board members, and volunteers to

6

both agree with and abide by its beliefs and missions are driven by the organization's belief that such views "comport with God's Will and Word." Id. at ¶ 92.  Requiring such fealty, CompassCare explains, is also driven by a belief "that by associating with like-minded individuals," CompassCare "will be able to spread an authentic message of love and hope that will be received more readily by patients[.]" Id. ¶ 93.  That authenticity, CompassCare believes, "will ultimately save more lives and reduce the perceived need for abortion." Id.  CompassCare asserts that its policies saved "the lives of 225 babies . . . whose mothers were abortion inclined when they arrived for their appointments[.]" Id. at ¶ 94.

CompassCare not only operates as a "pregnancy care center" that "facilitat[es] medical and other assistance to women facing unplanned pregnancies," but also "provides training and tools to other" similar facilities. Id. at ¶ 95.  In this way, CompassCare "seeks to optimize treatment and counseling procedures throughout the industry." Id. CompassCare also operates websites and a blog that promulgates "a pro-life message and" CompassCare's "positions regarding various laws and cultural developments dealing with life, pregnancy, abortions, contraception, and other issues." Id. at ¶ 96.  The organization also uses radio and television "spots" to promote its message. Id.

### b.    NIFLA

Plaintiff National Institute of Family and Life Advocates ("NIFLA") is a Virginia religious non-profit with a principal place of business in Fredericksburg, Virgnia. Id. at ¶ 42.  NIFLA is made up of "member pregnancy care centers from across the nation." Id. at ¶ 43.  Forty-one such centers operate in New York. Id.  They "provide pregnancy related medical and/or non-medical information and services without charge to their clients." Id.

7

NIFLA also provides legal resources and legal counsel for "medical and non-medical pro-life pregnancy centers[.]"  Id. at ¶ 99.  NIFLA's aim is to "[develop] a network of life-affirming ministries in every community across the nation . . . to achieve an abortion-free America."  Id.  NIFLA holds conferences to "[educate] individuals and organizations as to best practices" about providing "pro-life services and advocacy on behalf of the unborn."  Id. at 100.  NIFLA operates by "equipping pregnancy centers with legal counsel and support; enabling pregnancy centers to convert to medical clinic status where possible; and energizing pregnancy centers with a renewed vision for the future."  Id. at ¶ 101.

Many of NIFLA's 41 member centers in New York "are religious organizations that pursue their pro-life missions and spread their pro-life message as an exercise of their religious beliefs."  Id. at ¶¶ 102-103.  The organization "emphasizes the importance of statements of faith and codes of conduct" among member centers.  Id. at 104.  NIFLA "strongly encourages that its centers implement such documents in their daily operations."  Id.  NIFLA provides a template for an employee handbook and "encourages member centers to adapt" the template to "use as circumstances dictate."  Id. at ¶ 105.  Many New York NIFLA "member centers require their employees and all who serve them in any capacity" to agree to and "personally live by, among other things, their organizational codes of conduct, positional statements, and/or statements of faith regarding pregnancy, abortion, contraceptive use, and sexual conduct outside the context of a marriage between one man and one woman."  Id. at ¶ 106.  At these centers, "employees are required to assent to and/or sign these operative documents to signal their agreement with their contents and their intention to live by and model the beliefs contained therein."  Id.  Many NIFLA-affiliate centers in New York have an employee handbook.  Id. at ¶ 107.

NIFLA describes the organization's "religious mission" as "includ[ing] helping its members

centers advance their religious missions and beliefs."  Id. at ¶ 108.

### c.  First Bible

Plaintiff First Bible is a Christian Church organized as a non-profit "exclusively for

religious purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code."

Id. at ¶ 44.  First Bible's church is located in Hilton, New York.  Id.  First Bible also

operates a school located in Rochester, New York.  Id.  The church serves the town of

Hilton, New York and the suburbs of Rochester.  Id. at ¶ 114.  The church has been in

service for more than fifty years.  Id. In addition to its work in the Rochester area, First

Bible "seeks to spread God's message throughout the world" through "a thriving

missionary purpose and practice."  Id. at ¶ 115.

First Bible's lead pastor is Kevin Pestke.  Id. at ¶ 116.  The Church "believes the

Bible is the inerrant Word of God and the final authority for human conduct."  Id. at ¶ 117.

First Bible therefore contends that "its mission, message, and statement of faith are in

direct alignment with the Bible."  Id.  First Bible professes that "each human life, from the

moment of conception, is formed by God and bears His image."  Id. at ¶ 118.  First Bible

operates according to a Constitution.  Id. at ¶ 119.  The Constitution includes the Church's

"beliefs regarding human sexuality and abortion."  Id.  The Church "believes that God has

commanded that no intimate sexual activity be engaged in outside of marriage between a

man and a woman."  Id. at ¶ 120.  The Church also professes and teaches that conception

begins life and unborn children are living human beings.  Id. at ¶ 121.  An abortion, the

First Baptist teaches, "constitutes the unjustified, unexcused taking of unborn human

life[.]"  Id.  Abortion thus violates Biblical prohibitions "against the intentional destruction of

innocent human life." Id.  As such, "participation in, facilitation of, or payment for abortion in any circumstance is a grave sin." Id. at ¶ 122.

These beliefs cause First Bible to "[seek] to recognize and preserve the sanctity of human life from conception until natural death." Id. at ¶ 123.  The Church uses "a variety of events, ministries, and partnerships" to promote and support this "pro-life mission" at First Bible and in the broader community. Id. at ¶ 124.  First Bible has a partnership with Mission Share Outreach Center. Id. at ¶ 125.  Mission Share "provides, among other things, pro-life pregnancy care services, food and clothing support, and training classes in life skills." Id. at ¶ 126.  First Bible also has a partnership and provides monthly financial support for Lifesaver Ministries, a pregnancy care center in Gloversville, New York. Id. at ¶ 127.  The Church also has a foster care ministry called HIS Ministry. Id. at ¶ 128.  HIS Ministry gives away diapers, toys, and gift cards to new foster parents. Id. HIS Minstry also offers "respite care" for such parents and uses prayer teams to "lift up each of the foster families and their needs on a regular basis." Id.  These efforts go beyond church members to include foster families who are "outside of First Bible." Id.

First Bible has "14 pastors and directors, . . 24 full-time and part-time employees, and . . . 900+ volunteers." Id. at ¶ 129.  The Church "expects its pastors, directors, employees and volunteers– . . . all who minister in any capacity–to abide by and agree with the church's moral and ethical standards[.]" Id. at ¶ 130.  These standards include First Bible's "religious beliefs and teachings on human sexuality and abortion, in both their work life and private life." Id.  The Church declares that it "will not hire or retain any pastor, director, employee, or volunteer who refuses to assent to its statement of faith, or refuses to live out that statement of faith in his or her personal life." Id. at ¶ 131.  Hiring and

retention decisions are made "in light of its statement of faith." Id. at ¶ 132.  "Pastors,

directors, employees, and volunteers who violate the principles contained in First Bible's

statement of faith can be subject to disciplinary action, up to and including termination."

Id.

First Bible operates Northstar Christian Academy.  Id. at ¶ 133.  This school offers

"traditional curriculum" to around 350 students ranging from preschool to 12th grade. Id.

The Academy has 6 administrators, 33 teachers, and "myriad volunteers."  Id.  Northstar's

mission is:

> to glorify God; establish the scriptures as the final, absolute authority; provide a
> distinctly Christian environment for its student body; teach traditional course
> offerings from a biblical worldview; encourage excellence in all aspects of life;
> encourage the student body to be conformed to Christ; and prepare its students to
> be servant disciples of Christ.

Id. at ¶ 134.  The school "stresses the inculcation of Christian character, virtues, and

morality."  Id. at ¶ 135.  Such values include "the belief that every child is made in the

image and likeness of God," as well as "that abortion is the unjustified taking of an

innocent human life[.]"  Id. These values also include the idea "that sexual activity should

be reserved for a marriage between one man and one woman."  Id.  The Academy

"follows First Bible's statement of faith in all respects."  Id. at ¶ 136.

First Bible owns and operates Grace and Truth Athletics and Sports Park.  Id. at ¶

137.  Grace and Truth "offers recreational and sports programs for children and adults[.]"

Id.  Those programs teach  "good sportsmanship, teamwork, fundamental skill

development, and positive Christian values."  Id.  First Bible employs a director and ten

part-time employees through Grace and Truth.  Id. at ¶ 138.  Grace and Truth "follows

First Bible's statement of faith in all respects."  Id. at ¶ 139.  At both Grace and Truth and

11

Northstar, First Baptist refuses to "hire or retain any director, teacher, employee, or volunteer who refuses to assent to its statement of faith, or who refuses to live out that statement of faith in his or her personal life." Id. at ¶ 140.  The church makes decisions about who to hire and retain in these programs in light of those beliefs, and will not hire or retain "any director, teacher, employee, or volunteer" who does not abide by those beliefs. Id. "Staff, faculty, volunteers, or board members at its school or sports program and facility who violate the principles contained in First Bible's statement of faith can be subject to disciplinary action, up to and including termination." Id.

### B.   Plaintiffs' Allegations Regarding the Statute in Question

At issue here is a bill that became law as Section 203-e of the New York Labor Law.  Plaintiffs allege that the New York State legislature issued memoranda that declared that the statute "would '[ensure] that employees or their dependents are able to make their own reproductive health care decisions without incurring adverse employment consequences.'" Id. at ¶ 147 (quoting New York State Assembly Bill A584 Summary; Senate Bill 660 Bill Summary, Sponsor Memo).  Both the State Senate and State Assembly claimed that the legislation aimed to close "'legal loopholes . . . to ensure that employees' decisions about pregnancy, contraception, and reproductive health are . . . protected under state law.'" Id. at ¶ 148  (quoting above-cited legislative statements). Plaintiffs contend that neither body provided a "description of the genesis or provenance of such asserted legal loopholes." Id. at ¶ 149.  Neither did either body cite any example of employees being deprived of their rights because of these "loopholes" in the law. Id. The summaries also fail, Plaintiffs allege, to point to any actual "'adverse employment consequences' precipitated by any employer decisions in light of employee reproductive

health decisions." Id. at ¶ 150.  The text of the Act also fails to provide any insight into instances of discrimination of legal loopholes that the text sought to solve.  Id. at ¶¶ 151-152.  Plaintiffs allege that the main sponsor of the legislation in the New York State Assembly could not point to any past or present discrimination on the basis of reproductive health decisions in New York when questioned on the matter.  Id. at ¶ 153.  Instead, the legislative sponsor pointed to the actions of Michigan, North Carolina, Illinois and Ohio in enacting similar legislation.  Id. at ¶ 154.  The Senate floor sponsor, Plaintiffs allege, also failed to point to any examples of discrimination in passing the statute.  Id. at ¶ 155.

Plaintiffs further allege that the State Assembly and Senate described support for the Act as a response to challenges by employers to a mandate in the federal Affordable Care Act ("ACA") requiring employer-sponsored health care plans to offer coverage for contraceptives.  Id. at ¶ 156.  Legislators, Plaintiffs claim, characterized these efforts as efforts to discriminate against employees based on their health-care decisions.  Id. Plaintiffs contend that legislators passed the Act in question as an attempt to "[prevent] religious employers form managing their employment relationships consistent with their religious missions and beliefs."  Id. at ¶ 157.  A senate sponsor of the Act argued that "'[w]e are on a dangerous, slippery slope in this country when it comes to protecting an individual's right to privacy and autonomy on decision-making about family planning and reproductive health.'"  Id. at ¶ 159.  She cited lawsuits filed by religious employers and the United States Supreme Court's decision in Hobby Lobby v. Burwell, 573 U.S. 682 (2014) as part of this supposed attack on reproductive health decision-making.  Id. at ¶¶ 160-161. That senator characterized employer-initiated lawsuits against the contraceptive mandate as "encroachments" on employees' reproductive health decisions and argued that the Act

13

was an attempt "to 'prevent' such 'encroachments.'"  Id. at ¶¶ 165-166.  Plaintiffs contend

that legislators' animus to religion is also displayed by their failure to include an exemption

for religious employers.  Id. at ¶¶ 168-169.  One sponsor explained that the Bill did not

contain an explicit ministerial exemption, though the First Amendment's ministerial

exception could be used as a defense in court.  Id. at ¶ 171.

### C.    Statute in Question

The statute in question, a portion of the New York Labor Law, is titled "Prohibition

on discrimination based on an employee's or a dependent's reproductive health decision

making."  N.Y Labor Law § 203-e.  That statute prohibits an employer from "accessing an

employee's personal information regarding the employee's or the employee's dependent's

reproductive health decision making[.]" N.Y. Labor Law § 203-e(1).  The prohibition on

access also "includ[es] but is not limited to, the decision to use or access a particular drug,

device, or medical service without the employee's prior informed affirmative written

consent."  The statute also provides that:

> 2.  An employer shall not:
>
>> (a) discriminate nor take any retaliatory action against an employee with respect to compensation, terms, conditions, or privileges of employment because of or on the basis of the employee's or dependent's reproductive decision making, including, but not limited to, a decision to use or access a particular drug, device, or medial service; or
>>
>> (b) require an employee to sign a waiver or other document which purports to deny an employee the right to make their own reproductive or health care decisions, including use of a particular drug, device, or medical service.

N.Y. Labor Law § 203-e(2).  The statute provides an employee the right to "bring a civil

action . . . against an employer alleged to have violated the provisions of this section."

N.Y. Labor Law § 203-e(3).  In such cases, a court may award damages, including back

pay and attorneys fees and costs, injunctive relief, reinstatement, and liquidated damages. N.Y. Labor Law § 203-e(3)(a-d).  The statute also permits civil penalties against an employer who retaliates against an employee for exercising rights under the statute.  N.Y. Labor Law § 203-e(5).  Finally, "[a]n employer that provides an employee handbook to its employees must include in the handbook notice of employee rights and remedies under this action."  N.Y. Labor Law § 203-e(6).

### D.    Alleged Effect of Statute on Plaintiffs

Plaintiffs allege that the statute in question will have an adverse effect on their ability to operate for their intended purposes and will restrict their freedom of speech, expressive association, religious autonomy, and free speech.  Id. at ¶ 196.  They also claim that the Act infringes their Fourteenth Amendment due process rights because the law is impermissibly vague.  Id.  Complying with the law "would undermine and compromise their pro-life and religious missions, messages, and purposes."  Id. at ¶ 197. The law would also force them "to associate with employees who do not share" their "missions, messages, and purposes."  Id.  The law makes them "permit employees who" lack their beliefs serve "as their messengers to third parties[.]"  Id. at ¶ 198.  Doing so, they claim "would necessarily dilute and change Plaintiffs' messages."  Id.  The law also harms their ability to obtain new employees, since they face "uncertainties surrounding how to find, recruit, and hire new employees consistent with their pro-life and religious missions, messages, and purposes."  Id. at ¶ 199.  They could also face enforcement actions from State officials and could also be subject to private suit.  Id. at ¶¶ 200-201.  The private right of action contained in the statute exposes Plaintiffs to "crippling litigation costs, damages (including liquidated damages), and attorneys' fees and costs."  Id. at ¶ 201.

15

Reinstatement–a remedy available in the statute–would also harm Plaintiffs' ability to avoid employees who act "inimically to the mission and beliefs of those religious organizations."  Id. at ¶ 202.  CompassCare, which has a small budget, would have difficulty absorbing these costs.  Id. at ¶ 203.  All of the Plaintiffs allege that, if they were required to "hire and employ those who have abortions, use abortifacient drugs, or flout Plaintiffs' beliefs regarding sexual morality," they would likely receive fewer donor funds. Id. at ¶¶ 205-206**.**

Plaintiffs allege that they "intend to continue to require their employees, volunteers, board members (and any other persons who serve their organizations) to comply with, among other things, their respective employee handbooks, code of conduct, positional statements, and statements of faith regarding reproductive health decisions, including, but not limited to, pregnancy, abortion, contraceptive use, and sexual morality."  Id. at ¶ 207. CompassCare will not hire anyone who refuses "to waive" the law's "provisions and will refuse to hire or retain any employees" who "refuse to agree to" such a waiver.  Id. at ¶ 208.  CompassCare will not include a notice of rights or remedies in its employee handbook.  Id. at ¶ 209.  NILFA's New York members will take the same actions.  Id. at ¶¶ 210-211.

At present, First Bible does not have an employee handbook and does not require any pastors, directors, employees, or volunteers to sign any handbook, code of conduct, or other statement regarding reproductive health or other issue.  Id. at ¶ 213.  At the same time, the Church does expect such people "to abide by its mission and beliefs in the conduct of their work for First Bible and in their personal lives."  Id. at ¶ 214. First Bible intends to create an employee handbook that describes the Church's beliefs, and will

require pastors, directors, employees and volunteers to sign the handbook.  Id. at ¶ 215.
The Church will therefore require signatories to state "agreement with and fealty towards
First Bible's faith positions."  Id.  All employees and applicants for jobs will be required to
assent to and sign the Church's statement of faith.  Id. at ¶ 216.[2]  Were it not for the new
law, First Bible would put the new employee handbook into operation once completed.  Id.
at ¶ 218.  The Church would not include the notice of rights required by statute into the
employee handbook.  Id. at ¶ 219.

All of the Plaintiffs "intend to take adverse employment action against employees
who choose to procure abortions or otherwise violate their organizational policies
regarding pregnancy, abortion, contraceptive use, and sexual morality."  Id. at ¶ 220.
None of them will comply with any of the notice requirements in the law.  Id. at ¶ 221.
When recruiting employees in any medium, the Plaintiffs intend to include language
stating that employees are required to comply with their "beliefs regarding pregnancy,
abortion, contraceptive use, and sexual morality."  Id. at ¶ 222.

    **E.**    **Causes of Action**

---

[2]The proposed handbook would contain the following language:

All applicants and employees, as a condition of hiring and continued employment,

must agree to personally abide by First Bible's beliefs regarding reproductive health decisions and sexual morality.  More specifically, no employee or perspective employee may have an abortion, help another to obtain an abortion, use abortifacient drugs or devices, or engage in sexual activity outside the context of a marriage between one man and one woman.  Engaging in such activities may result in discipline or termination.  Moreover, as a condition of employment, all employees must agree to waive the protections regarding reproductive health decision making contained in SB 660.

Complt. at ¶ 217.

Plaintiffs' Complaint raises five causes of action, all of them pursuant to 42 U.S.C. § 1983.  Count One alleges that New York Labor Law § 203e violates their First Amendment right to expressive association.  Count Two alleges that the statute violates Plaintiffs' First Amendment free speech rights by forbidding certain speech about their employment standards and compelling them to provide a message to their employees contrary to their religious beliefs.  Count Three alleges that Labor Law § 203e violates Plaintiffs' First Amendment right to religious autonomy by requiring them hire and retain employees who do not believe in and refuse to abide by their ideas about abortion, contraception, and sexual morality.  Count Four alleges that the statute violates Plaintiffs' First Amendment right to free exercise of religion by interfering with their right to hire employees who agree with their values.  Count Five alleges that the statute violates Plaintiff's Fourteenth Amendment due process rights because the law is impermissibly vague.  Plaintiffs seek a declaration from the Court that Labor Law § 203e is unconstitutional and an injunction preventing enforcement of the statute.

After filing the Complaint and serving the Defendants, Plaintiffs filed a motion for a preliminary injunction.  In responding to the preliminary-injunction motion, the Defendants also moved to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief could be granted.  The parties have briefed the issues, and matter is ripe for disposition.

## II.     Legal Standards

### A.      Preliminary Injunction

"A preliminary injunction is an equitable remedy and an act of discretion by the court."  ACLU v. Clapper, 804 F.3d 617, 622 (2d Cir. 2015).  To obtain an injunction, a

18

party "must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." Id.  "A plaintiff who seeks a preliminary injunction that will alter the status quo must demonstrate a 'substantial' likelihood of success on the merits." N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013).  The parties have disputed the prevailing standard for granting an injunction.  The Second Circuit often applies two separate preliminary injunction standards: "(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make a fair ground for litigation, and a balance of the hardships tipping decidedly in the movant's favor." Kelly v. Honeywell International, Inc., 933 F.3d 173, 184 (2d Cir. 2019).  Courts in the Circuit, however, "have repeatedly stated that the serious-questions standard cannot be used to preliminarily enjoin governmental action." Trump v. Deutsche Bank AG, 943 F.3d 627, 637 (2d Cir. 2019).  "A plaintiff cannot rely on the 'fair-grounds-for litigation' alternative to challenge 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme.'" Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs., 769 F.3d 105, 110 (2d Cir. 2014) (quoting Plaza Helath Labs, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1977)).  This rule applies because of "the idea that governmental policies implemented or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Id. (quoting Able v. United States, 44 F128, 131 (2d Cir. 1995)).

> **B.    Motion to Dismiss**

Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.    Analysis

The Court will address the motions in turn, concentrating first on the Plaintiffs' preliminary injunction motion and then addressing the motion to dismiss, as appropriate.

### A.    Irreparable Harm

Defendants argue that the Plaintiff cannot prove irreparable harm.  Since the Court cannot issue preliminary injunction if the Plaintiffs cannot show irreparable harm, the Court must first address that issue.  Plaintiffs point to irreparable harm in several ways. Defendants dispute that any of these alleged harms are legally sufficient for the Court to grant an injunction, particularly because the Plaintiffs have not pointed to any employees who have actually defied the Plaintiffs' restrictions on use of contraception, abortion, or abortifacient drugs.

As a preliminary matter, courts have concluded that "'perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if

20

it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" Borey v. National Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991) (quoting Mamiya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983)). "Violations of First Amendment rights 'are commonly considered irreparable injuries for the purposes of preliminary injunction.'" Latino Offficers Ass'n v. City of New York, 196 F.3d 458, 462 (2d Cir. 1999) (quoting Bery v. City of New York, 97 F.3d 689, 693 (2d Cir. 1996)).  Still, "[a]lthough 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" courts "have not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights[.]" Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 349 (2d Cir. 2003) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  In the Second Circuit, when "a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." Id. at 349.  "In contrast, in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation free speech rights." Id. at 350.  To meet this standard of showing "a cognizable claim founded on the chilling of First Amendment rights, a party must articulate a 'specific present objective harm or a threat of specific future harm.'" Id.  (quoting Laird v. Tatum, 408 U.S. 1, 33 (1972)).  A "conjectural chill," such as when a person "theoretica[lly]" might not speak due to a regulation, "is not sufficient to establish real and imminent irreparable harm." Latino Officers Ass'n v. Safir, 170 F.3d 167, 171 (2d Cir. 1999).

Plaintiffs here in part allege that the statute in question violates their First

21

Amendment right to expressive association by forcing them to accept as employees

persons who do not support or abide by their views on abortion and birth control, prevents

them from avoiding government interference in their internal affairs, and limits their

speech.[3]  Courts in the Second Circuit have used the standard cited above in evaluating

expressive association claims.  See Bray v. City of New York, 346 F.Supp.2d 480, 488

(E.D.N.Y. 2004) (finding that a plaintiff's fear that police would confiscate their bicycles if

_____

[3]Plaintiffs point to a number of ways that the legislation allegedly interferes with their associational rights:

- •	[the statute] requires Plaintiffs to associate with those who disagree with their beliefs and missions, undermining their reason for being.
- •	[the statute] hampers Plaintiffs' ability to recruit and hire new employees because it subjects Plaintiffs to legal liability for requiring and gaining assent to their religious beliefs and codes of conduct.
- •	[the statute] prevents Plaintiffs from taking any adverse employment actions against even those employees who persistently and publicly defy Plaintiffs' religious beliefs and codes of conduct.
- •	[the statute] prevents Plaintiffs from counseling current employees for personally having abortions or using abortifacient medications, or for encouraging or facilitating the same for others, all of which are violations of Plaintiffs' employee handbooks, codes of conduct, and statements of faith.
- •	[the statute] hinders Plaintiffs from communicating their religious pro-life message to women facing unplanned pregnancies, to church members, to school students, and to the public, because it requires them to hire and retain employees who dissent from their beliefs.
- •	[the statute] exposes Plaintiffs to unnecessary legal liability by deputizing private individuals to sue them, when those individuals may not know about Plaintiffs' right to religious autonomy, and in so doing threatens to tie them up in costly litigation, damaging their ability to focus on their pro-life missions.
- •	[the statute] prevents Plaintiffs from requiring compliance with their employee handbooks, statements of faith, and codes of conduct, when that compliance is necessary to the accomplishment of Plaintiffs' religious missions.
- •	[the statute] prevents Plaintiffs from continuing to discuss their religious beliefs and required codes of conduct with their current employees, or from broaching the same with prospective employees, because that could be considered 'propop[sing] to commit a violation' of the" statute.

Plaintiffs' Brief in Response/Reply, dkt. # 25, at 36-37.

they participated in a "critical mass" bike ride did not establish a "chilling effect on" plaintiffs' "First Amendment rights tangible enough to constitute irreparable harm.").

The Plaintiffs thus complain that different portions of the statute violate their First Amendment rights in particular ways.  As to the portion of that statue which prohibits adverse employment actions by an employer based on an employee's decisions about reproductive health care, Plaintiffs allege that they will be forced to associate with employees who do not share their views on abortion and birth control, be required to keep on employees who do not share their views or mission, and be unable to communicate effectively their views on abortion and contraception because of fears of litigation.  The Court finds that these allegations, supported by affidavits and detailed descriptions of the Plaintiffs' operations, are sufficient to establish an irreparable harm that granting an injunction would prevent.  The harm alleged by the operation of the statute would produce a chilling effect on the Plaintiffs' speech, undermining their ability to choose with whom they associate in their cause, and producing a fear of liability caused by promotion of their values.  Plaintiffs have therefore demonstrated that the portion of the statute that regulates employer decisionmaking has a potentially chilling effect on their First Amendment Associational rights.  They have alleged harm sufficiently specific to constitute irreparable harm.

Moreover, as to the portion of the statute that requires the inclusion of particular language in employee handbooks, courts have found that "'[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech.'" Evergreen Ass'n v. City of New York, 740 F.3d 233, 246 (2d Cir. 2014) (quoting Riley v. Nat'l Fed. of the Blind of N.C., Inc., 487 U.S. 781, 795 (1988)).  The regulation here in

question–which requires that certain language be placed in employee handbooks–compels speech from the Plaintiffs that they allege they would not ordinarily make.  Plaintiffs have employee handbooks or intend to produce employee handbooks.  The statute requires the employer to include the speech in any employee handbook that the employer provides.  For the regulation that mandates speech, then, irreparable harm is presumptive, and the Court must determine whether a likelihood of success on the merits exists as to that portion of the statute as well.

### B.    Likelihood of Success on the Merits

The Court must therefore consider next whether the Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claims.  The Court will address each claim in turn.

### i.    Right to Expressive Association

Plaintiffs first argue that Labor Law 203-e violates their right to expressive association by interfering with their right to organize and advocate for their viewpoint on abortion without a compelling state interest for such regulation.  Defendants dispute this contention, and argue that Plaintiffs have failed to state a claim on this issue.

The Supreme Court has concluded that "'implicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" Boy Scouts of America v. Dale, 530 U.S. 640, 648 (2000) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984)). "[T]he First Amendment's protection extends beyond the right to speak."  Rumsfeld v. Forum for Academic & Institutional

24

Rights, Inc., 547 U.S. 47, 68 (2006).  The Amendment also protects the "right to associate

for the purpose of speaking, . . . a 'right of expressive association."  Id. (quoting Dale, 530

U.S. at 644).  That right exists because "[t]he right to speak is often exercised most

effectively by combining one's voice with the voices of others."  Id. "The right to associate

also includes the right not to associate."  Hsu by & Through Hsu v. Union Free Sch. Dist.

No. 3, 85 F.3d 839, 858 (2d Cir. 1996).  "Insisting that an organization embrace

unwelcome members . . . 'directly and immediately affects associational rights.'" Christian

Legal Soc'y Campter of the Univ. of Cal. v. Martinez, 561 U.S. 661, 679 (2010) (quoting

Dale, 530 U.S. at 659).

        The parties appear to agree that claims asserting associational rights under the

First Amendment should employ a three-part standard.  First, the Court should determine

whether the group is engaged in expressive activity.  Next, if the group is engaging in such

activity, the Court should determine whether the law would have a significant impact on

that activity.  Third, the Court should determine whether a justification exists for that

restriction.  See Plaintiff's brief, dkt. # 17-1, citing Dale, 530 U.S. at 648.  The Court will

address Labor Law § 203-e in that way, recognizing that "[i]n the context of claims

asserting First Amendment associational rights we have instructed that, depending on the

burden on those rights, we will 'apply either strict scrutiny, in which case the restriction

survives only if it narrowly drawn to advance compelling state interest, or rational basis

review, in which case the restriction need only be rationally related to a legitimate state

interest." Jacoby & Myers, LLP v. Presiding Justices of the First, Second, Third & Fourth

Dep'ts, 852 F.3d 178, 191 (2d Cir. 2017) (quoting Kraham v. Lippman, 478 F.3d 502, 506

(2d Cir. 2007).  "Strict scrutiny applies only when a challenged regulation imposes 'severe

burdens' on associational rights."  Id.  (quoting Kraham, 476 F.3d at 506).

"The right to free association for expressive purposes is implicit in the First

Amendment free speech guarantee."  Hsu, 85 F.3d 859.  "That right is an instrumental

one: expressive association is protected 'as an indispensable means of preserving other

liberties.'"  Id. (quoting Roberts, 468 U.S. at 618.  "The right to associate also means the

right not to associate."  Id.  "[E]xpressive association is implicated when the decision to

exclude is made in order to foster the group's shared interest in particular speech."  Id. at

859.  Some courts have concluded that "states may enforce antidiscrimination laws

against certain private organizations, defined by particular sets of ideologies, if the

enforcement will not impair the group's ability to pursue those goals and espouse those

ideologies.  State v. Arlene's Flowers, 193 Wn.2d 469, 533 (WA. 2019).  "But the

Supreme Court has never held that a commercial enterprise, open to the general public, is

an 'expressive association' for the purposes of First Amendment protections."  Id.

### a.  Expressive Activity

The first question for the Court is whether the Plaintiffs engage in expressive

activity of the type entitled to First Amendment protection.  "'[E]xpressive association' . . .

protects the right of individuals to associate for purposes of engaging in activities

protected by the First Amendment, such as speech, assembly, the exercise of religion, or

petitioning for the redress of grievances."  Sanitation & Recycling Indus. v. City of New

York, 107 F.3d 985, 996 (2d Cir. 1997).  "To determine whether a group is protected by

the First Amendment's expressive associational right," a court "must determine whether

the group engages in 'expressive association."  Dale, 530 U.S. at 648.  While the

expressive association right "is not reserved for advocacy groups[,] . . . a group must

engage in some form of expression, whether it be public or private."  Id.

Plaintiffs contend that their organizations are entitled to assert an expressive-association right.  In "joining together" to "[communicate] their religiously informed pro-life worldview," Plaintiffs contend, they engage in expressive activity.  They argue that they engage in this activity in a variety of ways:

> CompassCare engages in expressive activity each time it meets with a patient and provides comprehensive information regarding pregnancy and childbirth in hopes that the woman will choose life for her unborn child, each time it offers to share the Gospel with patients as an outreach ministry of Jesus Christ through his church, and each time it authors a blog post or radio spot to provide the community insight into the effect that abortion, and related issues have on our culture.  Plaintiff NIFLA engages in expressive activity by establishing a network of pregnancy care centers dedicated to achieving an abortion-free America, by equipping such centers with legal counsel, support, and guidance on how best to communicate a pro-life message and vision in their communities; and by holding educational seminars to help centers more effectively transmit their pro-life message and thereby save more unborn lives . . . Plaintiff First Bible engages in expressive activity by preaching the Gospel, by inculcating the Christian faith to its students at Northstar Christian Academy, by working with local pro-life pregnancy centers, and by transmitting Christ's message of love and hope to the broader world through its vibrant missionary program.

In other words, every activity in which the Plaintiffs engage is aimed at ending abortion in the United States, and they therefore qualify as expressive associations.  The Court agrees that persons joining together to express an opposition to abortion amounts to expressive activity.  Similarly, persons joining together to encourage others to adopt a particular religious faith or set of religious practices amounts to expressive association. The activities described in the Plaintiffs' Complaint and in the affidavits accompanying their motion describe expressive activity, and the Court finds that they satisfy this part of the test.

**b.    Interference with Right**

27

The Court must next determine if Labor Law 203-e represents substantial interference with the right.  "[T]he right to engage in activities protected by the First Amendment implies 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 548 (1987) (quoting Roberts, 468 U.S. at 622).  To violate the constitution, a law that interferes with such associational rights must "affect in [a] significant way the existing members' ability to carry out their various purposes." Id.  As is at issue here, "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." Roberts, 468 U.S. at 623.  "Freedom of association . . . plainly presupposes a freedom not to associate." Id.

Plaintiffs allege that the regulation would substantially interfere with their expressive activity because it would:

> compel them to associate with employees who disagree with and refuse to live by Plaintiffs' pro-life principles.  The law would alter Plaintiffs' pro-life messages, require them to adopt standards of conduct at odds with their beliefs, and even conscript them into giving their employees notice that the state's views on reproductive health decisions trump the organization's own.  It would force Plaintiffs to employ messengers who would compromise and even contradict the message for which Plaintiffs associate to convey.  For instance, CompassCare and NIFLA's member pregnancy care centers would be forced to counsel pregnant women considering abortion with dissenting staff who insist on personally having abortions, using abortifacient drugs, or advocating positions contrary to the pro-life beliefs of Plaintiffs.  Meanwhile, First Bible would have to rely on preachers, teachers, and other employers who similarly fail to adhere to the church's teaching and beliefs on these subjects.  Even more astonishing, Plaintiffs would have to tolerate employees who not only fail to abide by Plaintiffs' principles in their personal lives, but also those who publically and privately advocate for reproductive health choices directly at odds with Plaintiffs' missions and beliefs.

The Court concludes that Plaintiffs overstate the interference with their expressive

28

rights imposed in Labor Law § 203-e.  First, Plaintiffs elide important limitations on the

reach of the statute. The statute does not apply to all people associated with the

organization, but only to employees.  The statute does not regulate volunteers, who

Plaintiffs allege do much of their work.  Moreover, the statute–as the State

acknowledges–cannot regulate ministers, since such employees are entitled by the First

Amendment to a ministerial exception to employment discrimination laws.  See Hosanna-

Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 190-191 (2012)

(finding that a "ministerial exception" to an otherwise valid employment discrimination

law).[4]  Likewise, nothing in the statute requires Plaintiffs to permit their employees to

---

[4]Much of the activity that employees undertake, particularly for CompassCare and
the member centers in the NFLI, appears to have a focus other than religious outreach,
advocacy to end abortion, or efforts to engage in public debate concerning sexual
morality, abstinence, or contraception.  CompassCare's work, as Plaintiffs describe it,
seems largely to consist of medical care:   "clinical pregnancy testing . . . ; ultrasound
exams; gestational age determinations; complete pregnancy, abortion, and adoption
options consultations; STD testing and treatment; abortion pill reversal services; and
medical, insurance, and community support referrals."  Complt. at ¶ 58.  Likewise, the
Court is uncertain what expressive or ministerial activity is involved in providing "accurate
and complete comprehensive information concerning prenatal development, pregnancy
and childbirth, abortion procedures and risks, and alternatives to abortion."  Id. at ¶ 59.
Like many medical providers, CompassCare claims to offer "rigorous and consistent
treatment and testing protocol," and "informational resources" on "pregnancy, abortion,
post-abortion care and expectations, contraception, and STDs."  Id. at ¶ 60.  Providing this
sort of information to patients seems to the Court a rather standard service provided by
many medical providers and clinics, whatever their position on abortion.  Giving out such
information appears to require medical training, not theological knowledge.  Of course,
Plaintiffs also point out that the medical information their employees provide is part of their
anti-abortion activity, and that the employees who provide this care also offer religious
witness to patients who are amenable.  Those who provide medical information also do
not, consistent with CompassCare's beliefs, "recommend, provide, or refer for abortions or
abortifacient drugs or devices," and instead encourage "adopttion for women experiencing
unplanned and unwarranted pregnancies."  Id. at ¶¶ 69-70.  While CompassCare
provides education about birth control, employees do not "refer patients for birth control in
any form."  Id. at ¶ 73.  The Court offers no opinion as to whether such employees would
qualify for a ministerial exception to the protections in Section 203-e.  The intersection of

advocate positions contrary to their anti-abortion, pro-marriage, religious agenda. Plaintiffs, the Defendants admit, could fire an employee who offered a message contrary to the Plaintiffs' views.  Nothing in the statute regulates what Plaintiffs can say about abortion or how they advocate for the rights of unborn persons.  Plaintiffs could fire an employee who advised a patient to have an abortion, use birth control, engage in sex outside of marriage to a person of the opposite sex, or declared that God did not exist and not face any consequences under Labor Law 203-e.  Plaintiffs could also terminate an employee who advocated publically for abortion rights, same-sex marriage, or access to contraception.  As such, nothing in Labor Law § 203-e puts any direct limits on the expressive activity that Plaintiffs insist is at the core of the organizations' agendas.

The limitations the law actually imposes are different.  First, Plaintiffs are somewhat correct to complain that they may be forced to associate with "employees" whose actions indicate that they do not share their views on abortion and other family planning issues. Plaintiffs would not be permitted to fire or take other adverse action against an employee because of that employee's or that employee's dependent's "reproductive decision making, including, but not limited to, a decision to use or access a particular drug, device, or medial service."  Plaintiffs contend that forcing them to retain employees whose personal lives and actions fail to comport with their ideals would undermine their message and jeopardize funding from people who might believe the organizations failed to live up to their stated pro-life beliefs.  Plaintiffs' complaint, then, is that Labor Law § 203-e will alter

medical training and advocacy represented by CompassCare's work, however, underscores why discovery would be necessary to determine the training, education, and responsibilities of any individual position, and whether an employer could use the ministerial exception as a defense against firing them.

their appearance and thus undermine their message.  People will know that, even though they proclaim a public commitment to a particular message about religion, sexuality, abortion, and contraception, employees may engage in conduct contrary to their professions of faith.

"When evaluating a First Amendment challenge to a limitation on associational freedom, courts apply either strict scrutiny, in which case the restriction survives only if it is narrowly drawn to advance a compelling state interest, or rational basis review, in which case the restriction needs only be rationally related to a legitimate state interest."  Karham v. Lippman, 478 F.3d 502, 506 (2d Cir. 2007).  "Strict scrutiny applies only when a challenged regulation imposes 'severe burdens' on associational rights."  Jacoby & Myers, 852 F.3d at 191.  "Mere incidental burdens on the right to associate do not violate the First Amendment; rather, '[t]o be cognizable, the interference with [plaintiffs'] associational rights' must be 'direct and substantial' or 'significant.'"  Tabbaa v. Chertoff, 509 F.3d 89, 101 (2d Cir. 2007) (quoting Fighting Finest, Inc., 95 F.3d 224, 228 (2d Cir. 1996)).  The Court, as explained above, finds that the statute in question imposes some incidental limitations on the Plaintiffs' associational rights, but that those limitations do not place a restriction on their ability to advocate against abortion, contraception, and in favor of particular understandings of human sexuality, much less a severe one.  Moreover, Plaintiffs admit that volunteers perform much of the work they do.  Such employees are not covered by Section 203-e.  A regulation that "make[s] it more difficult for individuals to exercise their freedom of association . . . does not, without more, result in a violation of the First Amendment."  Fighting Finest, 95 F.3d at 228.  The limitations here are not on the speech for which the Plaintiffs contend they associate, but instead threaten to create a

31

situation where hearers might perceive that not all employees (and only employees) of the

Plaintiffs practiced what they preached.  The danger that others be able to call the

Plaintiffs hypocrites is not a significant limitation on Plaintiffs' speech or right to associate.

Given the way that our political discourse currently works, such allegations are surely a

feature of advocacy in the highly charge area in which the Plaintiffs engage.  The Court

also fails to see how a regulation promulgated by the State of New York would cause

potential donors to conclude that Plaintiffs are not sincere in their anti-abortion activity.

Plaintiffs can certainly draw a distinction for donors between what they believe and what

the State requires.  The Court therefore finds that the Section 203-e question needs only

to survive rational basis scrutiny.

### c.     Justification for Regulation

Defendants contend that New York promulgated Section 203-e in an attempt to

"prohibit employers from discriminating against employees based on the employees' or

dependents' reproductive health decision . . .  and to protect New Yorkers' rights to privacy

and autonomy in their healthcare and family planning decisions and records information

related thereto."  The Court agrees that the state has a legitimate interest in protecting

employees' rights to make their own decisions about family planning and the privacy of

such decisions.  A law that prevents all employers from taking adverse action against

employees who exercise these rights bears a rational relation to that aim.  Plaintiffs have

therefore failed to demonstrate a likelihood of success on the merits of this claim, and their

motion for a preliminary injunction will be denied in this respect.  The Court will also grant

the Defendants' motion to dismiss in this respect.  For the reasons explained in connection

with Plaintiffs' preliminary injunction motion, Plaintiffs have failed to allege facts sufficient

to make it plausible that they could prevail on their expressive association claim.  They have not alleged that the Section 203-e places a significant restriction on their associational rights, and the Court concludes that the statute can survive rational basis scrutiny.

### ii.    Free Exercise

Plaintiffs also contend that the statute violates their right to free exercise of religion by preventing them from hiring or firing individuals who share their views on abortion and contraception.  They argue that the law targets their religion and is not generally applicable.  To support this "targeting" claim, Plaintiffs point to the legislative history of the law, discussed above.  They argue that this "targeting" means that the law is not neutral, even if it appears so.  In any case, Plaintiffs insist, the law is not neutral because it does not apply to all employers in the state, at least in terms of the notice provision.  That provision applies only to employers who have handbooks.

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."  Employment Div. v. Smith, 494 U.S. 872, 876 (1990).  "The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'"  Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S.Ct. 2012, 2019 (2017) (quoting Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 533 (1993)).  At the same time, a profession of religious faith does not permit an observant religious person to ignore any law that contradicts that person's religious beliefs: the Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State

33

is free to regulate."  Smith, 494 U.S. at 879.  To the contrary, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct his religion prescribes (or proscribes).'"  Id. (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982)).  "Where the government seeks to enforce a law that is neutral and of general applicability," the government "need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices."  Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002).

Plaintiffs first argue that the law is not neutral.  "To determine neutrality, we being with the statute's text, 'for the minimum requirement of neutrality is that a law not discriminate on its face."  Cent. Rabbinical Cong. of the Untied States v. New York City Dep't of Health & Mental Hygiene, 763 F.3d 183, 193 (2d Cir. 2014) (quoting Lukumi, 508 U.S. at 533).  Plaintiffs do not dispute that, on their face, the provisions of the statute are neutral.  The inquiry does not end with facial neutrality, however, "because the neutrality requirement extends beyond facial discrimination."  Id. at 193-194.  "'Official action that *targets religious conduct for distinctive treatment*' must also satisfy strict scrutiny."  Id. at 194 (quoting Lukumi, 508 U.S. at 534 (emphasis added in original)).  A neutral law that "'target[s] the practices of a particular religion'" is not neutral.  Id. (quoting Lukumi, 508 U.S. at 542).  A regulation that *"purposefully* singles out religious conduct performed" by a particular religious group is not neutral.  Id. (emphasis in original).

Plaintiffs point to the testimony of New York State Senator Jen Metzger during a hearing on the bill that became Section 203-e as evidence that the statute is not neutral. Senator Metzger stated:

34

> We are on a dangerous, slippery slope in this country when it comes to protecting an individual's right to privacy and autonomy in decision-making about family planning and reproductive health.  Since enactment of the Affordable Care Act, over 100 lawsuits have been filed by employers determined to deny workers coverage of reproductive health services and products based on the employer's own personal and political beliefs.
>
> In its 2014 decision in the Hobby Lobby case, the Supreme Court for the first time recognized a qualification for a religious exemption by a corporation.
>
> As Justice Ruth Bader Ginsburg argued: "The court has essentially treated for-profit corporations as people capable of exercising religion, putting us on a dangerous path with regard to employees' privacy and personal freedoms."
>
> The Boss Bill seeks to prevent this further encroachment by employers into the private decisions of employees on matters that having nothing to do with the performance of their job.
>
> Choosing whether, when and how to have children is a decision for individuals and their families.  No one should fear that they will lose their job or be demoted because of their own private reproductive health decisions.

New York State Senate, Transcript of Regular Session, January 22, 2019, dkt. # 1-2, at 433-434.

Plaintiffs' Complaint includes a transcript of the debate in the New York Assembly. See Transcript of NY Assembly Debate, January 22, 2019, dkt. # 1-3.  Assemblywoman Ellen Jaffee sponsored the legislation.  Id. at 121.  She stated that "[t]his legislation is about simple fairness."  Id.  "No one," Jaffee claimed, "should have to experience discrimination in the workplace or risk losing their job because of their private and personal health decisions."  Id. at 121-122.  Because of the legislation, persons and families in New York would be "able to make decisions about their reproductive health, including assessing care related to pregnancy, family planning or any other reproductive health service" without suffering "discrimination or facing retaliatory personal action in the hands of their employer."  Id. at 122.  The State, Jaffee explained, "has a long history of

35

protecting individuals from discrimination in the workplace.  Decisions about pregnancy, using contraception and other personal health matters should also be protected under the law."  Id.

In response to a question about from another legislator about "where" such "discrimination" was "occurring," Jaffee explained that "there are many employers and we have–I have definitely–there have been a number of incidents where the employers have found information about personal, you know, decisions about contraception or other certain reproductive health care" who then "punish their workers, and it happens in a variety of places."  Id.  When asked to cite studies that showed such discrimination, Jaffee responded that Illinois, Michigan, North Carolina, Ohio, and the District of Columbia had all passed similar laws.  Id. at 123.  So had New York City.  Id.  Asked if the bill would "prevent" a "religious organization . . . from enforcing their religious precepts," Jaffee responded "No."  Id. at 127.  The "legislation applies to all employers and does not contain any mention of religious beliefs."  Id.  An employer could use the "ministerial exception" as a defense, but "the court would then determine whether or not the employee is considered a minister for the purposes of religious organization that is being accused of this–of this kind of a discrimination."  Id.

In the end, Jaffee argued:

Employers should not be allowed to use their personal beliefs to discriminate against their employees.  Over the years, various Federal and State laws have been enacted with the commitment to protecting individuals against employment discrimination.  However, employees are still vulnerable to discrimination based on their reproductive health decisions, and this happens quite frequently, unfortunately.  When employers are allowed to discriminate in the workplace because they disagree with an employee's or their dependents private reproductive health decision, their actions not only create an unfair and intimidating work environment, but they also jeopardize the overall health, safety and livelihoods of

36

women and their families.  Women, not their bosses, should get to decided when, whether and how they start a family.  Individuals should not have to worry about the risk of being fired, getting demoted or facing threats and retaliation at the hands of their employer simply because they choose to use birth control or access other reproductive health services.  No employee in the State of New York should ever be discriminated or retaliated against by their employer for these personal and private decisions regarding their reproductive health.

Id. at 132.  Jaffee further added that she had sponsored the legislation in the Assembly over the previous five sessions and that she felt pride "to be a part of this historic moment as we move to protect women's reproductive health choices and their families in New York State."  Id. at 133.

Assemblyman Goodell spoke to raise concerns about the bill.  While he agreed with "the general concept that an employee's reproductive decisions overall in general are none of the business of an employer," he had concerns about the language of the statute. Id. at 129-30.  The bill did not seem to carve out "exceptions to the general rule" on discrimination that were necessary, such as for "a very pregnant firefighter fighting fires" who might endanger herself or her child, or "a policewoman."  Id. at 130.  The bill also lacked an exception for religious organizations which were "very clear about how their view of morality is in terms of sexual relationships, particularly those sexual relationships that are outside of marriage."  Id.  "Does this language have any exception for a church?" he asked.  Id.  Could a church fire a nun who became pregnant, "[a]nd what if the church is practicing abstinence and they discover that the person who is teaching that class is violating the very things that the church stands for."  Id.  One Assembly member, Assemblyman O'Donnell, addressed Goodell's concerns about nuns.  Id. at 133.  He pointed out that "[n]uns are not employees. They're never employees."  Id.  Thus, O'Donnell claimed, "to stand here on the floor and act as if nuns can be fired for getting

37

pregnant is wrong." Id.

Assemblywoman Simon also spoke to explain her vote. She described the intent of the bill as "protect[ing] workers' abilities to make reproductive health decisions without the fear of getting fired or other repercussions." Id. at 134. The bill aimed to "protect an individual's employment status when the employee's reproductive health decisions do not match those the boss deems acceptable." Id. Such decision "are personal, private health care decisions," Simon explained, "and there is no place for a boss to interfere in these decisions." Id. Such decisions could include "a worker accessing birth control, an LGBT couple adopting, a person having a child outside of marriage, using in vitro fertilization or having a vasectomy." Id. A person should be permitted to make such decisions "free from fear of retaliation by their boss because their boss holds other views. Workers should be evaluated on their work performance and not their reproductive health decisions." Id.

Plaintiffs' Complaint also contains as an exhibit the memorandum in support of the bill that became section 203-e. See dkt. # 1-4. That memorandum states as the purpose of the bill: "[t]o prohibit employers from discriminating against employees based on the employee's or dependent's reproductive health decision, and to provide remedies for such violations." Id. at 4. The memorandum also provides "justification for the legislation." Id. That justification provides that the "bill ensures that employees or their dependents are able to make their own reproductive health care decisions without incurring adverse employment consequences." Id. As did the bill's floor sponsor, the justification notes that employers have challenged a mandate in the ACA that employer-provided health care include "FDA-approved birth control methods without out-of-pocket costs," citing their

"personal beliefs." Id.  "Employers," the bill's sponsors claimed, "should not be able to

discriminate or interfere in an employees' personal medical decisions." Id.  The bill also

sought to close "loopholes" in employment-discrimination law "which leave employees

vulnerable to discrimination based on their reproductive health decisions." Id. Closing

such "loopholes" would "ensure that employees' decisions about pregnancy,

contraception, and reproductive health are also protected under state law." Id.

Legislators also worried that employers, despite the medical privacy about health care

guaranteed in federal law, could become aware of an employee's health decisions

through various other means, such as social media, and would discriminate against

workers on that basis. Id. at 4-5.

A court may determine a statute had discrimination as its object "from both direct

and circumstantial evidence." Church of Lumi Babalu Ave v. City of Hialeah, 508 U.S.

520, 540 (1993).  "Relevant evidence includes, among other things, the historical

background of the decision under challenge, the specific series of events leading to the

enactment or official policy in question, and the legislative or administrative history,

including contemporaneous statements made by the members of the decisionmaking

body." Id.  Plaintiffs argue that evidence that the law was "targeted" at their religious

practice comes in the statute's sponsors' mention of the Hobby Lobby case, which

indicates that the legislature "passed" the statute "to prevent religious employers from

operating in accord with their faith."  That mention shows a lack of neutrality, Plaintiffs

claim.  Because the complaint alleges that Metzger "openly criticized the decision in

Hobby Lobby and bemoaned the Court's holding that certain religious employers had the

right to operate according to their faith," Plaintiffs claim, they have established that the

39

purpose of the legislation was to harm their practice.  Comments by other legislators and in the memoranda described above also indicate that such "targeting" existed.  Plaintiffs further argue that the legislature failed to put forth any evidence of actual employment discrimination on the basis of reproductive decision making.  Moreover, the legislation failed to exempt religious employers.

The Court has considered the documents attached to Plaintiffs' Complaint.  The Court agrees that the sponsor of the legislation, as well as the memoranda in support of that legislation, indicated a concern that certain employers had sought to limit their employees' use of contraceptives through their health care plans, and that such actions represented an attempt to interfere with the reproductive health care choices those employees made. While Plaintiffs claim that an animus towards their religion motivated such criticism, the statements cited and quoted by the Plaintiffs do not criticize the religious views of the employers who brought suit in Hobby Lobby.  While the employers in Hobby Lobby certainly stated religious doctrines as their motivations, the sponsors of the New York bill did not address such religious motivations but relied instead on the way that the views of employers interfered with the rights of New Yorkers to exercise their constitutional rights to contraception and abortion.  Those sponsors described a desire to protect women's rights, not interfere with religious doctrines.  They noted that the legislation was designed to protect both women who utilized contraceptives and had abortions and women who faced discrimination because they did not use such methods.  Supporters acknowledged that the legislation would interfere with the religious views of some employers, but expressed an understanding that the law would not apply when workers qualified for the ministerial exception.  They also explained why religious employers were not entirely exempted from

40

the statute; as explained above, the ministerial exception applies only to certain employees, and litigation is necessary to determine whether, for example, an employee of a Christian school performs the functions of a minister and qualifies for the exception.

In the end, the Court cannot find that the evidence presented by the Plaintiffs establishes that the legislature's purpose was "to challenge the plaintiffs' religious beliefs" and instead finds that "there was a neutral, secular purpose" for Section 203-e: protecting New Yorkers' right to make their own decisions about reproduction, including whether to have a child and whether to use birth control. Commack Self-Service Kosher Meants, Inc. v. Hooker, 680 F.3d 194, 211 (2d Cir. 2012). In the legislative debates cited above, legislators made clear that they had a concern about employers punishing employees for choosing to use birth control or have an abortion, but the debates also indicate that legislators considered the neutral language in the law a benefit because it would protect whatever choice New Yorkers made about having children.

Plaintiffs next argue that the law itself is not generally applicable. "The general applicability requirement prohibits the government from 'in a selective manner impos[ing] burdens only on conduct motivated by religious belief.'" Cent. Rabbincal Cong., 763 F.3d at 196 (quoting Lukumi, 508 U.S. at 543. Assuming that the law is otherwise enforceable, the statute applies both to religious and non-religious employers on the same terms, and does not include any requirements that work to include or exclude religious employers from coverage. Defendants focus on the "notice" provision in the statute. See They argue that the provision is "underinclusive" because it does not apply to all employers, but only to those who maintain employee handbooks. By not including employers without employee handbooks in the notice provision, Plaintiffs claim, the legislation permits many

41

employers to "leave their employees in the dark as to their new 'rights' under the law." The Court is not persuaded.  Plaintiffs attempt to draw too fine a distinction.  The notice provision is generally applicable to all employers who publish an employee handbook; a covered employer who publishes a handbook must include the notice, and that requirement applies generally.  Thus, the law is generally applicable.

The Court therefore concludes that the statute need only pass rational basis scrutiny to survive a free exercise challenge on this basis. The court has already concluded that the statute can survive such review.  The Court will therefore deny the motion for a preliminary injunction on these grounds.  Because, considering the Complaint and the documents attached to the Complaint, the Court has concluded that the Plaintiffs have failed to allege facts sufficient to support a free association claim, the Court will grant the Defendants' motion to dismiss in this respect.

### iii.    First Amendment Freedom of Speech

Plaintiffs argue that Section 203-e's notice and waiver provisions violate the First Amendment's free speech guarantee.  Plaintiffs contend that the notice provision compels them to engage in speech they would not otherwise include in their handbooks and therefore violates the compelled speech doctrine.  Plaintiffs also contend that the waiver provision chills speech by prohibiting religious employers from asking their employees "to signify compliance with their statements of faith and/or codes of conduct by signing and assenting to them."  Both provisions, they claim, are invalid content and viewpoint regulations on speech and cannot survive a challenge.  They also contend that the statute as a whole prevents them from speaking on abortion-related issues.

"The First Amendment . . . prohibits laws that abridge the freedom of speech."  Nat'l

Inst. of Family & Life Advocates v. Becerra, 138 S.Ct. 2361, 2371 (2018).  Courts

"distinguish between content-based and content-neutral regulations of speech."  Id.

"Content-based regulations 'target speech based on its communicative content.'"  Id.

(quoting Reed v. Town of Gilbert, 576 U.S. ____, ____, 135 S.Ct. 2218 (2015)).  Such

regulations "'are presumptively unconstitutional and may be justified only if the

government proves they are narrowly tailored to serve compelling state interests.'"  Id.

(quoting Reed, 135 S.Ct. 2218).  When a state compels an individual "to speak a

particular message," the state "alter[s] the content of [their] speech,'" and engages in

content-based regulation.  Id. (quoting Riley v. National Federal of Blind of N.C., Inc., 487

U.S. 781, 795 (1988)).  A court is to "apply the most exacting scrutiny" to such restrictions

on speech.  Turner Broad. Sys. v FCC, 512 U.S. 622, 642 (1994).[5]  Under such "strict

scrutiny," a court considers "whether a law is narrowly drawn to serve a compelling

governmental interest."  Evergreen Ass'n v. City of New York, 740 F.3d 233, 245 (2d Cir.

2014).  "The statute must use the least restrictive means to achieve its ends."  Id. (quoting

United States v. Playboy Entm't Group, 529 U.S. 803, 813 (2000)).   The standard is a

difficult one to meet, but "it is not true 'that strict scrutiny is strict in theory, but fatal in

fact.'"  Id. (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237 (1995)).  "The

First Amendment is concerned with a *balancing* of interests."  Id. at 247 (emphasis in

original).

---

[5]The Court notes that the strict scrutiny test is different in the context of a free-exercise claim.  In that setting, a court considering whether legislation advances a compelling state interest is to "[look] beyond broadly formulated interests justifying the general applicability of government mandates and [scrutinize] the asserted harm of granting specific exemptions to particular religious claimants."  Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 431 (2006).

### a.   Compelled Speech

Plaintiffs first contend that the notice provision of Section 203-e is compelled speech unsupportable under strict scrutiny.   "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."  Wooley v. Maryland, 430 U.S. 705, 714 (1977). "[T]he First Amendment protects the 'right to decide what to say and what not to say.'" Burns v. Martuscello, 890 F.3d 77, 84 (2d Cir. 2018) (quoting Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011)).

Section 203-e provides that "[a]n employer that provides an employee handbook to its employees must include in the handbook notice of employee rights and remedies under this section."  NY Labor L. § 203-e(6).  The statute does not dictate particular language or a particular form for the notice.  Presumably, the rights about which the employer would have to notify an employee would be the prohibition on an employer's accessing information about an employee's or an employee's dependent's "reproductive health decisionmaking," the statute's prohibition on discrimination or retaliation because of such decision making, and the statute's protection against an employer-mandated waiver of the employee's right to make their own reproductive health-care decisions.  See NY Labor L. §§ 203-e(1)-(2).  Such notice might also include the situations in which an employee could raise a retaliation claim.  NY Labor L. § 203-e(5)(a-c).  The employer would also be required to report the remedies available in the statute, including the employee's right to bring a civil action against "an employer alleged to have violated the provisions" of the statute.  N.Y. Labor L. § 203-e(3).  In filing such a lawsuit, an employee could obtain damages, including back pay, benefits, and attorneys fees and costs.  N.Y.

44

Labor L. § 203-e(3)(a).  The employee could also obtain injunctive relief, reinstatement, and liquidated damages.  N.Y. Labor L. § 203-e(3)(b-d).

The Defendants argue that the speech the statute compels is not based on the content of the employers' speech because it applies to all employers, not just religious ones like the Plaintiffs.  The statute also aims at protecting individual rights to autonomy and protects against discrimination.  The language in question does not require employers to take a position on the issue of abortion and contraception, but instead simply directs them to state factual and accurate information.  A mandate to disclose such "factual" information, Defendants insist, must meet only rational basis scrutiny.  The statute meets that requirement by promoting the state's interest in prohibiting discrimination, protecting individuals' right to make their own health decisions, and protecting the privacy of health information.

Plaintiffs contend that their reason for being is to oppose abortion, contraception, and ideas of sexual morality that are contrary to their understanding of Christianity and the Holy Bible.  They also share their faith in Jesus Christ.  They assert that the speech they would be compelled to give here is contrary to those understandings.  They contend that under Section 203-e they are required "to tell employees that they can obtain abortions without employment consequences[.]"  Including such statements, they claim, will force them to "[tell] employees they can view abortion and other objectionable activities as permissible alternatives."  Plaintiffs state that they would not make such statements to their employees without the statutory mandate.

The Supreme Court recently addressed a similar requirement to provide notice In National Institute of Family & Life Advocates, 138 S.Ct. 2361.  There, the Court

45

considered the level of scrutiny required when the State of California mandated that certain licensed medical facilities that provided "'family planning or pregnancy-related services'" read a notice to patients that explained that "'California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women." Nat'l Inst., 138 S.Ct. at 2369 (quoting Cal. Health & Safety Code Ann. §§ 123471(a), 123472(a)(1)). The Court concluded that this notice requirement amounted to "a content-based regulation of speech" because it "compell[ed] individuals to speak a particular message" and thus "'altered the content of [their] speech.'" Id. at 2371 (quoting Riley v. National Federal of Blind of N.C., Inc., 487 U.S. 781, 795 (1988)). The notice altered the Plaintiffs' speech because it "requir[ed] petitioners to inform women how they can obtain state-subsidized abortions . . . at the same time petitioners tr[ied] to dissuade women from choosing that option[.]" Id. The court below had applied a lower level of scrutiny because the communications between clinics and doctors amounted to "professional speech." Id. The Supreme Court examined the issue and concluded that "neither California nor the Ninth Circuit has identified a persuasive reason for treating professional speech as a unique category that is exempt from ordinary First Amendment principles." Id. at 2375. Rather than deciding whether there were situations where professional speech mandated a different level of scrutiny, the Court found the regulation invalid because the requirement could not "survive even intermediate scrutiny." Id.

The Court finds the situation here analogous. The notice directed by the statute is language that the Plaintiffs would otherwise not use, and they contend that the prohibitions on discrimination because of "reproductive decision making" undermines their

46

message that the only choices that persons should make on such matters are to carry a child to term, not use birth control, and conduct their sexual lives according to the standards Plaintiffs claim the Bible sets out.  While the language in Section 203-e's notice section does not mention abortion by name, does not suggest to anyone that abortion providers are available, and does not direct anyone to use birth control, the Court finds that the statute compels Defendants to use language they otherwise would not.  The notice provision, therefore, is subject to strict scrutiny.  No issue of professional speech applies here, which could raise an issue concerning some other level of scrutiny.

The Defendants advance the protection of employees' right to be free from discrimination because of their reproductive health care choices, as well as a desire to protect the privacy of health care choices and information, as the objective of the statute. The Court agrees that such an aim amounts to a compelling state interest.  The right to make choices about abortion and birth control, after all are rights guaranteed in the Constitution.  See, e.g., Planned Parenthood v. Casey, 505 U.S. 833 (1992) (acknowledging both a woman's right to choose to terminate a pregnancy and the right of the state to place some limits on that right);  Griswold v. Connecticut, 381 U.S. 479, 485 (1965) (Connecticut law forbidding use of contraceptives violated the constitutional right to privacy contained in the Due Process clause); Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 727 (2014) ("Under our cases, women (and men) have a constitutional right to obtain contraceptives[.]").  A state has a compelling interest in preventing discrimination and "discriminatory interference with constitutional rights[.]"  Jews for Jesus, Inc. v. Jewish Community Relations Council, Inc., 968 F.2d 286, 295 (2d Cir. 1992).  The Defendants have therefore articulated a compelling interest.

The question is therefore whether the notice requirement is "narrowly tailored" to achieve that compelling interest. In doing so, the Court is to consider whether "the statute . . . uses the least restrictive means to achieve its ends." Evergreen Ass'n, 740 F.3d at 245. The Court is also to note that "[t]he First Amendment is concerned with a *balancing* of interests." Id. at 247 (emphasis in original). The notice requirement here is different from the notice requirement in National Institute of Family & Life Advocates, which the Supreme Court found failed even intermediate level scrutiny. In engaging in such a balancing test, the audience for the notice is different. In National Institute, the audience is the patients who appeared at a clinic, seeking information and assistance with pregnancy. The plaintiffs' mission in treating those patients, like the Plaintiffs' here, was to provide information and argument to convince pregnant women that they should not have abortions. Requiring the same people arguing against abortions to tell their patients that abortion was an option that frustrated that message. The audience in this case is Plaintiffs' employees. Those employees are not the subjects of Defendants persuasive campaigns as much as they are participants in them. The notice requirement would thus appear to do less damage to Plaintiffs' message here than in National Institute, since the notice is tied up with the Plaintiffs' internal affairs and not the spaces where they advocate against abortion and birth control and for a certain understanding of human sexuality. The speech would therefore do less damage to Plaintiffs' mission than the notice requirement in National Institute.

The content of the notice is also dissimilar. While a notice that forced anti-abortion activists to inform pregnant women that abortion is an available option for those women addresses directly the ill that the National Institute plaintiffs sought to address, the notice

48

here does not mention abortion or contraception.  Instead, the statute simply uses the phrase "reproductive health decision making."  Plaintiffs understand that phrase to imply abortion and contraception, but employees would need to share in that inductive leap to reach that conclusion.

Those differences make the threat to Plaintiffs' speech less direct than the threat in National Institute.  The notice requirement does not force the Plaintiffs to read a message that implicitly attacks their views on abortion and contraception to the patients they are trying to convince to choose life and thus the language of the notice does not undermine that mission.  At the same time, the notice could be interpreted to inform employees that their employer's views on these issues are contradicted by the State's views.  The notice requirement is not the least restrictive means available to inform Plaintiffs' employees of their rights under Section 203-e.  The Defendants require Plaintiffs either to speak their message about the rights available under Section 203-e or refrain from publishing an employee handbook, but the State could inform employees of their rights by other means that did not interfere with the message Plaintiffs aim at their employees.  The State could advertise Section 203-e.  The State could publicize the rights available under the statute with other information concerning employment discrimination laws separate from the Plaintiffs' handbooks.  See Nat'l Inst., 138 S. Ct. at 2376 (discussing ways California could have informed the public about other pregnancy-related services available without requiring that anti-abortion plaintiffs provide that information).  There are thus ways to make employees aware of their rights without requiring the Plaintiffs to promote them. See Riley, 487 U.S. at 800.  As such, the notice provision is not narrowly tailored and the Court finds that Plaintiffs have a substantial likelihood of success on the merits of their

49

compelled speech claim as it relates to the notice provision.

Having found a substantial likelihood of success on the merits on this claim, the Court must consider whether the balance of the equities favors granting an injunction, as well as whether doing so would be in the public interest. Clapper, 804 F.3d at 622. The Court finds that the balance of the equities favors granting the injunction, since the Plaintiffs face a deprivation of their constitutional rights by enforcement of this portion of the statute, and the Defendants do not face harm from enforcing an unconstitutional statute. Likewise, enjoining enforcement of a statute that potentially violates citizens' constitutional rights is in the public interest.

Because the Court has concluded that Plaintiffs meet the preliminary injunction standard in this respect, the Court will deny the Defendants' motion to dismiss on that basis. Plaintiffs have clearly stated a claim upon which relief could be granted.

### b.    Content-based Regulations

Plaintiffs contend that Section 203-e's notice and "no waiver" provisions amount to content-based regulations of speech and violate their First-Amendment rights. Plaintiffs argue that the notice provision forces them to speak words they would otherwise never utter, and it does so at the beginning of the employment relationship. "At the very time Plaintiffs need to convey to their employees the centrality of living the organizations' messages," Plaintiffs claim, "the state forces them to inform potential employees that such conduct is not required at all, thereby undermining Plaintiffs' efforts to establish a team-oriented approach to accomplishing their respective missions." The waiver provision is a content-based regulation, Plaintiffs claim, because it bans speech concerning a particular subject matter but nothing else. The waiver concerns only reproductive health decisions

50

while permitting waivers on other subjects but does not allow Plaintiffs to address the primary matter of their concern.   As content-based regulations, Plaintiffs claim, the notice and no-waiver provisions are subject to strict scrutiny.  Plaintiffs insist that they cannot survive such scrutiny.  Since the Court has determined that the notice provision cannot be enforced, the Court will address only the waiver provision.

In evaluating First-Amendment claims, courts "distinguish between content-based and content-neutral regulations of speech."  Nat'l Institute of Family & Life Advocates v. Becerra, 138 S.Ct. 2361, 2371 (2018).  A content-based regulation "'target[s] speech based on its communicative content.'"  Id. (quoting Reed v. Gown of Gilbert, 576 U.S. ___, ___, 135 S.Ct. 2218, 192 L.Ed2d 236 (2015)).  Such regulations are presumed to violate the constitution and survive only strict scrutiny.  Id.  "In the analysis of whether a regulation is content-based or content-neutral, the 'principal inquiry . . . , in speech cases generally . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'"  Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d Cir. 2005) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  A regulation "'is content neutral so long as it is justified without reference to the content of the regulated speech.'"  Id. (quoting Ward, 491 U.S. at 791) (internal quotations omitted)).  "'A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'"  Id. at 150 (quoting Ward, 491 U.S. at 791).  "Thus, a regulation that targets only potentially harmful secondary effects of speech, rather than the contents of the speech itself or the listener's agreement or disagreement with those contents, is deemed content-neutral."  Id.

The Court has already concluded that the notice provision cannot be enforced

against the Plaintiffs, and will therefore concentrate on the waiver provision.  That

provision that prohibits an employer from "requir[ing] an employee to sign a waiver or

other document which purports to deny an employee the right to make their own

reproductive health care decisions, including use of a particular drug, device, or medical

service."  NY Labor L. § 203(e)(2)(b).  The Court finds that this regulation is content-

neutral.  The regulation does not target Plaintiffs' pro-life speech directly and has a

primary purpose of regulating conduct, not speech.  The regulation does nothing to

prevent Plaintiffs from continuing to speak against abortion, birth control, contraception, or

certain types of marriages.  The regulation does not prevent employers from telling

employees that certain behaviors are morally objectionable and contrary to the ethos of

their organization.  The regulation simply prevents employers from requiring employees to

sign a waiver of the rights Section 203-e protects.  Any restriction on speech in the

regulation is secondary to the regulation's purpose: to prevent employers from forcing

employees to waive their rights under Section 203-e as a condition of employment.  The

Court's conclusion regarding the neutrality of the statute in the free-exercise context

supports the Court's conclusion here.

When a regulation is content-neutral, the Court applies "'intermediate scrutiny'" to

such a regulation.  Matrovincenzo v City of New York, 435 F.3d 78, 98 (2d Cir. 2006).

Regulations survive that scrutiny when they "'are reasonable, are narrowly tailored to

serve a significant governmental interest, and leave open ample alterative channels for

communication of that information.'"  Id. (quoting Hobbs, 397 F.3d at 149).  Under this

standard, the government does not need to use "'the least intrusive means'" to meet its

aims.  Id. (quoting Hobbs, 397 F.3d at 149).  Instead, the government's regulation survives

scrutiny "'so long as the . . . [content-neutral] regulation promotes a substantial government interest that *would be achieved less effectively absent the regulation*." Id. (quoting Hobbs, 397 F.3d at 149) (emphasis in original)). The regulation here survives such scrutiny. The government interest here is to prevent discrimination and retaliation against persons who exercise their constitutional rights regarding abortion and birth control, and the regulation serves that purpose by preventing an employer from conditioning employment on foregoing those rights. Without the regulation, an employer could use a waiver to regulate the very acts the government seeks to protect. Moreover, the regulation itself does not prevent employers from speaking on the issue and explaining the views and standards of the organization. The regulation also does nothing to prevent employers from advocating for their views to the general public.

The Court will therefore find that Plaintiffs have not demonstrated a substantial likelihood of success on the merits with respect to the waiver provision in the statute. The Court will therefore deny the motion for a preliminary injunction in that respect. The Court will grant the Defendants' motion as it applies to this claim against the waiver provision.

### c.    Viewpoint Discrimination

Plaintiffs also contend that the statute amounts to viewpoint discrimination. They argue that the statute "was designed to make one viewpoint reign supreme–namely, that pro-abortion beliefs and action triumph over the contrary views of religious employers." They point particularly to the notice and waiver provisions. They assert that the waiver provision "prevents" them from requiring compliance with their organizational codes of conduct regarding abortion, contraception, and sexual morality." As a result, the statute "prevents Plaintiffs from expressing any opposition to such decisions, or from gaining

agreement by prospective or active employees that such conduct matters to their employment status." The waiver prohibition, Plaintiffs therefore claim, "ensures that the state's view on these matters supplants Plaintiffs'." Plaintiffs claim that the legislative history of Section 203-e indicates that the purpose of the legislation was silencing groups like theirs. That legislative history, they claim, also indicates that the law does not address any discrimination that has actually occurred.

Courts hold that "'viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" Buzzetti v. City of New York, 140 F.3d 134, 139-40 (2d Cir. 1998) (quoting Rosenberger v. Rector and Visitors of the Univ. of Virginia, 515 U.S. 819, 829 (1995)). "The government discriminates against viewpoints when it disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" Wandering Dago, Inc. v. Destito, 879 F.3d 20, 31 (2d Cir. 2018) (quoting Rosenberger, 515 U.S. at 829).

As a general matter, Section 203-e does not serve to limit any of Plaintiffs' advocacy against abortion, promotion of certain religious views, and public arguments for particular versions of sexual morality. The statute does not prevent the Plaintiffs who provide medical information to pregnant women from telling those women that they should not get abortions, urging them not to use contraception, or telling them about their religious beliefs. On that basis, the general prohibition on reproductive-choice discrimination does not amount to unconstitutional viewpoint discrimination.

Plaintiffs' arguments here focus on two allegedly unconstitutional speech

requirements in the statute.  The Court has already explained why the notice provision amounts to unconstitutionally compelled speech.  As to the waiver provision, the Court finds that the waiver does not target "'particular views taken by speakers on a subject.'" Make the Rd. by Wallking, Inc. v. Turner, 378 F.3d 133, 150 (2d Cir. 2004) (qutoing Rosenberger, 515 U.S. at 829).  The Court has already explained that the evidence does not demonstrate that legislators aimed that statute at particular religious views, and the waiver provision serves to prevent any employer from avoiding the non-discriminatory intent of the statute by conditioning employment on an employee's waiver of rights.  The statute does not aim at the speech of the employer, but the attempt of the employer to avoid legal liability.

The Court will therefore find that Plaintiffs have not demonstrated a significant likelihood of success on the merits on their free-speech claim in this respect.  The motion for a preliminary injunction will be denied on this basis as well.  The motion to dismiss will be granted in this respect as well.  Plaintiffs have failed to state a claim upon which relief could be granted in that respect.

### iv.    Religious Autonomy

Plaintiffs allege that Section 203-e also violates their right to "religious autonomy" by interfering with their ability to order their internal affairs.  They argue that the Supreme Court has concluded that even neutral non-discriminatory laws are not applicable to religious organizations where such laws interfere with the organization's religious mission, and that Section 203-e, by limiting their ability to choose or discipline their employees on the basis of their religious principles, violates this First Amendment right.

The Supreme Court has been clear that "the First and Fourteenth Amendments

55

permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters."  Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 724 (1976). Courts may not interfere with the decisions of such religious tribunals.  Id. at 724-725. The Supreme Court's jurisprudence in this area "'radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation–in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" Hosanna-Tabor, 565 U.S. at 186 (quoting Kedroff v Saint Nicholas Cathedral of Russian Orthodox Church in North America, 344 U.S. 94, 116 (1952)).

This First Amendment restriction on government interference with religious decisions extends to employment.  The Supreme Court, in considering whether the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., can be applied to "a religious institution and its ministers," found that "a ministerial exception" applied.  Hoasanna-Tabor, 565 U.S. at 188.  The Court explained that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon much more than a mere employment decision."  Id.  Allowing application of such laws "interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs."  Id.  Interfering with a church's ability to select its ministers "infringes on the Free Exercise Clause, which protects a group's right to shape its own faith and mission through its appointments."  Id.  Moreover, such interference with a church's decision about "which individuals will minister to the faithful also violates the Establishment Clause[.]"  Id. at 189.

As the Supreme Court recognized in Hoasanna-Tabor, the question for any court in relation to the ministerial exception is when that exception applies to an otherwise-valid employment discrimination statute.  Id. at 190.  While the Court recognized that "the ministerial exception is not limited to the head of a religious congregation," the Court also declined "to adopt a rigid formula for deciding when an employee qualifies as a minister." Id.  Other courts have concluded that "judges are 'ill-equipped to assess whether, and to what extent, an employment dispute between a minister and his or her religious group is premised on religious grounds.'" Penn v. N.Y. Methodist Hosp., 884 F.3d 416, 428-429 (2d Cir. 2018) (quoting Fratello v. Archdiocese of N.Y., 863 .3d 190, 203 (2d Cir. 2017)). A court "asked to 'take sides in a religious matter' . . . must dismiss the case."  Id. (quoting Commack v. Self-Service Kosher Meats, Inc., 294 F.3d 415, 425 (2d Cir. 2002)).  In the Second Circuit, "in determining whether the ministerial exception bars an employment-discrimination claim against a religious organization, the only question is whether the employee qualifies as a 'minister' within the meaning of the exception."  Fratello, 863 F.3d at 192.  The Second Circuit has directed courts to consider the factors the Supreme Court articulated in Hosanna-Tabor in deciding whether the ministerial exception applied to the religious-school teacher who was the plaintiff in that case: "'[1] the formal title given [to the teacher-plaintiff] by the Church, [2] the substance reflected in that title, [3] her own use of that title, and [4] the important religious functions she performed for the Church[.]"  Id. at 204.  These factors, however, are not a court's only consideration in determining whether the ministerial exception applies: they "neither limit the inquiry to those considerations or [require] their application in every case."  Id. at 205.  In the end, "[i]t is the relationship between the activities the employee performs for her employer, and the religious activities

57

the employer espouses and practices, that determines whether employment-discrimination laws implicate the religious group's First Amendment rights by interfering with its freedom to exercise its religion, or establishing in that religion's stead other beliefs or practices."  Id. at 205-206.

Plaintiffs argue that the Section 203-e interferes with their "religious autonomy" by telling them who they can hire.  The phrase "religious autonomy" appears to come from Justice Alito's concurrence in Hoasanna-Tabor.  Justice Alito stated that "[i]n a case like the one now before us–where the goal of the civil law in question, the elimination of discrimination against persons with disabilities, it is easy to forget that the autonomy of religious groups, both here in the United States and abroad, has often served as a shield against oppressive civil laws."  Hosanna-Tabor, 565 U.S. at 199.  First Amendment law, he argued, works "[t]o safeguard this crucial autonomy."  Id.  "Religious autonomy," Justice Alito argued, "means that religious authorities must be free to determine who is qualified to serve in positions of substantial religious importance."  Id. at 200.  While Justice Alito acknowledged that which employees serve important religious functions depends on the nature of the religious organization, he contended that "it is nonetheless possible to identify a general category of 'employees' whose functions are essential to the independence of practically all religious groups."  Id.  He suggested that such workers could "include those who serve in positions of leadership, those who perform important functions in worship services and in the performance of religious ceremonies and rituals, and those who are entrusted with teaching and conveying the tenets of the faith to the next generation."  Id.  The Second Circuit has directed courts to consider Justice Alito's discussion in deciding whether the ministerial exception applies.  Fratello, 863 F.3d at

58

205-206.

Plaintiffs argue that the right to "religious autonomy" that Justice Alito articulated in Hosanna-Tabor and which the Second Circuit has adopted establishes that Section 203-e interferes with their right to decide which employees to hire and fire.  They thus claim that the statute violates the Free Exercise and Establishment clauses of the First Amendment. The Court finds that this argument pushes the idea of religious autonomy farther than the current state of the law allows.  As explained above, courts have acknowledged that a ministerial exception applies to limit the reach of employment discrimination law over religious institutions.  Cases that address that issue, however, make application of that exception very fact specific, limiting the ministerial exception to persons who fit particular roles within a religious organization.  No court has found that the religious autonomy the First Amendment provides offers a blanket exception to religious organizations in their hiring and firing practices, or that anti-discrimination laws do not apply to religious employers.  At this point, "religious autonomy" does not permit a religious employer to operate free of any interference from the state.  Instead, the fact-intensive inquiry required to apply anti-discrimination laws to such institutions means that enjoining enforcement of the statute on the basis that a future employee may be covered by the ministerial exception is not appropriate.  The Court cannot enjoin enforcement of a statute that has many constitutional applications, both in a general sense and for these particular Plaintiffs. As the allegations in the Complaint and the affidavits provided by the Defendants make clear, Plaintiffs employ many people who may not qualify for the ministerial exception as presently understood.

The Court acknowledges that the statute in question does not contain an explicit

ministerial exception.  Such an absence, however, does not mean that the exception does

not exist for the statute, or that a court considering a lawsuit brought under Section 203-e

would not apply that constitutional protection in an appropriate situation.  The Court notes

that the statute the Supreme Court considered in Hossanna-Tabor, the ADA, does not

contain an explicit ministerial exception.  See 42 U.S.C. § 12101, et seq.  In that case, the

Court noted that the Courts of Appeals have had "extensive experience" applying the

ministerial exception to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e et seq.  Title VII also does not contain a ministerial exception.  That does not mean,

however, that the ministerial exception does not apply to Section 203-e.  The Defendants

acknowledge, as they must, that the First Amendment applies and that the statute cannot

be enforced in favor of a person who qualifies as a minister under the terms the Ccourts

describe.  See Washington v. African Methodist Episcopal Church, Inc., No. 11-cv-6087,

2011 U.S. Dist. LEXIS 108117, at *6 (W.D.N.Y. Sept. 16, 2011) ("'[j]ust as there is a

inisterial exception to Title VII, there must also be a ministerial exception to any state law

cause of action that would otherwise impinge on the church's prerogative to choose its

ministers or to exercise its religious beliefs in the context of employing its ministers.'")

(quoting Bollard v. California Province of the Soc'y of Jesus, 196 F.3d 940, 950 (9th Cir.

1999)).  The lack of an explicit statement excepting ministers from the statute is not fatal

to its enforcement.

Under those circumstances, the Court cannot find that Section 203-e cannot be

applied against the Plaintiffs as religious employers in all circumstances.  Whether the law

is applicable depends on the facts of any situation where an adverse employment action

occurs and an employee complains.  The Plaintiffs' motion for a preliminary injunction will

be denied on this basis.  The Defendants' motion to dismiss will be granted.  Plaintiffs

have not alleged that any particular employee has alleged discrimination or retaliation and

the Court therefore cannot find Section 203-e is not applicable to that employee because

of the role the employee plays in the religious organization.

> **v.    Vagueness**

Plaintiffs contend that the statute is void for vagueness.  "The void-for-vagueness

doctrine reflects the principle that 'a statute which either forbids or requires the doing of an

act in terms so vague that [persons] of common intelligence must necessarily guess at its

meaning and differ as to its application, violates the first essential of due process of law.'"

Roberts, 468 U.S. at 629 (quoting Connally v. General Construction Co., 269 U.S. 385,

391 (1926)).  This "requirement that government articulate its aims with a reasonable

degree of clarity . . . ensures that state power will be exercised on behalf of policies

reflecting an authoritative choice among competing social values," limits inconsistent and

discriminatory enforcement of the laws, "enables individuals to conform their conduct to

the requirements of the law, and permits meaningful judicial review."  Id.  A law must "'be

crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable

opportunity to know what is prohibited' and to 'provide explicit standards for those who

apply them.'"  Thibodeau v. Portuondo, 486 F.3d 61, 65 (2d Cir. 2007) (quoting Betancourt

v. Bloomberg, 448 F.3d 547, 552 (2d Cir. 2006)).  "'The degree of vagueness tolerated in

a statute varies with its type: economic regulations are subject to a relaxed vagueness

test, laws with criminal penalties to a stricter one, and laws that might infringe

constitutional rights the strictest of all.'"  Commack, 680 F.3d at 213 (quoting VIP of Berlin,

LLC v Town of Berlin, 593 F.3d 179, 186 (2d Cir. 2010)).  Laws that are "'capable of

61

reaching expression sheltered by the First Amendment" must supply "'a greater degree of specificity than in other contexts.'" Id. (quoting VIP of Berlin, 593 F.3d at 186). A court examining a statute for vagueness is "relegated . . . to the words of the ordinance itself, to the interpretations of the court below given to analogous statutes, and perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.'" VIP of Berlin, 593 F.3d at 187 (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)). Facial challenges on vagueness grounds "are generally disfavored." Dickerson v. Napolitano, 604 F.3d 732, 741 (2d Cir. 2010).[6]

Plaintiffs contend that the statute both fails to provide adequate notice of prohibited conduct and encourages arbitrary and discriminatory enforcement. They point out that the

---

[6]As the Supreme Court explained in Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450-51 (2008):

Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Sabri v. United States, 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L. Ed. 2d 891 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is applied.'" Ashwander v. TVA, 297 U.S. 288, 346-347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting Liverpool, New York & Philadelphia S.S. Co. v. Commisioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L. 3d 899 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" Ayotte v. Planned Parenthood of Northern New Eng., 546 U.S. 320, 329, 126 S. Ct. 961, 163 L. Ed. 2d 812 (2006) (quoting Regan v. Time, Inc., 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.. Ed. 2d 487 (1984) (plurality opinion).

Wash. State Grange, 552 U.S. at 450-451.

term "reproductive health decision making" is not defined in the statute, thus leaving "what decisions are protected by the law" unclear.  Plaintiffs note that the statute does not explain whether the prohibition applies to "past, present, [or] future decisions," or whether the "decisions protected are only those kept private or are also those that are publicly expressed or communicated in the workplace and beyond."  The law also "fails to define how state officials can and may enforce" the law's "provisions against employers, when they can do so, and what penalties they can impose on employers found to be in violation of the law."

Plaintiffs complain that the phrase "reproductive health decision making" used in the statute is unnecessarily vague.  The statute uses the phrase three times.  The first instance occurs in reference to a prohibition on "accessing and employee's personal information."  NY Labor Law § 203-e(1).  The second comes in the statute's prohibition on discrimination and retaliation for an employee's "reproductive health decision making[.]" NY Labor Law § 203-e(2)(a).  The third comes in the act's prohibition on requiring an employee to sign a waiver "purport[ing] to deny an employee the right make their own reproductive health care decisions."  NY Labor Law § 203-e(2)(b).  In alleging vagueness, however, Plaintiffs leave out part of the statute's language.  Each of the three mentions of the term "reproductive health decision making" contain a qualification: "including, but not limited to, a decision to use or access a particular drug, device or medical service[.]" NY Labor Law §§ 203-e(1); 203-e(2)(a); 203-e(2)(b).  This qualification helps to explain the acts the statute prohibits.  An employer cannot take action against an employee who uses a drug, device, or medical service in relation to reproductive health.  A person of ordinary intelligence would understand such language to include products related to reproduction

63

such as condoms, other contraceptives, birth-control pills, and medications designed to end pregnancies.  A person of ordinary intelligence would also interpret the statute to prohibit an employer taking action against a person because they chose either to continue or end a pregnancy.  Likewise, a person of ordinary intelligence would understand that an employer's requirement that the employee waive any rights about decisions regarding pregnancy violates the statute.

The statute does not list specific drugs or medical procedures or specify particular health decisions which the statute protects, but the vagueness "doctrine does not require 'meticulous specificity' from every statute, as language is necessarily marked by a degree of imprecision."  Thibodeau, 486 F.3d at 66 (quoting Farrell, 449 F.3d at 485).  Still, the statute permits an ordinary employer to understand that the law prohibits accessing an employees' medical record to determine whether that employee had used birth control or not, or had an abortion or carried a child to term.  That employer would also understand that New York has prohibited discrimination against or retaliation against an employee for decisions made about birth control or pregnancy.  Given the constant change that characterizes technology and medicine, listing particular drugs or particular procedures would place the statute in danger of becoming quickly irrelevant to the action decisions that people make about reproductive health.

Indeed, this type of statute, which New York has denoted a labor law and which deals with a prohibition on employment discrimination, is designed to deal with the complex social environment represented by the modern American workplace.  Courts have held that "'[t]he degree of a vagueness the Constitution tolerates–as well as the relative importance of fair notice and fair enforcement–depends in part on the nature of

64

the enactment.'" Thibodeau, 486 F.3d 61, 66 (2d Cir. 2007) (quoting Village of Hoffman

Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)).  The statute

contains a civil right of action as an enforcement mechanism.  As with other statutes

prohibiting employment discrimination on the basis of race, ethnicity, sex, or disability, the

statute prohibits a category of conduct but relies on litigation to determine whether

particular conduct violates the statute.

The Court is also unpersuaded by Plaintiffs' claim that the statute is

unconstitutionally vague because it fails to specify the protections that apply to "past,

present, and future decisions," or decisions made at a particular time.  A person of

reasonable intelligence would understand from the statute that an adverse employment

action aimed at a person for their reproductive choices would violate the statute, no matter

when those acts occurred.  If an employer fired an employee because they were currently

using birth control, that action would violate the wording of the statute.  A firing that

occurred because of an employee's past use of birth control or previous abortion would

also violate the statute.  The statute provides a general prohibition, which a reasonably

intelligent employer would understand limits the action an employer can take in relation to

reproductive health decisions, whenever they occurred.  Similarly, Plaintiffs' complaint that

the law is unclear about whether an employee can be punished for speaking about

reproductive health or simply making decisions about reproductive health ignores the

language of the statute.  The language focuses on an employer's actions, not on the

employee's speech.

Plaintiffs' complaint that the statute does not explain how State officials will enforce

the statute is likewise unavailing.  As explained, the statute itself defines sufficiently the

65

conduct proscribed by Section 203-e.  The Court finds that, given the nature of the conduct addressed, the prohibitions on accessing information and discrimination or retaliating against a person because of their reproductive health care decision making are sufficient to provide explicit directions for enforcement of the statute.  The rest of the New York Labor Law, which applies to Section 203-e, also provides for powers and procedures for enforcing these provisions, as well as penalties.  See N.Y. Labor Law §§ 21, 213.

As such, the Court finds that the statute in question is not void for vagueness and Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits on this basis.  The Court will therefore deny the motion for a preliminary injunction on these grounds.  Moreover, as explained, Plaintiffs have failed to allege that the law is impermissibly vague.  The Court has examined the statute under the relevant standards and concluded that Plaintiff's have not and could not allege that the legislation is void for vagueness.  They have thus failed to state a claim on their void-for-vagueness claim.  The Court will grant the Defendants' motion in that respect and dismiss the void-for-vagueness claim with prejudice.

## IV.    CONCLUSION

For the reasons stated above, the Court will GRANT the Plaintiffs' motion for preliminary injunction, dkt. # 17, in part and DENY the motion in part.  The motion is GRANTED with respect to the "notice" provision in New York Labor Law § 203-e(6).   That provision of the statute may not be enforced against any employer.  The Plaintiffs' motion is DENIED in all other respects.  The Defendants' motion to dismiss, dkt. # 19, is hereby GRANTED in part and DENIED in part, as follows.  The motion is DENIED with respect to Plaintiffs' free speech claim as it relates to the notice provision in Section 203-e(6).  The

motion is GRANTED in all other respects.

Thomas J. McAvoy
Senior, U.S. District Judge

**IT IS SO ORDERED.**

**DATED: June 5, 2020**